## In re RAYMOND PROFESSIONAL GROUP, INC., et al., Debtors.

### Raymond Professional Group, Inc., et. al., Plaintiff,

Raymond Management Services, Inc. n/k/a Raymond Professional Group–Design/Build, Inc., Co–Plaintiff to Count VI

v.

William A. Pope Company, Defendant.

William A. Pope Company, Counter–Plaintiff as to Count VI

v.

Raymond Professional Group, Inc. and Raymond Management Services, Inc. n/k/a Raymond Professional Group–Design/Build, Inc., Counter–Defendants.

National Fire Insurance Company of Hartford, a Connecticut Corporation, Intervening Plaintiff

v.

Raymond Professional Group, Inc., Raymond Professional Group–Design/Build, Inc. and William A. Pope Company, Intervening Defendants.

Bankruptcy No. 06 B 16748.
Adversary No. 07 A 00639.

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

July 21, 2009.

See also 397 B.R. 414.

Eugene J. Geekie, Jr., Jason M. Torf, Schiff Hardin, LLP, Chicago, IL, for Debtor.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER TRIAL ON COUNT VI

JACK B. SCHMETTERER, Bankruptcy Judge.

## Table of Contents

*HISTORY AND PLEADINGS* .............................................. 720

*FINDINGS OF FACT* .................................................... 722
 *Summary of the Findings of Fact* ................................... 722

*JURISDICTION* ........................................................ 727

*CONCLUSIONS OF LAW* ................................................. 727
 *Introduction* ..................................................... 727

 I. *FUNDS IN THE ACCOUNT ARE HELD IN A PREBANKRUPTCY TRUST FOR POPE UNDER THE ILLINOIS MECHANICS LIEN ACT.* ........................................................ 728
 a. *Pope did not waive its lien rights by virtue of the September 26, 2001 "Final" Lien Waiver.* ....................................... 729
 b. *Pope was not required to file and therefore did not fail to file timely its lien claim. Accordingly, it did not allow its rights under the Mechanics Lien Act to lapse.* ................................. 731
 c. *The January 30, 2003 Final Lien Waiver applied to Pope's outstanding lien claim which exceeded the amount of the AES Settlement.* ..................................................... 734

II. RAYMOND MANAGEMENT SERVICES AND POPE OWNED THE
ACCOUNT AS TENANTS IN COMMON SUBJECT TO OUTCOME
OF THE ARBITRATION AND MECHANICS LIEN TRUST
RIGHTS. POPE NOW HOLDS THE SOLE MECHANICS LIEN
TRUST RIGHTS IN THE ACCOUNT. .............................738
Conclusion as to the Mechanics Lien Act and Ownership of the
Account ................................................741

III. POPE'S ALTERNATIVE TRUST THEORIES ARE WITHOUT
MERIT.....................................................741
a. There is no constructive trust.........................741
b. There is no resulting trust. ..........................742

IV. THE INITIAL ACCOUNT AND CURRENT ACCOUNT IS NOT AND
NEVER WAS AN ESCROW ACCOUNT. POPE WAIVED THE
CONTRACTUAL REQUIREMENT FOR AN ESCROW. ................743

V. POPE HAS NOT ESTABLISHED THAT THERE WAS AN ACTION-
ABLE MISREPRESENTATION OR THAT IT REASONABLY
RELIED ON ANY MISREPRESENTATION BY RAYMOND. ...........745

VI. TO THE EXTENT NOT ALLOWED HEREIN, THE INTERVENING
COMPLAINT BY NFIC IS NOT SUSTAINED; AND JUDGMENT
WILL ENTER AGAINST THE COMMITTEE........................746

CONCLUSION ................................................748

APPENDIX: DETAILED FINDINGS OF FACT .................................749

### HISTORY AND PLEADINGS

On December 18, 2006, Raymond Professional Group, Inc. ("RPG") and Raymond Management Services, Inc. n/k/a Raymond Professional Group—Design/Build ("RMS") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in related bankruptcy cases 06–16748 and 06–16753, respectively. Raymond Professional Group is the 100 percent shareholder of RMS.[1] Raymond Professional Group provided shared corporate services to each of the debtor-subsidiaries, including RMS. The subsidiaries provided engineering, architectural, design/build and other technical services to private and government clients, primarily in the power, industrial and process market sectors.

On July 17, 2007, RPG filed this Adversary Complaint against William A. Pope Company ("Pope"), originally in five counts, seeking (1) a declaration determining that RPG owns the Account; (2) pursuant to 11 U.S.C. § 544(a), to avoid any trust found to have been imposed on the Award; (3) to avoid the Award as a preference under 11 U.S.C. § 547(b); (4) to avoid the Award as a fraudulent transfer under 11 U.S.C. § 548(a)(1)(B); and (5) to disallow Pope's claim for the amount of the Award under 11 U.S.C. § 502(d). In its Amended Answer to Complaint, Pope as-

---

1. Additional wholly-owned subsidiaries include debtors Raymond Professional Group–A/E, Inc. (bankruptcy case no. 06–16749), Raymond Professional Group—Government, Inc. (bankruptcy case no. 06–16750), and Raymond International, Inc. (bankruptcy case no. 06–16754). Raymond Professional Group—Puerto Rico Engineering PSC (bankruptcy case no. 06–16755) is an affiliate of RPG through common ownership. (Collectively with RPG and RMS, the "Debtors".) An Order providing for joint administration has been entered.

serted a counterclaim seeking *inter alia* a declaration that funds in the Account are held in trust for its benefit pursuant to section 21.02 of the Illinois Mechanics Lien Act. 770 Ill. Comp. Stat. Ann. 60/21.02 (West 2001) *amended by* 770 ILCS 60/21.02 (Supp.2007) [hereinafter 770 ILCS 60/21.02].

Raymond Professional Group and RMS (collectively "Raymond") have since filed an Amended Complaint adding Count VI seeking a declaration that Pope does not own the bank account; that the account is not an escrow account; and that the funds in the account are not held in trust pursuant to the Illinois Mechanics Lien Act. The Official Committee of Unsecured Creditors (the "Committee") filed an Amended Third–Party Complaint joining in the relief sought by RPG and RMS. Pope has counterclaimed in Count VI asserting ownership of the account as an asserted "joint account" or as an "escrow," or through mechanics lien or trust rights thereon. National Fire Insurance Company of Hartford ("NFIC") filed an Amended Intervening Complaint in Count VI requesting a declaration that funds in the Account are assets of RMS and Pope, and are to be used to satisfy obligations of RMS and NFIC under a Payment Bond that had been provided under the EPC Contract; and also directing J.P. Morgan Chase Bank, N.A. (where the Account is presently on deposit) to release the funds in the account to NFIC to satisfy obligations of RMS and NFIC under the Payment Bond. Count VI and all issues therein were bifurcated for trial separately from the other counts in the Adversary proceeding. The trial concluded and written post-trial arguments were received in the form of Proposed Findings of Fact and Conclusions of Law.

The proceedings have often been characterized by personal attacks on the credibility of witnesses and the professional integrity of counsel. In their post-trial briefs, Raymond and Pope argued in broad brush attacks that their opponent's Proposed Findings of Fact and Conclusions of Law provided incomplete or inaccurate record citations, and otherwise mischaracterized the record. (Pope Response at 12–13 n. 7; Raymond Reply at 14 n. 9–11.) They suggested that these inaccuracies "are made throughout," (Pope Resp. at 12 n. 7), and asked the Court to "take extreme caution when evaluating each and every fact ... to verify that the 'fact' is actually established by the record." (Raymond Reply at 14.) In light of these arguments, those parties were each ordered to file a Response to the Proposed Findings of Fact of the other party admitting or denying each proposed fact and citing to the trial record in support of their denials.[2] (Docket No. 391.) The parties' Responses filed as a result of that Order revealed that few of the proposed facts of each are actually disputed by the other.

Some of the stipulated facts and facts established by evidence are redundant and many are not directly relevant or necessary in resolving Count VI. Moreover, some of the stipulated documents admitted into evidence and referenced by the parties in their Proposed Findings of Fact and Conclusions of Law are duplicative.[3] Ray-

---

2. This Order was entered pursuant to the District Court Local Rules, Appendix A, Guidelines for Proposed Findings of Fact and Conclusions of Law, *available at* http://www.ilnd.uscourts.gov/LEGAL/NewRules/proposed—findings—guidelines.htm (last visited Mar. 27, 2009), incorporated in this Ad-

versary proceeding by Local Bankruptcy Rule 1002–C.

3. In at least one instance, Raymond objected to the relevancy of a set of documents, (see Joint Trial Exhibits ("JTEx") 31, 31(a)), yet stipulated to the admission of the same docu-

mond used much trial time and argument trying to re-litigate issues that had been decided by the Arbitration Panel. Over Pope's objections to relevancy, Raymond was permitted to offer this evidence in support of its theory that Pope let its rights under the Mechanics Lien Act lapse by failing to perfect timely its lien claim. For reasons discussed below, however, it is now found and held that those arguments are without merit. Nevertheless, the parties were given wide latitude in presenting their positions, and all stipulated and proven facts and documents have been included here in order to create a full record for the possible appeal.

After considering the evidence, including stipulated evidence and arguments presented by the parties, the following Findings of Fact and Conclusions of Law are made and will be entered. Pursuant thereto it will be adjudged and declared on Count VI that: (1) the funds in the Current Account were and are impressed with a statutory trust under section 21.02 of the Illinois Mechanics Lien Act of which Pope is the sole beneficiary, and therefore those funds are not property of the bankruptcy estate of any Debtor; (2) the Initial and Current Accounts are not and were never escrow accounts; (3) the Initial and Current Accounts were always held under the foregoing statutory trust subject to claims and disputes between RMS and Pope that were resolved by Arbitration and by judgment confirming the Arbitration Award which determined that the Account is due to Pope and nothing is due to RMS from that Account or from Pope; and (4) Pope's remaining claims as to constructive trust and resulting trust, and its defense of equitable estoppel are held to be without merit. Finally, (5) National Fire Insurance Co. and the Committee of Unsecured Credi-

tors adopted Pope's and Raymond's arguments, respectively, and therefore the Committee is denied relief and NFIC is denied any relief sought by it that is not granted herein.

## FINDINGS OF FACT

The parties stipulated to a timeline and outline of facts which were admitted into evidence pursuant to the Second Amended Final Pre–Trial Order entered on November 20, 2008 (Docket No. 239). The evidence presented at trial provided the further clarifying detail needed to decide the case. The Stipulations are included in the Appendix hereto and incorporated by this reference. The evidence stipulated to and admitted at trial was voluminous, though much of it was not directly useful in analysis of the case. Therefore it is helpful to a reader to place the detailed Findings of Fact at the end as an Appendix while this Summary of the Findings of Fact may clarify directly relevant facts that guide the ruling. Both the Appendix and the following Summary are Findings of Fact made and to be entered following trial of Count VI.

### Summary of the Findings of Fact

On September 12, 2000, RMS entered into the EPC Contract with AES for the engineering, procurement, construction and start-up of a cogeneration power facility (the "Project"). (Finding of Fact ("FOF") 46.) The EPC Contract called for RMS to be paid a lump sum of $34,600,000. (FOF 50.) Between the beginning of construction on the Project in July 2000, and the execution of the EPC Contract in September 2000, RMS was providing engineering, procurement, construction and start-up services pursuant to a Letter of Intent with AES (the "LOI").

ments when they were offered as exhibits attached to their Complaint. (*See* JTExs 237–

38.) Joint Trial Exhibits 237 and 238 were duly admitted into evidence.

(FOF 84, 86.) Raymond Professional Group was not a party to the LOI, (*see* FOF 86), and was not a party to the EPC Contract, nor did it have any contract with AES for the Project. (FOF 51–52.)

In January 2001, RMS and Pope executed the Subcontract effective September 12, 2000. (FOF 89–92.) Raymond Professional Group was not a party to the Subcontract, and did not have any contract with Pope for the Project. (FOF 93–94.) Thus, RPG has no apparent contractual claim against the Account because the Account was established by RMS and Pope pursuant to their contractual relationship, (though Count VI does not resolve any issue as to whether RPG would have any claim to monies in the Account as part of its bankruptcy estate should RMS prevail here).

Pursuant to paragraph 7 of the Subcontract, RMS and Pope agreed to allocate Project revenues as follows: (1) to reimburse costs incurred by third party subcontractors; (2) to reimburse RMS and Pope for their costs; (3) to provide an allowance for RMS' and Pope's projected monthly expenses; and (4) to divide the remaining profit or loss from the Project equally. (FOF 101.) In addition, paragraph 7 called for creation of an escrow account in which to deposit excess Project funds. (*Id.*) Finally, pursuant to paragraph 7, RMS and Pope agreed to "jointly determine and agree to expended project costs and related profitability" as of December 31, 2000. (FOF 101, 160.)

The amount of the Pope Subcontract, including profit, was $22,010,000. (FOF 108.) Pope's cost budget was approximately $18–19 million. (FOF 107.) Pope secured performance and payment bonds in the penal sum of $22 million. (FOF 109–10.) Raymond Management Services secured performance and payment bonds from National Fire Insurance Company ("NFIC") in the penal sum of $12,600,000. (FOF 68–79.)

Pursuant to the Profitability Report as of February 23, 2001, the Project had "Profitability (Excess Cash)" of $773,896 as of December 31, 2000, and $1,361,034 as of January 31, 2001, for a total of $2,134,930. (FOF 167.) On February 2, 2001, Mr. Chidley, as President of RMS, and Mr. Troyke, as President of Pope, met to discuss the opening of the escrow account called for in the Subcontract. (FOF 117.) Mr. Chidley told Mr. Troyke that articles of escrow would have to be drafted explaining RMS' and Pope's intent relative to an escrow account; that there would be an escrow agent fee; and that escrow accounts are not interest bearing. (FOF 118.)

Mr. Troyke wanted to obtain the highest possible rate of return on the deposited funds. Therefore, Mr. Chidley and Mr. Troyke agreed to open a commercial checking account requiring the dual signatures of a RMS representative and a Pope representative to disburse funds or make changes to the account. (*Id.*) Pope thereby waived the escrow requirement in the Subcontract, and no escrow account was ever established. (See discussion below in Conclusions, Part IV.) In February 2001, the Initial Account was opened with the $2,134,930 excess cash as of January 31, 2001. (FOF 162–67.)

Thereafter billing disputes continued between RMS and Pope regarding the accuracy of Pope's claimed costs and whether or not Pope's invoices included profit. (*See* FOF 158.) Raymond Management Services stopped remitting payment to Pope for Pope's work after March 2001. (FOF 178.) According to the Sworn Statement for Contractor to Owner dated March 6, 2001, and submitted by RMS to AES in connection with the RMS February 2001 pay request, Pope's Balance to

Complete was to cost $3,198,057.34. (FOF 174.)

On May 23, 2001, Pope made a claim on the RMS Payment Bond issued by NFIC. (FOF 180.) On June 19, 2001, Pope executed a Notice of Claim of Subcontractor, 770 ILCS 60/24 which was delivered to AES. (FOF 181–83.) From June 2001 through October 3, 2001, AES withheld payment for RMS' invoices covering work performed in May 2001. (FOF 184.)

On September 26, 2001, RMS, Pope and NFIC entered into an Interim Settlement Agreement (the "ISA"), (FOF 194), in order to facilitate the payment of Project funds from AES and agree on the minimum amount due to Pope at the time. (*See* FOF 199.) The ISA called for the payment of certain amounts from RMS to Pope in exchange for Pope's execution of a waiver of lien. (FOF 202.) Specifically, pursuant to paragraph 7 of the ISA, RMS agreed to pay Pope $2,808,671 from the Account or as funds became available in the Account. (FOF 206.) At the time of the ISA, Pope claimed that it was owed more than that amount from RMS. (FOF 212.) Raymond Management Services concedes that only $220,000 of the amounts called for in paragraph 7 were ever paid to Pope. (FOF 273–76.)

On September 26, 2001, a Pope representative executed a "Final Waiver of Lien and Release" on its behalf. (FOF 217–19.) The September 26, 2001 "Final" Lien Waiver contained an exception for Pope's "claim for any retainage withheld for not-yet-completed punch list work [and] for any sums owed for the work which is the subject of the pending but not-yet-resolved change order requests." (FOF 223.) That language was drafted by counsel for RMS. (FOF 244.) AES initially objected to Pope's excepting from waiver and release its claims for retainage and contract change orders. (FOF 245.) Counsel for

RMS told AES that Pope would submit a revised lien waiver but disagreed with AES' characterization of the lien waiver as "insufficient and defective," because "it is unfair and unreasonable for AES to request that the Lien Waivers be final and absolute, without exception, because they are not being exchanged for final payment." (FOF 248.)

AES did subsequently accept the September 26, 2001 Final Lien Waiver, and on October 3 and October 12, 2001, AES made three payments totaling $1,815,917 for RMS' invoices for May through July 2001. (FOF 250.) On September 27, 2001, Pope sent AES a letter withdrawing its June 19, 2001 Notice of Claim. (FOF 252–53.) The amount of difference between Pope's September 26, 2001 Lien Waiver and the immediately preceding partial lien waiver, or $305,118.71, was used to pay Pope subcontractors. (FOF 226.)

Raymond argues that Pope fully and finally waived its lien rights by virtue of the September 26, 2001 Lien Waiver. However, merely because the September 26, 2001 Lien Waiver was entitled a "Final Waiver of Lien and Release" does not make it so. A waiver of mechanics lien will not be given effect beyond its terms, and waivers specified to be partial lien waivers will be enforced as such. (See discussion below in Conclusions, Part I.A.) The September 26, 2001 Lien Waiver specifically excepted from waiver and release Pope's claims for retainage and contract change orders and, therefore, Pope did not thereby waive its lien claims to payment for those additional matters. (*Id.*)

After November 2001, disputes existed between AES and RMS regarding approximately $1 million withheld as retainage, and approximately $2.8 million for contract change orders. (FOF 317.) On June 6, 2002, RMS recorded a lien against the real

estate on which the Project is located for approximately $3.8 million. (FOF 320–21.) Pope assisted RMS in attempting to collect funds from AES in connection with the Retainage and Extra Work. (FOF 324.) Its representative attended two meetings between AES and RMS where a settlement of those claims was discussed. (FOF 332.) On or about January 30, 2003, AES and RMS entered into the AES Settlement Agreement, (FOF 326), whereby RMS agreed to accept $2.5 million in exchange for a waiver and release of all claims against AES. (FOF 334.) Pope agreed with RMS as to that settlement amount, and gave its waiver of lien along with RMS' lien waiver so that AES would agree to pay the settlement. (*See* FOF 332.)

Raymond argues that by the time RMS paid the $2.5 million, Pope had let its rights under the Illinois Mechanics Lien Act lapse by failing to follow the strict statutory requirements of that Act. However, RMS' Sworn General Contractor's Statement served to put AES on notice of Pope's claim as required by section 24 of the Mechanics Lien Act. (See discussion below in Conclusions, Part I.B.) In addition, contrary to Raymond's argument that Pope was required to perfect its lien claim within four months of providing labor or materials, the applicable provision of the Illinois Mechanics Lien Act gives a subcontractor two years to file a lien claim against an owner, (*id.*), and AES paid the agreed settlement of $2.5 million before the two years expired in return for final waivers of lien from RMS and Pope.

The AES Settlement Agreement required Pope as well as RMS to provide their respective final waivers of mechanics lien. According to the Pope January 30, 2003 Final Lien Waiver, that waiver was given in exchange for "Ten Dollars ($10.00), and other good and valuable consideration...." (FOF 350.) In addition,

that Final Lien Waiver included a section entitled "Contractor's Affidavit" in which Pope acknowledged having received $19,656,738.54. (FOF 352.) The difference between the amount thereby shown on the January 30, 2003 Final Lien Waiver and the prior September 26, 2001 Lien Waiver, amounted to $2,505,603.51. All of that sum except for the $220,000 used to pay Pope pursuant to paragraph 7 of the ISA, was used to pay Pope subcontractors from the Initial Account between October 1, 2001 and November 25, 2002. (FOF 353.) The January 30, 2003 Contractor's Affidavit listed Pope's total contract value for the Project as $22,900,000 (FOF 354), leaving an unpaid balance due and claimed of $3,243,261.46. (FOF 355.)

Raymond argues that at most $10.00 could be held in trust under the Mechanics Lien Act, disregarding the other words in the lien waiver ("other good and valuable consideration") which did not make a precise dollar claim. However, the Contractor's Affidavit identified what the "other good and valuable consideration" consisted of. That affidavit served to put AES on notice, consistent with the RMS March 6, 2001 Sworn Statement, that Pope asserted a lien claim in excess of $3 million. The evidence shows that, except for the $220,000 paid to Pope, all amounts paid between September 2001 and November 2002, and reflected in the acknowledged $19,656,738.54, were used to pay Pope's subcontractors, not Pope.

At that time, Pope held and asserted an inchoate lien claim that exceeded the amount of the $2.5 million AES Settlement amount. The Illinois Mechanics Lien Act protects an owner who follows the statutory procedures from having to pay more than it owes on the prime contract. AES was on notice that Pope claimed more than the settlement amount, and therefore it required a waiver of lien before paying any

more sums to RMS. It is of no legal consequence what consideration Pope recited in the Final Lien Waiver as long as that document satisfied the requirements of a lien waiver so as to protect AES from any lien claim in exchange for the payment of the $2.5 million settlement. Therefore, Pope is able to recover on its lien claim. (See discussion below in Conclusions, Part I.C.)

On February 4, 2003, AES caused $2.5 million to be deposited directly into the Account. (FOF 367.) Subsequently, Pope renewed its demand for payment from RMS, and RMS made a written demand for an accounting of Project costs in Arbitration. (FOF 370–72.) The cost and performance-based disputes were arbitrated under American Arbitration Association (the "AAA") procedures as required by an arbitration provision of the Subcontract. The purpose of the arbitration was to resolve the dispute regarding claimed costs, and provide an accounting of project revenue to be divided between RMS and Pope.

On November 30, 2006, the Arbitration Panel issued its Award. (FOF 484.) The Award found that "[t]he total amount to be paid Pope is $3,634,714," (FOF 496), which was to be satisfied from the funds in the Account and interest accrued thereon, and any additional funds required were due from RMS. (*Id.*) The Award denied all RMS claims. Since the Award was larger than the funds on deposit in the Account, the Award meant that the entire Account was due to Pope. The Award has since been confirmed and judgment thereon entered in favor of Pope through an Adversary proceeding in this Court. *Raymond Mgmt. Servs. v. William A. Pope Co. (In re Raymond Prof'l Group, Inc.)*, 397 B.R. 414 (Bankr.N.D.Ill.2008) at Docket Nos. 56, 59 *supplemented by* 400 B.R. 621 (Bankr.N.D.Ill.2008) at Docket Nos. 62, 63.

That judgment was not appealed, and therefore it stands to fix the amount of debt owed by RMS to Pope and to determine that the entire Account was to be the source of payment to Pope through their contractual agreement.

In confirming the Award, it was found and held that the issue as to ownership of the bank account was not litigated by parties in the Arbitration proceeding and was not adjudicated by the AAA Panel Award. *Id.* The instant litigation is to determine whether or not Pope owns the account or otherwise has an interest in the funds deposited therein which should be recovered by Pope in whole or partial satisfaction of the debt owed to it.

For the foregoing reasons discussed in detail below, it will be found and held that Pope did not waive its lien rights by virtue of the September 26, 2001 Lien Waiver or let its lien rights lapse by failing to follow the statutory requirements of the Mechanics Lien Act. Rather, Pope held a valid inchoate lien claim as of January 30, 2003. AES and RMS requested and required Pope to provide a lien waiver in exchange for the $2.5 million AES Settlement. Pursuant to section 21.02 of the Mechanics Lien Act, those funds were held in trust and deposited into the Account subject to RMS' and Pope's claims against one another under the Subcontract. The Arbitration Panel found that RMS was owed nothing on the Subcontract. Having no debt owed to it, any mechanics lien interest of RMS and mechanics lien trust rights in the Account protect nothing for RMS. Therefore, it will be found and held that all funds in the Account (which are less than amount of the Award to Pope) are held in trust under the Illinois Mechanics Lien Act for the sole benefit of Pope, and therefore are not property of the bankruptcy

estate of any Debtor.[4]

All other issues in Count VI of the Adversary proceeding are then easily resolved. The Committee of Unsecured Creditor's position fails with that of Raymond. Whether or not National Fire Insurance Co. is liable to Pope under the Payment Bond for any deficiency after the funds in the Account are used to pay Pope lies outside the bankruptcy court's core and related jurisdiction and, therefore, cannot be decided here.

Detailed numbered Findings of Fact are included as an Appendix hereto and incorporated here by this reference.

## JURISDICTION

Subject matter jurisdiction lies under 28 U.S.C. § 1334. This matter is before the Court pursuant to 28 U.S.C. § 157 and is referred here by District Court Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. Venue lies under 28 U.S.C. § 1409. This Adversary proceeding constitutes a core proceeding under 28 U.S.C. §§ 157(b)(2)(A) and (O).

## CONCLUSIONS OF LAW

### Introduction

The key issue that must be decided in Count VI of Plaintiffs' Amended Complaint is whether or not the Current Account is property of the RMS bankruptcy estate or was subject to the mechanics lien interest of Pope and is now held in trust for Pope.

■ Pursuant to 11 U.S.C. § 541(a)(1), the bankruptcy estate is comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case." However:

Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest ... becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

11 U.S.C. § 541(d). Accordingly, property held in trust for the benefit of others at the time of the filing of the bankruptcy petition is not property of the estate. *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 n. 10, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983); *Marrs–Winn Co., Inc. v. Giberson Elec., Inc. (In re Marrs–Winn Co., Inc.)*, 103 F.3d 584, 589 (7th Cir.1996).

■ As the Account is the largest potential asset of either Debtor, Raymond argues that it would be inequitable for Pope to obtain priority rights over it thereby leaving nothing for other creditors. (Raymond Post–Trial Brief at 10.) "However, the estate's rights are limited to those had by the debtor: 'whatever rights a debtor had at the commencement of the case continue in bankruptcy—no more, no less.'" *Matter of Jones*, 768 F.2d 923, 927 (7th Cir.1985) (quoting *Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1213 (7th Cir. 1984)). "Property interests are created and defined by state law." *Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). Looking to state law to determine the estate's interest "prevent[s] a party from receiving 'a windfall merely by reason of the happenstance of bankruptcy.'" *Id.* (quoting *Lewis v. Mfr. Nat'l Bank*, 364 U.S. 603, 609, 81 S.Ct. 347, 5 L.Ed.2d 323 (1961)). In this case, by looking to state law under which

---

**4.** Following trial, the parties were ordered to supply a bank record showing the amount on deposit. The bank statement through June of 2009 was supplied and filed of record, (Docket No. 414), showing a balance on deposit of $3,331,121.

Pope is found to be beneficiary of a trust under the Illinois Mechanics Lien Act, other creditors are prevented from receiving a windfall at Pope's expense.

▮ In its Counterclaim to Count VI, Pope alleges three alternative theories as to why funds in the Initial and Current Accounts are not property of either of the Debtors bankruptcy estates, namely: (1) the funds in the Account are held in trust for the benefit of Pope under the Illinois Mechanics Lien Act, 770 ILCS 60/21.02; (2) the Account is an escrow account of which Pope is now the beneficiary; and (3) alternatively, the account is jointly owned by Pope and RMS. Whether a claimed interest in property is property of the estate is a "federal question to be decided by federal law; however, courts must look to state law to determine whether and to what extent the debtor has any legal or equitable interests in property as of the commencement of the case." *Butner*, 440 U.S. at 55, 99 S.Ct. 914. The parties agree that Illinois law applies, and Illinois state law determines Pope's interest, if any, in the Account. As discussed below, Pope prevails under its mechanics lien trust theory, not on the others.

I. *FUNDS IN THE ACCOUNT ARE HELD IN A PREBANKRUPTCY TRUST FOR POPE UNDER THE ILLINOIS MECHANICS LIEN ACT.*

▮ According to the Illinois Mechanics Lien Act:

Construction Trust Funds. Any owner, contractor, subcontractor, or supplier of any tier who requests or requires the execution and delivery of a waiver of mechanics lien by any person who furnishes labor, services, or materials for the improvement of a lot or a tract of land in exchange for payment or the promise of payment, shall hold in trust the unpaid sums subject to the waiver of

mechanics lien, as trustee for the person who furnished the labor, services, or materials.

770 ILCS 60/21.02(a). The Mechanics Lien Act thereby imposes a statutory trust on money owed by an owner (in this case AES) in favor of the contractor (in this case RMS) and its subcontractor (in this case Pope) until waivers of lien are supplied to the owner and money is paid. In addition to the owner and contractor, the language of the statute specifically contemplates that a "subcontractor, or supplier of any tier" can request or require a waiver of lien, and therefore holds in trust sums due but was paid to these parties. Therefore, the money paid by the owner remains in the trust as it passes through to contractors and subcontractors so as to protect the suppliers at any tier until all are paid.

▮ The Statute has five elements: (1) when an owner or contractor requests or requires (2) the execution and delivery of a waiver of mechanics lien (3) by any person who furnishes labor, services, or materials for the improvement of land (4) in exchange for payment or the promise of payment, (5) the sums subject to the waiver of mechanics lien are held in trust.

Here, AES, the owner, agreed with RMS to settle all claims against it for payment of $2.5 million. The payment was conditioned on RMS and Pope each providing waivers of lien. Those lien waivers were given, and the $2.5 million was deposited into the Initial Account.

▮ In interpreting the Mechanics Lien Act, "[m]echanic's liens are purely statutory, in derogation of the common law, and must be strictly construed." *Midwest Envtl. Consulting & Remediation Servs., Inc. v. Peoples Bank of Bloomington,* 251 Ill.App.3d 256, 189 Ill.Dec. 501, 620 N.E.2d 469, 472 (1993) (citing *Hoier v.*

*Kaplan,* 313 Ill. 448, 145 N.E. 243, 244 (1924)). On the other hand, "[t]he object and purpose of the Act is to protect those who in good faith furnish material or labor for the construction of a building." *Norman A. Koglin Assocs. v. Valenz Oro, Inc.,* 277 Ill.App.3d 142, 213 Ill.Dec. 625, 659 N.E.2d 971, 975 (1995) *aff'd* 176 Ill.2d 385, 223 Ill.Dec. 550, 680 N.E.2d 283 (1997) (citing *State Bank of Lake Zurich v. Winnetka Bank,* 245 Ill.App.3d 984, 185 Ill. Dec. 421, 614 N.E.2d 862, 869 (1993)). The Act balances the owner's benefit of the bargain with the subcontractor's right to be paid for the labor and materials furnished in good faith. *Premier Elec. Constr. Co. v. American Nat'l Bank of Chicago,* 276 Ill.App.3d 816, 213 Ill.Dec. 128, 658 N.E.2d 877, 883 (1995) (citing *Edward Hines Lumber Co. v. Dell Corp.,* 49 Ill.App.3d 873, 7 Ill.Dec. 207, 364 N.E.2d 368, 375 (1977)). Terms of the Mechanics Lien Act should be construed in a way to carry out its remedial purpose. *Petroline Co. v. Advanced Envtl. Contractors, Inc.,* 711 N.E.2d 1146, 1149 (1999) (citing 770 ILCS 60/39).

 Those principles have been reconciled as follows: "The statute is strictly construed as to the requirements which bring one within the statute, but this strict construction applies only to the requirements upon which the right to a lien depends and is not used to invalidate a lien which had properly attached." *Koglin Assocs.,* 213 Ill.Dec. 625, 659 N.E.2d at 975 (quoting *State Bank of Lake Zurich,* 185 Ill.Dec. 421, 614 N.E.2d at 869).

Pope cites *Doing Steel, Inc. v. Castle Constr. Corp.,* No. 02–C–1674, 2002 WL 31664476, at *4–5 (N.D.Ill. Nov.21, 2002), for the proposition that language of section 21.02 of the Mechanics Lien Act is unambiguous and, therefore, must be given its plain meaning. *See also Safeco Ins. Co. v. Wheaton Bank & Trust Co.,* No. 07–C–

2397, 2008 WL 216396, at *5 (N.D.Ill. Jan.24, 2008); *James Cape & Sons Co. v. Bowles (In re Bowles),* 318 B.R. 129, 142 (Bankr.E.D.Wis.2004). Pope argues that it provided the January 30, 2003 Final Lien Waiver in exchange for AES depositing $2.5 million into the Initial Account and, therefore, those funds are held in trust for the benefit of Pope.

Raymond argues that *Doing Steel* and *Bowles* can be distinguished from the facts presented here, because in those cases the subcontractors seeking to impress the funds with a statutory trust conceded that they did not provide lien waivers. 2002 WL 31664476, at *5, 318 B.R. at 142. In those cases, it was held that application of the Mechanics Lien Act was clear: If no lien waiver is provided there can be no statutory trust. (*Id.*)

 To challenge Pope's statutory lien and trust rights, RMS disputes the legal effect of Pope's January 30, 2003 Final Lien Waiver arguing that Pope had previously waived its lien rights by virtue of the Pope September 26, 2001 Lien Waiver. Alternatively, Raymond argues that Pope let its lien rights lapse by failing to perfect them after September 2001 pursuant to procedures set forth in 770 ILCS 60/7, 24 (West 2009). Finally, Raymond argues that if any sums are held in trust, only the amount of $10.00 is the subject of the January 30, 2003 Final Lien Waiver, even though that document recited that it was given for "$10.00 and other good and valuable consideration." (JTEx 164.)

a. *Pope did not waive its lien rights by virtue of the September 26, 2001 "Final" Lien Waiver.*

 Pope first argues that the September 26, 2001 Lien Waiver was rejected by AES and, therefore Pope did not waive any lien rights as a result thereof. Raymond asserts that the September 26, 2001

Lien Waiver was eventually accepted by AES. Indeed, it is clear that after initially objecting to its form and content, AES did accept the September 26, 2001 Lien Waiver.[5]

AES originally objected to the fact that the Lien Waiver "except[ed] claims for retainage, punch list work and scope change requests." (FOF 245; JTEx 95.) Although AES' counsel testified that AES never accepted the September 26, 2001 Lien Waiver, (FOF 250), the evidence admitted at trial establishes that counsel for RMS eventually persuaded AES to accept the Lien Waiver, and that AES paid out monies in reliance thereon. In particular, between October 3 and October 12, 2001, AES made three payments totaling $1,815,917 an amount that corresponds to the total amount of RMS' invoices for May through July 2001. (*Id.*) Since AES made those payments which AES had been withholding from RMS, its earlier objections to the September 26, 2001 Lien Waiver had been resolved.

■■■ However, finding that AES accepted the September 26, 2001 Lien Waiver does not mean that Pope waived its

---

5. Assuming *arguendo* that AES did not accept the September 26, 2001 Lien Waiver, Raymond argues that Pope waived its lien rights by entering into the Interim Settlement Agreement, and that based on promises made in the ISA, Pope is estopped from now relying on the Mechanics Lien Act. (Raymond Post–Trial Brief at 6–10.) Raymond further argues that Pope had a contractual obligation pursuant to paragraph 3 of the ISA to provide an acceptable lien waiver, and failure to do so constitutes a breach of the ISA. (*Id.* at 12–13.) Although the relevancy of these arguments are partially affected by the finding that AES accepted the September 26, 2001 Lien Waiver, it must be found and held that Raymond waived its remaining promissory estoppel arguments by not timely raising them before trial as required by the Pre–Trial Order.

A Second Amended Final Pre–Trial Order was entered herein on November 20, 2008, which required the parties to file Proposed Findings of Fact and Conclusions of Law seven days prior to the trial. According to the Order, "Any party not filing proposed Conclusions of Law or a brief may be found to have waived legal issues not thereby presented." In addition to its Proposed Findings of Fact and Conclusions of Law, Raymond chose to file a Pretrial Statement. Final pretrial orders are designed to prevent unfair surprise and give parties an opportunity to fairly prepare for and defend against new claims. *Paloian v. Grupo Serla S.A. de C.V. (In re GGSI Liquidation, Inc.)*, 351 B.R. 529, 596 (Bankr. N.D.Ill.2006) (citing *Gorlikowski v. Tolbert*, 52 F.3d 1439, 1443–44 (7th Cir.1995)). Nowhere in its Proposed Findings and Conclusions or its Pretrial Statement did Raymond articulate its legal theory that Pope waived its lien rights by entering into the ISA or that Pope should be estopped from relying on the Mechanics Lien Act for allegedly breaching the ISA by failing to provide an acceptable lien waiver. As a result, these arguments would be deemed waived. *SNA Nut Co. v. Haagen–Dazs Co.*, 302 F.3d 725, 732 (7th Cir.2002) (holding that "a defense not raised in a pretrial order is deemed waived."). However, since AES did accept the September 26, 2001 Lien Waiver, this issue is moot.

Furthermore, it is found and held that Pope did not make any asserted misrepresentation supporting any promissory estoppel. According to paragraph 3 of the ISA, "Provided that Raymond performs in accordance with this Agreement, Pope agrees not to file or assert any further mechanic's liens pertaining to or arising out of the Project." (JTEx 85.) First, in order to be actionable the alleged misrepresentation has to be of a past fact, and not of some speculative future event. In addition, it is found and held that Pope performed in accordance with paragraph 3 of the ISA. Pope withdrew its Notice of Claim of Subcontractor on September 27, 2001. (FOF 252–53.) However, for the reasons discussed below, AES was on notice by virtue of the RMS March 6, 2001 Sworn Statement that Pope had an inchoate lien. AES requested the January 30, 2003 Final Lien Waiver based on the notice from RMS, and not as a result of any mechanics lien filed or asserted by Pope. Therefore, Pope did not make any actionable misrepresentation.

further lien rights. Calling the September 26, 2001 lien waiver a "Final Waiver of Lien and Release", even though that is how the parties sometimes refer to it, (see FOF 217 n. 19), did not make it final.

A waiver of a mechanic's lien will not be given effect beyond its terms, and waivers intended to be partial lien waivers as to particular work will be enforced as such. A purported final waiver will be effective for work completed at the time the waiver is given, but may not affect work done after the date of the final waiver pursuant to an additional contract.... A waiver for a clearly expressed special purpose will be confined thereto, but where the waiver is general the enforcement thereof is broad, and when nothing shows a contrary intention, it will be enforced as written.

26 Ill. Law and Prac. Mechanics' Liens § 87 (2008) (internal citations omitted). Therefore, to determine the scope of the September 26, 2001 Lien Waiver, one must look to actual language of the document.

Raymond argues that the language waiving any lien for labor or materials furnished "heretofore or which may hereafter be furnished," (JTEx 88) expresses Pope's intent to waive finally all its lien rights. This argument completely ignores the last paragraph of the September 26, 2001 Lien Waiver which provides that "this waiver and release does not waive or release the undersigned's claim for any retainage withheld for not-yet-completed punchlist work nor for any sums owed for the work which is the subject of the pending but not-yet-resolved change order requests." (FOF 223.)

 It is this last paragraph to which AES originally objected, because the language allowed Pope to retain its lien claim for retainage and extra work. Relying on *Midwest Envtl. Consulting*, 189 Ill.Dec. 501, 620 N.E.2d at 472, Raymond now argues that Pope's lien claim and contract rights were cumulative, and therefore it contends that the "claim" referred to in the last paragraph of the September 26, 2001 Lien Waiver referred to any contract claim on the underlying obligation. However, RMS did not make this argument to AES when it was trying to convince AES to accept the September 26, 2001 Lien Waiver. Rather, Mr. Friedlander, counsel for RMS, wrote to counsel for AES, that it was unfair and unreasonable for AES to demand that Pope waive its lien rights relating to the retainage and extra work. (FOF 248.) In addition, Mr. Friedlander invoked industry custom and usage, arguing that "[i]n the typical construction project, final, unconditioned waivers of lien are exchanged for the final payment, not for a second– or third-to-last payment." (*Id.*) Raymond concedes that the September 26, 2001 Lien Waiver, including the last paragraph, was drafted by Mr. Friedlander. Any ambiguity should be interpreted against the drafter. *Baker v. America's Mortg. Servicing, Inc.*, 58 F.3d 321, 327 (7th Cir.1995). If he intended that "claim" referred merely to Pope's contract rights, he would have argued such to AES.

It must be found and concluded that under the express language of the September 26, 2001 Lien Waiver, Pope excepted certain claims for retainage and extra work and, therefore, did not therein fully and finally waive all of its mechanic lien rights.

b. *Pope was not required to file and therefore did not fail to file timely its lien claim. Accordingly, it did not allow its rights under the Mechanics Lien Act to lapse.*

 Over Pope's objection, Raymond devoted much effort at trial to presenting evidence regarding when Pope

completed work on the Project, and the nature of that work as punch list, warranty or repair work. Pope's objections were overruled based on Raymond's argument that the evidence was relevant to its theory that Pope's lien rights had lapsed by January 2003 and, therefore, the January 30, 2003 Final Lien Waiver was null and void. In its post-trial briefs, Raymond argues that punch list, warranty and repair work is not lienable and, therefore, Pope last performed lienable work in August 2001.[6] Raymond argues further that under the Mechanics Lien Act a lien claimant has to perfect its lien claim by filing same with the county Recorder of Deeds within four (4) months of furnishing labor or materials, and that Pope let its lien rights lapse by failing to do so within four months of August 2001. However, as shown below the Mechanics Lien Act clearly provides that a contractor or subcontractor has two (2) years to file a lien claim against an owner, 770 ILCS 60/7 (West 2009). The owner, AES, honored the lien claims of RMS and Pope by payment of its settlement thereof in January 2003, well within the two years after August 2001, thus mooting any need for Pope to file its lien claim at some subsequent date within the two years. Raymond's arguments regarding the last date on which Pope performed lienable work are, therefore, irrelevant.

■ Providing labor or furnishing materials creates an inchoate lien which must be perfected in accordance with the procedural requirements of the Mechanics Lien Act. *Delaney Elec. Co., Inc. v. Schiessle*, 235 Ill.App.3d 258, 176 Ill.Dec. 280, 601 N.E.2d 978, 982 (1992). Raymond argues that Pope let its lien rights lapse after August 2001 by failing to perfect them within the time required by the Mechanics Lien Act. It suggests that there are two steps to perfection: (1) that the subcontractor must provide the owner with a written notice of claim within ninety (90) days of furnishing labor or material, *see* 770 ILCS 60/24 (West 2009); and (2) that the subcontractor must file its lien with the Recorder of Deeds for the county within which the project sits within four months of furnishing labor or material. *See* 770 ILCS 60/7 (West 2009).

■ Raymond's argument regarding the ninety-day notice requirement results from a partial reading of the statute. According to the full applicable text of section 24 of the Mechanics Lien Act:

> [Subcontractors] … may at any time after making his or her contract with the contractor, and shall within 90 days after the completion thereof … cause a written notice of his or her claim and the amount due or to become due thereunder, to be sent by registered or certified mail, with return receipt requested, and delivery limited to addressee only, to or personally served on the owner of record or his agent or architect, or the superintendent having charge of the building or improvement and to the lending agency, if known; *and such notice shall not be necessary when the sworn statement of the contractor or subcontractor provided for herein shall*

6. Under Illinois law, "[w]ork that is trivial and insubstantial, and not 'essential to the completion of the contract' does not extend the time to file a lien under the Mechanics Lien Act." *SLT Realty*, 246 Ill.Dec. 866, 731 N.E.2d at 401–02 (quoting *Braun–Skiba, Ltd. v. La Salle Nat'l Bank*, 279 Ill.App.3d 912, 216 Ill.Dec. 425, 665 N.E.2d 485, 491 (1996)). It is well-settled, therefore, that warranty and corrective repair work is generally held not to be lienable under Illinois law. *In re T. Brady Mech. Servs., Inc.*, 133 B.R. 441, 447 (Bankr. N.D.Ill.1991); *Cyclonaire Corp. v. ISG Riverdale, Inc.*, 378 Ill.App.3d 554, 317 Ill.Dec. 804, 882 N.E.2d 684, 690 (2007).

*scrvc to give the owner notice of the amount due and to whom due, but where such statement is incorrect as to the amount, the subcontractor or material man named shall be protected to the extent of the amount named therein as due or to become due to him or her. ...* 770 ILCS 60/24 (West 2009) (emphasis added). Therefore, apart from the procedure for a ninety-day notice, an owner can receive valid notice of a claim through a contractor's sworn statement. In this case, AES was put on adequate notice of Pope's lien claim by virtue of the amounts listed in the "Balance to Complete" column of the RMS March 6, 2001 Sworn Statement. *See Contractors' Ready–Mix, Inc. v. Earl Given Constr. Co.,* 242 Ill.App.3d 448, 183 Ill.Dec. 266, 611 N.E.2d 529, 532 (1993) ("Where ... a prior section 5 affidavit of the contractor had stated that 'the items mentioned [in that affidavit] include all labor and material required to complete said work' no further section 5 affidavit was required to justify payment by the owner to the contractor.").

■■■■ "The purpose of the strict notice requirements of section 24 is to prevent owners from being forced to pay subcontractors for labor or materials for which they have already paid the contractor." *Petroline Co.,* 238 Ill.Dec. 485, 711 N.E.2d at 1149–50. Furthermore, "Illinois courts have interpreted the strict requirements of notice by examining how effectively a party did in fact notify the other side rather than simply basing rights solely on whether every phrase of the statute was followed in exact detail." *Id.* (quoting *A.Y. McDonald Mfg. Co. v. State Farm Mut. Auto. Ins. Co.,* 225 Ill.App.3d 851, 167 Ill.Dec. 354, 587 N.E.2d 623, 627 (1992)). Therefore, "when the owner receives actual notice and his or her rights are protected, courts have been willing to overlook minor formal deficiencies." *Id.*

In this case, it is clear that AES had notice of Pope's lien claim regarding the retainage and extra work. AES was fully protected because it had not yet parted with money, and requested the January 30, 2003 Final Lien Waiver before making any payment. The ninety-day notice requirement was therefore not a requirement upon which Pope's lien rights as to AES depended, because AES had other written notice of Pope's claims.

■■■■ Failure of Raymond counsel to read the entire statute is fatal to the second prong of argument concerning recording of the mechanic's lien claim. According to the first sentence of section 7 of the Mechanics Lien Act, "No contractor shall be allowed to enforce such lien against or to the prejudice of any other creditor or incumbrancer or purchaser, unless within 4 months after completion ..." the contractor brings an action to enforce or records its lien. 770 ILCS 60/7 (West 2009). Since no litigation was filed within four months, Raymond focuses on the alternative recording requirement. "The four-month recording requirement is intended to give third parties dealing with the property, other than those with an ownership interest, notice of the lien." *Koglin Assocs.,* 223 Ill.Dec. 550, 680 N.E.2d at 286 (citing *Federal Savs. & Loan Ins. Corp. v. American Nat'l Bank & Trust Co.,* 115 Ill.App.3d 426, 71 Ill.Dec. 132, 450 N.E.2d 820, 822 (1983)).

However, the recording requirement is different as to owners. *Id.* (citing 770 ILCS 60/7). According to the second sentence of section 7, "Such claim for lien may be filed at any time after the claimant's contract is made, *and as to the owner may be filed at any time after the contract is made and within 2 years after the completion of the contract.* ..." 770 ILCS 60/7 (emphasis added.)

■ The applicable recording period in this case relative to AES is therefore set forth in the second sentence of section 7. Assuming as held earlier that Pope's lienable work was last performed in August 2001, based on the plain reading of section 7, it is found and held that Pope still had until August 2003 to record and thereby to perfect its lien claim against AES. However, Pope held an inchoate lien at the time it delivered the January 30, 2003 Final Lien Waiver in return for the $2.5 million settlement from AES being paid into the Account, all done well within the two year period. Accordingly:

> [W]here inchoate liens have been satisfied by timely payment, a contractor has no cause or need to record its verified claim for lien. In fact, if a mechanics lien claim has been paid or satisfied, the contractor whose claim has been paid may not bring a cause of action under the Act.

*Golfview Dev'l Ctr., Inc. v. All–Tech Decorating Co. (In re Golfview Dev'l Ctr., Inc.),* 309 B.R. 758, 769 n. 3 (Bankr.N.D.Ill.2004). Because Pope held valid inchoate lien rights as of January 30, 2003, AES and RMS requested and required the execution and delivery of the January 30, 2003 Final Lien Waiver before AES would pay the $2.5 million. That money was paid, so it cannot be said that Pope's lien rights lapsed.

c. *The January 30, 2003 Final Lien Waiver applied to Pope's outstanding lien claim which exceeded the amount of the AES settlement.*

The remaining issue is raised by the Raymond argument as to what amounts were the subject of the January 30, 2003 Final Lien Waiver.

■ Raymond argues that if any funds are held in trust under the Illinois Mechanics Lien Act, the only "unpaid sums subject to the waiver of mechanics lien" is the $10.00 referred to on the face of the January 30, 2003 Final Lien Waiver. Raymond concedes that there is no Illinois precedent that directly address what the phrase "unpaid sums subject to the waiver of mechanics lien" means. (Raymond Post–Trial Brief at 21.) The Mechanics Lien Act must be interpreted the way can interpreting judge reasons that the Illinois Supreme Court would do so. *See Doing Steel,* 2002 WL 31664476, at *4 (citing *Erie R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) (additional citations omitted)). Under Illinois law, the primary goal in interpreting the language of a statute "is to ascertain and give effect to the legislature's intent." *Id.* (quoting *Michigan Ave. Nat'l Bank v. Cook County,* 191 Ill.2d 493, 247 Ill.Dec. 473, 732 N.E.2d 528, 535 (2000)). The statutory language is the best indication of the legislature's intent. *Doing Steel,* 2002 WL 31664476, at *4 (citing *Yang v. City of Chicago,* 195 Ill.2d 96, 253 Ill.Dec. 418, 745 N.E.2d 541, 545 (2001)).

Raymond cites *Doing Steel* for the proposition that "the unpaid sums subject to the waiver of mechanics lien" should be read to mean those sums due that subcontractor. 2002 WL 31664476, at *5. This is so, but it is absurd to argue that Pope was only due $10.00 when it executed the January 30, 2003 Final Lien Waiver.

The interpretation of section 21.02 is complicated by the fact that the use of the term "lien waiver" does not appear to be consistent with the overall notice requirements and payment scheme contemplated by the Mechanics Lien Act. For one, "the [Mechanics Lien] Act does not define lien waivers, or explain their effect." *Contractor's Ready–Mix, Inc. v. Earl Given Constr. Co.,* 242 Ill.App.3d 448, 183 Ill.Dec. 266, 611 N.E.2d 529, 537 (1993) (Cook, J. concurring). Except for section 21.02,

"[t]he term 'final lien waiver' is not used in the Act." *Id.* (Section 21.02 was added to the Mechanics Lien Act effective July 25, 1997.)

In *Contractor's Ready–Mix,* the Illinois appellate court reversed the trial court's finding "that section 22 of the [Mechanics Lien] Act authorizes an owner to require a lien waiver from any party." *Id.* 183 Ill. Dec. 266, 611 N.E.2d at 534. Nevertheless, it is "a well-established practice [that] prudent owners and contractors often demand lien waivers to support their payments to persons entitled to [those payments]." *Id.* 183 Ill.Dec. 266, 611 N.E.2d at 535. It is not uncommon in the construction industry for a contractor or subcontractor to furnish a lien waiver swearing she has been paid even though, in fact, she has not been paid. 24 Ill. Prac., Illinois Construction Law Manual § 13:46 (2007–2008 ed.) (citing *Edward Hines Lumber Co. v. Dell Corp.,* 49 Ill.App.3d 873, 7 Ill.Dec. 207, 364 N.E.2d 368 (1977) ("The evidence amply demonstrated that [the supplier], following a building industry custom, issued its lien waiver to [the subcontractor] before receiving payment.")). The Mechanics Lien Act, therefore, creates a statutory trust as to monies not paid but claimed to be due when the "owner, contractor, subcontractor, or supplier of any tier who requests or requires the execution and delivery of a waiver of lien ... in exchange for payment or promise of payment...." *Id.* (citing 770 ILCS 60/21.02).

■ While the Act provides for certain steps that the parties may take to protect themselves, neither the owner nor a subcontractor is required to take every precaution afforded by the Act. Rather, "[t]he Act seeks a fair result in each case." *Contractors' Ready–Mix,* 183 Ill.Dec. 266, 611 N.E.2d at 536 (Cook, J. Concurring).

According to section 32 of the Mechanics Lien Act, "No payments to the contractor ... shall be regarded as rightfully made, as against the sub-contractor ... if made by the owner without exercising and enforcing the rights and powers conferred upon him in Sections 5, 21 and 22 of this Act." [7] 770 ILCS 60/32.

Section 21 of the Mechanics Lien Act defines who is a subcontractor and provides for a lien for subcontractors for the unpaid amount of the value of their labor and material furnished to the premises plus interest as provided for the contractor under section 1. 770 ILCS 60/21(a); *Contractors' Ready–Mix,* 183 Ill.Dec. 266, 611 N.E.2d at 530. However, "in no case ... shall the owner be compelled to pay a greater sum for ... the completion of such ... improvement than the price ... in the original contract, unless payment be made to the contractor in violation of the rights and interests of the persons intended to be benefited [sic] by the act." 770 ILCS 60/21(d); *Contractors' Ready–Mix,* 183 Ill. Dec. 266, 611 N.E.2d at 531.

■ Section 5 of the Mechanics Lien Act requires the owner, before making any payment to the contractor, to obtain from the contractor an affidavit setting forth "the names and addresses of all parties furnishing [labor or materials] and of the amounts due *or to become due* to each." 770 ILCS 60/5 (emphasis added); *Contractors' Ready–Mix,* 183 Ill.Dec. 266, 611 N.E.2d at 531. According to section 24 of

---

**7.** Section 22 of the Mechanics Lien Act gives those providing labor and material to subcontractors the same lien rights as contractors under section 1, and subcontractors under section 21, *Contractors' Ready–Mix,* 183 Ill. Dec. 266, 611 N.E.2d at 533. That provision does not apply to Pope who was a first-tier subcontractor in contractual privity with RMS.

the Act, a subcontractor "may at any time after making his or her contract with the contractor, and shall within 90 days after completion thereof . . . cause a written notice of his or her claim and the amount due or to become due thereunder, to be sent" to the owner. 770 ILCS 60/24(a); *Contractors' Ready–Mix*, 183 Ill.Dec. 266, 611 N.E.2d at 531. However, a subcontractor is not required to provide notice under section 24 when the sworn statement pursuant to section 5 serves to put the owner on notice of the subcontractor's lien claim. 770 ILCS 60/24(a).

Here, AES fulfilled the requirements of section 5 by requiring RMS to provide sworn contractor's affidavits with RMS' pay requests. According to the RMS March 6, 2001 Sworn Contractor's Affidavit, Pope had a balance to complete the Project of $3,198,057.34. Therefore, pursuant to section 27 of the Mechanics Lien Act, AES was required to "retain from any money due or to become due the contractor, an amount sufficient to pay all demands that are or will become due such sub-contractor . . . of whose claim he is notified, and shall pay over the same to the parties entitled thereto." 770 ILCS 60/27. In other words, as of March 6, 2001, AES was required to retain $3,198,057.34 in order to pay Pope.

■ On June 19, 2001, Pope sent a Notice of Claim pursuant to section 24 to AES in the amount of $4.6 million. According to section 24, if a contractor's affidavit "is incorrect as to the amount, the subcontractor . . . named shall be protected to the extent of the amount named therein as due or to become due to him or her." 770 ILCS 60/24(a). Therefore, Pope's June 19, 2001 section 24 notice served to put AES on notice that Pope asserted a lien claim for more than the RMS March 6, 2001 Sworn Contractor's Affidavit, thereby protecting Pope for the difference between $4.6 million and $3,198,057.34.

Pope later withdrew that Notice of Claim. However, that withdrawal only returned the parties to their respective positions as of the RMS March 6, 2001 Sworn Contractor's Affidavit. *See Contractors' Ready–Mix*, 183 Ill.Dec. 266, 611 N.E.2d at 532 ("Where, as here, a prior section 5 affidavit of the contractor had stated that 'the items mentioned [in that affidavit] include all labor and material required to *complete said work*' no further section 5 affidavit was required to justify payment by the owner to the contractor." (Emphasis added)). Raymond has not cited, and the Court's own research has not revealed any authority that would allow AES to pay monies in derogation of sections 5, 27 and 32, as the result of the withdrawal of a section 24 notice of claim. The RMS March 6, 2001 Sworn Contractor's Affidavit, therefore, continued to serve to put AES on notice of a lien claim by Pope albeit for an amount less than Pope's Notice of Claim.

Furthermore, the January 30, 2003 Final Lien Waiver stated that is was executed "for and in consideration of Ten Dollars ($10.00) Dollars, *and other good and valuable consideration*." (JTExs 164, 249 (emphasis added).) Raymond seeks to read the last six words as a nullity, as if those words had no meaning at all. However, the Contractor's Affidavit attached to the January 30, 2003 Final Lien Waiver identified what constituted the "other good and valuable consideration." That affidavit served to put AES on notice pursuant to sections 5 and 24 of the Mechanics Lien Act that Pope asserted a lien claim for the difference between the total contract price of $22.9 million and the payments received to that date of $19,656,738.54, or a net of $3,243,261.46. (JTEx 164.) That claimed amount was consistent with the notice of

the Balance to Complete that RMS provided to AES in the March 6, 2001 Sworn Statement. (FOF 174.) The evidence shows that the $305,118.71 paid in reliance on the September 26, 2001 Lien Waiver was used to pay Pope's subcontractors. (JTEx 211.) Similarly, the difference between $19,656,738.54 received prior to the January 30, 2003 Final Lien Waiver, (JTEx 164), and $17,151,135.03, the accumulative consideration for the September 26, 2001 Lien Waiver, (JTEx 88), or $2,505,603.51 was also used to pay Pope's subcontractors. (*See* JTEx 211.)

Raymond argues that Pope failed to fill out the "Contractor's Affidavit Box" thereby admitting that it was owed nothing as of January 30, 2003. However, it is clear that the Contractor's Affidavit Box was intended for Pope to give notice to AES of claims, if any, by Pope's subcontractors pursuant to section 5 of the Mechanics Lien Act, and not of Pope's own claim in the body of the Contractor's Affidavit. Therefore, as of January 30, 2003, AES was on notice that Pope asserted a lien claim of $3,243,261.46, based on the value of the EPC Contract as incorporated into the Subcontract, but was not reporting any of its subcontractors to be unpaid.

 The Mechanics Lien Act provides for a lien against the improved premises and on the monies due or to become due on account of such improvements. 770 ILCS 60/21 (West 2009). If an owner (in this case AES) follows the statutory procedures set forth in the Act, it is protected from having to pay more than it owes either to the general contractor under the prime contract or to any unpaid subcontractors. *Id.;* 26 Ill. Law and Prac. Mechanics' Liens § 45. Here, AES and RMS entered into a final settlement of both the RMS claims under the EPC Contract and Pope's claim, all for $2.5 million conditioned, on delivery by RMS and Pope of their waivers of lien thus protecting AES.[8] (JTEx 165, 248 at ¶ 4). The $2.5 million settlement paid by AES was less than the value of Pope's asserted lien claim. In order to protect itself, AES required that RMS deliver its lien waiver, and that Pope execute and deliver the January 30, 2003 Final Lien Waiver before AES would make any payment on the AES Settlement. Pope was not directly a party to the AES settlement, yet execution of its Lien Waiver was clearly given in consideration of that settlement in light of information contained on the document and Pope's agreement with Raymond to put the settlement amount into the Initial Account for protection of their respective interests. Payment of the settlement amount into the Account clearly provided good and valuable consideration for the January 30, 2003 Final Lien Waiver, and the reference to "$10.00 and other good and valuable consideration" was the scrivener's use of an accepted convention for stating consideration so as to make the waiver document clearly binding on Pope and protective of AES no matter what the "other good and valuable consideration" actually amounted to. (The language is more modern but no less binding "consideration" than the peppercorn of law school days!)

In *Premier Elec. Constr.,* the opinion held that the subcontractor was "entitled to its pro rata share of the settlement proceeds, not to the full amount of its claim." 276 Ill.App.3d 816, 213 Ill.Dec. 128, 658 N.E.2d 877, 884 (1995). That opinion relied on section 28 of the Mechanics Lien Act which provides that in a suit to enforce a lien, "the owner shall be liable

---

8. Although RMS' waiver of lien was not introduced into evidence, it must be inferred that it did provide one to AES, because delivery of it was required by paragraph 2(a) of the AES Settlement and AES did in fact pay the $2.5 million pursuant to the Settlement.

to the plaintiff for no more than the pro rata share that such person would be entitled to with other sub-contractors out of the funds due to the contractor from the owner...." 770 ILCS 60/28 (West 2009). This provision under the Mechanics Lien Act protects an owner who follows the statutory requirements from having to pay more than it owes under the prime contract. Here, AES and RMS settled and released their respective claims against the owner AES under the EPC Contract for $2.5 million. Therefore, if Raymond were due any debt relating to its lien and trust claim for work performed, Pope would have to share the Current Account in proportion to its lien claim. As the Arbitration determined and Judgment has since confirmed here, Raymond is due nothing and so any lien and trust claim it might have is worth nothing.

II. *RAYMOND MANAGEMENT SERVICES AND POPE OWNED THE ACCOUNT AS TENANTS IN COMMON SUBJECT TO OUTCOME OF THE ARBITRATION AND MECHANICS LIEN TRUST RIGHTS. POPE NOW HOLDS THE SOLE MECHANICS LIEN TRUST RIGHTS IN THE ACCOUNT.*

The Subcontract between RMS and Pope did not fix a set amount to be paid to Pope, but provided for RMS and Pope to share profit or loss after the payment of Project costs. The Mechanics Lien Act trust funds deposited into the Account were subject to the outcome of the disputes between them which were to be arbitrated.

■ Raymond cites *In re Cloe*, 336 B.R. 762, 764 (Bankr.C.D.Ill.2006), for the proposition that "[u]nder Illinois law, a trustee establishes a prima facie case that money in an account belongs to the debtor when he shows that the money was in a joint account." (Additional citations omitted). However, the mere labeling of the Account by Raymond in its briefs as a joint account is rhetoric and of no consequence. *Barber v. First Midwest Bank (In re Johnson)*, 355 B.R. 103, 110 n. 5 (Bankr.C.D.Ill.2006) (citing *In re ANR Advance Transp. Co., Inc.*, 247 B.R. 771, 774 (Bankr.E.D.Wis.2000)). The joint account in Cloe expressly referred to "[t]he ownership of the account ... as 'joint—with survivorship (and not as tenants in common).'" *Cloe*, 336 B.R. at 763. Therefore, the holding and reasoning in *Cloe* applies only to accounts held in joint tenancy with right of survivorship.

■ No such joint tenancy account was established here. It is a statutory requirement for the creation of a joint tenancy that there be a signed agreement including the right of survivorship. *Doubler v. Doubler*, 412 Ill. 597, 107 N.E.2d 789, 791 (1952) (interpreting 765 ILCS 1005/2). Neither the Current Account Letter of Direction nor the Signature Card, (JTEx 252, 253), include any right of survivorship. In fact, the dual signature requirement for withdrawals from the Account supports the conclusion that there was not a joint tenancy, because the dual signature requirement specifically limited each party's right and ability to use or withdraw all of the funds from the Account. Therefore, under Illinois law legal title to the account was held by RMS and Pope as tenants in common. 765 ILCS 1005/1 (West 2009). *See also* 34 Ill. Law & Prac. Tenancy in Common § 2 (2008) ("A tenancy in common exists whenever an estate in real or personal property is owned concurrently by two or more persons under a conveyance or under circumstances which do not call for some other form of cotenancy.").

■ Where a conveyance is made to two or more parties as tenants in com-

mon without designating the portion which each is to take, the law presumes that ordinarily they are to take equal shares. *Sturdyvin v. Ward*, 336 Ill. 594, 601, 168 N.E. 666 (1929) (citing *Keuper v. Mette's Unknown Heirs*, 239 Ill. 586, 592, 88 N.E. 218 (1909)). However, this presumption can be rebutted by evidence to the contrary. *Id.* "A court of equity, though, is not foreclosed from looking behind the form of the transaction and determining the real, beneficial interest or interests as between the parties themselves." *Graves v. Graves*, 42 Ill.App.2d 438, 192 N.E.2d 616, 620 (1963). In this case the actual beneficial interest of each party was subject to both their respective rights under the Mechanics Lien Act and to the outcome of arbitration liquidating their disputes and claims.

Raymond relies in part on an internal "Savings Account Profile" generated by JPMorgan Chase, to argue that RPG, Inc. is the sole owner of the Account. (JTEx 196.) The asserted portion of the document reads:

| Name | Tax ID | Relationship | Date of Birth |
| --- | --- | --- | --- |
| RAYMOND PROFESSIONAL GROUP IN | 363869389 | Sole Owner | 00/00/0000 |
| DOUGLAS CHIDLEY | | Signer | 01/01/1903 |
| PAUL TROYKE | 000000000 | Signer | 01/01/1903 |

Raymond's reliance on the Savings Account Profile has neither logic nor legal support. It is clear from original Signature Card which controlled rights of the parties to dispose of the Account that signatures of a representative of each was required for any change. Pope never consented to placing the account into a "sole owner" account. The Bank, as mere depository, had no authority to change the rights of the parties, and Raymond had no authority to allow the Bank to do so. If the transfer of purported ownership by unauthorized parties could have any significance in changing title, a party guilty of conversion of another's interest might as well be able to claim legal rights.

"It is a fundamental principle of banking law that the relationship between a bank and its depositor is created and regulated by the express or implied contracts between them." *Symanski v. First Nat'l Bank of Danville*, 242 Ill. App.3d 391, 182 Ill.Dec. 455, 609 N.E.2d 989, 991 (1993) (citing *Bieze v. Coca*, 54 Ill.App.3d 7, 11 Ill.Dec. 652, 369 N.E.2d 106, 112 (1977)). "A binding contract between a bank and its depositor is created by signature cards and a deposit agreement." *Cont'l Cas. Co., Inc. v. Am. Nat'l Bank and Trust Co. of Chicago*, 329 Ill. App.3d 686, 263 Ill.Dec. 592, 768 N.E.2d 352, 357 (2002).

The parties did not offer into evidence the reverse side of the Letter of Direction which contained the deposit agreement, (*see* JTEx 252), but the Signature Card in evidence provided that the name on the bank account was "Raymond Professional Group—Pope Joint Account." The corporate name of Raymond Management Services ("RMS") had been changed to Raymond Professional Group—Design/Build as of December 28, 2000. (FOF 1 n. 1.) Therefore, the reference to Raymond Professional Group on the Letter of Direction and Signature Card is ambiguous when read in isolation, but it is undisputed that the Account was opened pursuant to the Subcontract between RMS and Pope and required signature on behalf of both Pope and RMS before anything could be done with the account. Therefore, the Chase Bank and RMS acted without authority when it transferred funds into a purported single owner account. Such transfer must

be viewed as a nullity, or else an unauthorized conversion.

 Alternatively, Raymond argues that it controlled and owned the Account because RPG, Inc.'s tax identification number was associated with the Account and RPG paid taxes on interest accruing on the Account. Because of their corporate structure, RPG and its subsidiaries were able to file a consolidated federal income tax return. The funds at issue were evidently reported as excess Project funds earned by RMS and Pope, and the Initial Account was listed as an asset of RMS on RPG's Financial Statements for 2001 through 2003. (FOF 380.)

Raymond asserts that Pope's representatives were aware that interest was accruing on the Account, and that taxes had to be paid thereon. The parties now disagree whether Pope should have volunteered to pay a portion of the taxes due, or whether it was Raymond's burden to ask for an appropriate contribution. Arguably, taxes paid on the interest income was a Project cost that could have been apportioned by the Arbitration Panel so that each party bore the tax burden for its share. However, the Panel actually adjudicated all issues as to the Project accounting, the Award was made and has been reduced to judgment. The Panel's decision and reasoning cannot be revisited here because all accounting issues, including any as to a possible tax burden on interest, is barred by *res judicata*. For the foregoing reasons, it is found and held that Raymond's unilateral and self-serving tax elections do not affect ownership of the Account and cannot be the basis for any claims here.

Finally, Raymond points to Mrs. Chidley's ability to request unilaterally and obtain from the bank a change in the Current Account after the filing of the bankruptcy petition. Somehow, her working relationship with and influence over the bank is asserted to establish ownership rights. In order to address this argument, the circumstances surrounding Debtors ceasing business and filing for bankruptcy should be addressed.

Raymond Professional Group and its subsidiaries funded its working capital needs through a line of credit with JPMorgan Chase. (J. Chidley Test. 291:2–6, Dec. 12, 2008.) The line of credit was limited to a certain percentage of eligible accounts receivable. (*Id.* at 291:7–9.) As a result of a downturn in business, RPG was unable to maintain the ratio of accounts receivable to credit and, therefore, JPMorgan Chase withdrew RPG, Inc.'s line of credit on May 18, 2005. (*Id.* at 291:9–17.) The Raymond family of companies ceased doing business that day. (FOF 26.)

Chase swept the Operating Account in order to setoff outstanding amounts owed to it on the line of credit. (J. Chidley Test. 291:18–22, Dec. 12, 2008.) On cross-examination, Mrs. Chidley testified that Chase did not sweep the Current Account, but that she did not know why. (*Id.* at 507:5–15, Dec. 15, 2008.) On re-direct, she clarified that Chase did threaten to sweep the Account, but that RPG's counsel advised the bank that remaining amounts owed were being paid down as accounts receivable were being collected, and asked that the Account not be swept because it was subject to an upcoming arbitration. (*Id.* at 507:16–23.)

After RPG and its subsidiaries filed for bankruptcy protection on December 18, 2006, the name of the Current Account was changed to Raymond Professional Group, Inc. DIP. (FOF 510.) Mrs. Chidley testified that she unilaterally made the change in her capacity as the authorized representative of RMS on the account without obtaining signature of Mr. Troyke

(of Pope) approving the change as required by the Letter of Direction and Signature Card. (FOF 513.) Mrs. Chidley was not an authorized signor on the Account, and therefore had no authority to make that change.

It is hereby found and held that the December 2006 Account Name Change was clearly made in breach of the parties' agreement with each other and in derogation of the bank's duties to Pope to make no changes without its consent. As a potential creditor of Debtors, the bank may have had an incentive to go along with Raymond's request to transfer the Current Account into the name of RPG, Inc. as debtor in possession. But Raymond and the Bank had no authorization from Pope to do that and the Account should have remained under control of both Pope and RMS until conclusion of this litigation. When the improper transfer came to light, an Order was entered in this proceeding and the bankruptcy case, prohibiting the Bank or any party from disbursing funds from the Account without Court permission, (Docket Nos. 336 and 431, respectively), and the parties supplied a bank statement showing that funds remain in the Account. (*Supra,* n. 4.)

*Conclusion as to the Mechanics Lien Act and Ownership of the Account*

For reasons stated above, it is found and held that the $2.5 million AES Settlement and all interest proceeds therefrom are now held in the Account under the trust created by Illinois Mechanics Lien Act for the sole benefit of Pope. That settlement was deposited into the Initial Account subject to adjudication of RMS' and Pope's respective contract claims against one another, but this did not change the nature of the funds as Mechanics Lien trust funds. Subsequently, the Arbitration Panel found that RMS was owed nothing on the Subcontract, and entered an Award for Pope

in the amount of $3,634,714. Based on the contractual history, that arbitration decision found that the Award was to be satisfied from funds in the Current Account plus interest accruing thereon, with any deficiency to be paid by Raymond, although the Award did not determine legal ownership of the Account. The Award was confirmed by judgment here that was not appealed. Since RMS is due nothing at all under the Award, its mechanics lien trust claim is worth nothing, leaving the mechanics lien trust on the Account only in favor of Pope.

### III. *POPE'S ALTERNATIVE TRUST THEORIES ARE WITHOUT MERIT.*

The foregoing discussion found and held that the Current Account is held in trust for benefit of Pope under the Illinois Mechanics Lien Act and, therefore, is not property of the estate of either Debtor. Therefore, it is unnecessary to decide Pope's alternative theories in Count VI as to why the funds are not property of either of Debtors' bankruptcy estates. *See Adamszewski v. Local Lodge 1487 et al.,* 496 F.2d 777, 786 (7th Cir.1974) ("But we need not decide that point since another ground exits for dismissing this action under any theory...."). However, for the same reasons that the parties were given wide latitude in developing a factual record and much stipulated but redundant evidence was allowed into the record, it is appropriate to address the other arguments by Pope for benefit of any reviewing court.

Pope argues in the alternative that the Account funds are held in a constructive or resulting trust. It is wrong in both of those theories.

### a. *There is no constructive trust.*

 Constructive trust is an equitable remedy that must be adjudicated by a court. *Peterson v. Berg (In re Berg),* 387

B.R. 524, 554 (Bankr.N.D.Ill.2008) (citing *Stevens v. Century Furniture Co. (In re CL Furniture Galleries, Inc.)*, 95–C–50103, 1995 WL 756853, at *8 (N.D.Ill. Dec.20, 1995)). However, a constructive trust cannot be imposed post-bankruptcy, as any rights recognized in bankruptcy must have been found under non-bankruptcy law to exist prior to the filing of the bankruptcy petition. *Id.* (citing *In re GGSI Liquidation*, 351 B.R. at 593; *In re Davenport*, 268 B.R. 159, 163 (Bankr. N.D.Ill.2001) (citing *Stevens*, 1995 WL 756853, at *8)). In other words, the interest of the bankruptcy trustee, as a hypothetical judicial lien creditor, lien creditor or bona fide purchaser of real property, would be superior to that of any equitable interest granted post-bankruptcy and could be avoided using the trustee's strong-arm powers. *See Matter of Pubs, Inc. of Champaign*, 618 F.2d 432, 439 (7th Cir.1980).

■ Pope argues that the Arbitration Award imposed a constructive trust on the funds held in the Account. However, nowhere does the Award declare a constructive trust, and the Award itself was not reduced to judgment until it was confirmed post-bankruptcy. It is unnecessary, therefore, to discuss the merits of a claim for constructive trust that was not adjudicated pre-bankruptcy.

### b. *There is no resulting trust.*

■ For the reasons discussed above concerning Raymond's estoppel arguments, it is found and held that Pope waived its arguments regarding resulting trust by failing to raise them in its pretrial Proposed Findings of Fact and Conclusions of Law as required by the Second Amended Final Pre–Trial Order. Pope suggests that it could make a motion to conform the pleadings to the evidence. If Pope were to make such a motion, Raymond would be entitled to respond. But Pope has not made any such motion and the Court will not treat what could hypothetically be done as though it had been done. Indeed such a motion would be required to specify what theory or theories should be decided and what evidence it or they would be based on. Without such a record, conjecture should not be used here to speculate on what such a motion would say.

■ Furthermore, although a party can impliedly consent to the trial of an unplead issue by failing to object to the introduction of evidence on that issue, "implied consent cannot be based on the introduction of evidence that is relevant to an issue already in the case when there is no indication that the party presenting the evidence intended to raise a new issue." *Green Country Food Market, Inc. v. Bottling Group, LLC*, 371 F.3d 1275, 1280 (10th Cir.2004) (citing *Moncrief v. Williston Basin Interstate Pipeline Co.*, 174 F.3d 1150, 1162 (10th Cir.1999)). Therefore, Raymond cannot be found to have consented to the trial of Pope's new resulting trust theory, because evidence admitted at trial or other theories was arguably relevant to this additional but unpleaded theory. It could therefore be said that Pope waived its possible rights to assert the theory of resulting trust.

■ That being said, waiver is a disfavored remedy, and Rule 15(b) Fed.R.Civ.P. "is 'intended to promote the objective of deciding cases on their merits rather than in terms of the relative pleading skills of counsel.'" *Brandon v. Holt*, 469 U.S. 464, 471 n. 19, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985) (quoting 6 C. Wright & A. Miller, *Federal Practice and Procedure* § 1491 at 453, 454 (1971 ed. and Supp.1983); *Green Country Food Market*, 371 F.3d at 1280). It is therefore appropriate to discuss the merits.

■ On the merits of this issue, Pope failed to establish the creation of a

resulting trust by clear and convincing evidence. *See Judgment Servs. Corp. v. Sullivan,* 321 Ill.App.3d 151, 254 Ill.Dec. 70, 746 N.E.2d 827, 831 (2001). "A resulting trust generally arises where one person purchases property with his own funds and allows title to be taken in the name of another." *Id.* (citing *In re Estate of Wilson,* 81 Ill.2d 349, 43 Ill.Dec. 23, 410 N.E.2d 23, 26 (1980)). It is possible that "[w]here money is placed in the hands of a person to be delivered to another, a resulting trust arises in favor of the latter." *Norton v. City of Chicago,* 293 Ill.App.3d 620, 228 Ill.Dec. 810, 690 N.E.2d 119, 126 (1997) (citing *In re Estate of Habel,* 88 Ill.App.2d 194, 231 N.E.2d 616, 620 (1967)). However, "a resulting trust is designed to carry the presumptive intention of the parties . . .," *Habel,* 231 N.E.2d at 620, and there is no evidence that AES paid the funds into the Account with intent that they be delivered to Pope or be owned entirely by Pope, nor did RMS have such intent. AES was concerned with meeting the requirements of the Mechanics Lien Act so that it was protected from subcontractors' lien claims. By complying with those requirements, a statutory trust arose in favor of the lien claimants RMS and Pope. But that does not establish that AES or RMS intended for the funds to be delivered to Pope. Indeed, at the time RMS and Pope were about to confront issues to determine through arbitration how the Account would be distributed. For the foregoing reasons, it is found and held that Pope's resulting trust arguments are without merit.

## IV. *THE INITIAL ACCOUNT AND CURRENT ACCOUNT IS NOT AND NEVER WAS AN ESCROW ACCOUNT. POPE WAIVED THE CONTRACTUAL REQUIREMENT FOR AN ESCROW.*

As a general rule, money held in an escrow account is not property of a debtor's bankruptcy estate. *In re Johnson,* 355 B.R. at 110 n. 5 (citing *Affiliated Computer Sys., Inc. v. Sherman (Matter of Kemp),* 52 F.3d 546, 550–52 (5th Cir.1995)). In support of its argument that the Initial Account was and the Current Account is an escrow account, Pope seems to rely largely on the various references to the Account as an "escrow" by it, RMS, and the Arbitration Panel, to show that the parties intended to treat the Account as an escrow account. However, "[m]erely attaching the label 'escrow' to property or to a document does not make it such . . . ." *Id.* (citing *In re ANR Advance Transp. Co., Inc.,* 247 B.R. 771, 774 (Bankr.E.D.Wis. 2000)). For the following reasons, it is found and held that Pope waived the Subcontract provision calling for the creation of an escrow account, and that the Initial and Current Accounts are not, and never have been, an escrow account under applicable legal standards.

Under Illinois precedent, an escrow account is held to be "[a] bank account, generally held in the name of the depositor and an escrow agent, that is returnable to the depositor or paid to a third person on the fulfillment of escrow condition." *In re Handy Andy Home Improvement Ctrs., Inc.,* 196 B.R. 87, 92 (Bankr.N.D.Ill.1996) (quoting *Black's Law Dictionary* (6th ed.)). An escrow is:

> [A] written instrument which by its terms imports a legal obligation, and which is deposited by the grantor, promisor or obligor, or his agent with a stranger or third party, to be kept by the depository until the performance of a condition or the happening of a certain event and then to be delivered over to the grantee, promisee or obligee.

*In re Johnson,* 355 B.R. at 110 (quoting *Midwest Decks, Inc. v. Butler & Baretz*

*Acquisitions, Inc.,* 272 Ill.App.3d 370, 208 Ill.Dec. 455, 649 N.E.2d 511, 517 (1995)).

██ Moreover, "[t]o make an escrow arrangement valid, delivery of the instrument involved must be made to a stranger thereto." 17 Ill. Law and Prac. Escrows § 1 (2008) (citing *Kraetsch v. City of Chicago,* No. 21,255, 198 Ill.App. 395, 1916 WL 1940, at *4 (Ill.App.Ct. Mar. 1916)). Pope cites no contrary authority permitting parties to an escrow agreement to act as the escrow agent or agents. The present dispute between RMS and Pope highlights the rationale for requiring a disinterested third-party to act as escrowee; an escrow agent would have a fiduciary duty to act impartially in carrying out the terms of the escrow agreement. *Meyers v. Rockford Sys., Inc.,* 254 Ill.App.3d 56, 192 Ill.Dec. 761, 625 N.E.2d 916, 921–22 (1993) (additional citations omitted). Here, there was no impartial escrowee who could or would be authorized to distribute the property placed in an escrow upon the happening of some stated event. Indeed, the Bank was not even authorized to deliver the Award funds to Pope after Pope prevailed in the Arbitration, and could not do so without signatures by the presidents of both companies.

██ While an escrow account was originally provided for by agreement of the parties, it is found from the evidence and held that Pope waived the opening of an escrow account as a condition of the Subcontract. According to what was asserted to be an integration clause in the Subcontract:

> Any term of this Agreement may be modified or deleted, but only if the modification or deletion is put in writing and signed by the parties.... This Subcontract represents the entire and integrated agreement between RMS and [Pope] for the Project and supersedes all prior

negotiations, representations or agreements, either written or oral.

(JTEx 2 at ¶ 11.) However, an integration clause "has no application when the issue is whether one of the parties later waived strict compliance with those terms." *Wisconsin Knife Works v. Nat'l Metal Crafters,* 781 F.2d 1280, 1289 (7th Cir.1986). "In contract law, if a party indicates by its conduct that compliance with a particular provision is not required, then waiver of that provision may be implied." *Midwest Builder Distrib., Inc. v. Lord & Essex, Inc.,* 383 Ill.App.3d 645, 322 Ill.Dec. 371, 891 N.E.2d 1, 28 (2007) (additional citations omitted). Waiver is the intentional relinquishment of a known right. *Braden v. Weinert,* 97 Ill.App.3d 929, 53 Ill.Dec. 522, 423 N.E.2d 1326, 1332 (1981).

In this case, Pope specifically and intentionally waived the escrow provision of the Subcontract. On February 2, 2001, Mr. Chidley and Mr. Troyke met to discuss the opening of the escrow account called for in the Subcontract. (FOF 117.) When Mr. Chidley told Mr. Troyke that there would be a fee associated with the opening of an escrow account and that escrow accounts are not interest bearing, Mr. Troyke responded that he wanted to obtain the highest possible return on the excess funds deposited in the account. (FOF 118.) Therefore, Mr. Troyke and Mr. Chidley agreed to open a commercial checking account that required the dual signatures of a RMS representative and a Pope representative to disburse funds or make changes to the account. (*Id.*) Thereafter, the Initial Account was established subject to the agreed-upon dual signature requirement. (FOF 122–24.)

This was not the only occasion that Mr. Troyke expressed his desire that the Project funds be invested so as to earn the highest interest rate. On March 12, 2003, at Mr. Troyke's request, the funds were

transferred from the Initial Account to the Current Account. (FOF 383–84.) The transfer to the Current Account was made after AES made the $2.5 million settlement payment, after RMS had notified Pope of a dispute over Pope's costs, and after RMS had refused Pope's renewed demand for payment under paragraph 7 of the ISA. (FOF 370–72.) Despite being aware of this payment dispute, Pope did not insist that the funds be deposited with an independent third-party escrowee who could disburse the funds upon the resolution of the dispute. (FOF 385.) The only controls on the Current Account were the same dual signature requirements that were on the Initial Account. (FOF 381–82, 397–98.) For reasons stated above, this dual signature requirement was not legally sufficient to create an escrow account.

Therefore, it is hereby found and held that Pope waived the Subcontract provision calling for the opening of an escrow account and the Current Account is not legally an escrow account.

## V. POPE HAS NOT ESTABLISHED THAT THERE WAS AN ACTIONABLE MISREPRESENTATION OR THAT IT REASONABLY RELIED ON ANY MISREPRESENTATION BY RAYMOND.

Finally, Pope argues that Raymond is equitably estopped from asserting that the funds in the Account are property of either of the bankruptcy estate of either RMS or RPG. The elements of equitable estoppel are: (1) a misrepresentation; (2) reasonable reliance on that misrepresentation; and (3) detriment. *Fed. Deposit Ins. Corp. v. Rayman,* 117 F.3d 994, 1000 (7th Cir.1997) (citing *Kennedy v. United States,* 965 F.2d 413, 417 (7th Cir.1992)). Equitable estoppel can be distinguished from promissory estoppel in that "[w]hereas

promissory estoppel is used offensively, to create a cause of action, equitable estoppel functions defensively 'to bar a party from raising a defense or objection it otherwise would have, or from instituting an action which it is entitled to institute.'" *Northrop Grumman Corp. v. United States,* 42 Fed.Cl. 1, 8 (1998).

The misrepresentations that Pope allegedly relied on were the RMS promise in the ISA to pay Pope $2,808,671 from the Account as funds became available, and RMS' characterization of the Account as an escrow account during the Arbitration. While fraudulent intent is not a requirement of estoppel, "[t]o be actionable, a false representation must generally relate to an existing or past event, not to a promise or prognostication concerning a future happening...." *Sinclair v. Sullivan Chevrolet Co.,* 31 Ill.2d 507, 202 N.E.2d 516, 518 (1964) (citing *Brodsky v. Frank,* 342 Ill. 110, 117–18, 173 N.E. 775 (1930); *Bielby v. Bielby,* 333 Ill. 478, 485, 165 N.E. 231 (1929)). Therefore, RMS' promise to pay the $2,808,671 at some point in the future is not a misrepresentation that would support Pope's theory of promissory estoppel. There is certainly a difference between a misrepresentation relied on and a contractual promise that may be breached. While RMS made a promise to pay certain amounts at the time it entered into the ISA, its intention regarding a future event was subject to change and developing disputes; Pope could not reasonably rely on that promise to create an estoppel. *See* 28 Am.Jur.2d Estoppel & Waiver § 50.

Similarly, Pope has not established that it did in fact reasonably rely to its detriment on the RMS alleged characterization of the Account as an escrow account. Throughout this litigation, Pope has argued that Debtors should be estopped from arguing that the Account is not an

escrow account based on the characterization by RMS during the Arbitration that it was an escrow account. Earlier iterations of the estoppel argument rested on Pope's assertion that the Arbitration Panel decided and declared that the Account was an escrow account and, therefore, Raymond is collaterally estopped from arguing otherwise.

■ Collateral estoppel requires that an actual adjudication of the issue be made in prior litigation. *H–D Michigan, Inc. v. Top Quality Serv.*, 496 F.3d 755, 760 (7th Cir.2007); *In re Consol. Med. Transp., Inc.*, 280 B.R. 633, 639 (Bankr.N.D.Ill. 2002). Such an adjudication was not made. The Arbitration merely provided an accounting of Project costs and a resolution of performance-based disputes between the parties. The Arbitration Panel did not adjudicate whether or not the Account was an escrow account. Therefore, Raymond correctly argues that collateral estoppel does not apply here.

Pope's current equitable estoppel argument is different from its prior version of that argument. Raymond filed a Motion to Strike this new argument as not having been timely raised pre-trial. (Docket No. 373.) However, Pope did raise equitable estoppel in its Pre–Trial Proposed Findings of Fact and Conclusions of Law, (Docket No. 276 ¶¶ 165–68), thereby putting Raymond on notice of the argument.

Nevertheless, Pope has not fulfilled the requirement of demonstrating detrimental reliance. Pope argues that it executed the January 30, 2003 Final Lien Waiver in reliance on RMS' promise in the ISA to pay the $2,808,671. For reasons stated above, this promise might have been breached, but did not constitute an actionable misrepresentation. Further, in executing the January 30, 2003 Final Lien Waiver, Pope could not have relied on any characterizations of the Account as an es-

crow account made by the parties during the Arbitration, because the Arbitration took place three years after execution of the lien waiver.

For the foregoing reasons, Pope's estoppel arguments are all without merit.

VI. *TO THE EXTENT NOT ALLOWED HEREIN, THE INTERVENING COMPLAINT BY NFIC IS NOT SUSTAINED; AND JUDGMENT WILL ENTER AGAINST THE COMMITTEE.*

As part of the payment dispute between RMS and Pope, Pope made a claim on the RMS Payment Bond issued by National Fire Insurance Company of Hartford. (FOF 180.) National Fire Insurance Co. was a party to the Interim Settlement Agreement. (FOF 194.) In its Amended Intervening Complaint for Declaratory Judgment in Count VI of Raymond Professional Group, Inc.'s Amended Complaint, (Docket No. 144), NFIC seeks a:

(B) [F]inding in favor of NFIC and against RPG on Count VI of the RPG Amended Complaint . . .

(C) declaring that any funds in the Account earned by RMS on the Project are dedicated to satisfy obligations of RMS and NFIC under the Payment Bond;

(D) declaring that the funds on deposit in the Account are Assets [sic] of RMS and Pope; [and]

(E) directing J.P. Morgan Chase Bank, N.A. to release the funds in the Account to NFIC to satisfy obligations of RMS and NFIC under the Payment Bond. . . .

National Fire Insurance Co.'s Amended Intervening Complaint included additional factual allegations regarding events and negotiations that occurred between the time Pope made a claim on the RMS Payment Bond and the execution of the ISA.

However, NFIC did not offer any evidence at trial establishing any of those additional facts. Nor has NFIC articulated or briefed a legal basis for the declaratory relief requested in its Amended Intervening Complaint. National Fire Insurance Co.'s counsel was asked to clarify the relief it was seeking within the narrow parameters of the issue to be tried in Count VI, namely, whether or not the Account is an asset of any bankruptcy estate. For example, NFIC prayed that funds on deposit in the Account be declared assets of both RMS and Pope, but it never explained what relief it sought if the funds were found to belong solely to Pope.

In compliance with the Second Amended Final Pre–Trial Order, NFIC filed Pre–Trial Proposed Findings of Facts and Conclusions of Law, (Docket No. 280), wherein NFIC argued that funds in the Account are held in trust for the benefit of Pope under the same section of the Illinois Mechanics Lien Act relied on by Pope. National Fire Insurance Co. adopted arguments in Pope's Post–Trial Proposed Findings of Fact and Conclusions of Law, (Docket No. 358), and Pope's Post–Trial Response Brief. (Docket No. 359.)

National Fire Insurance Co. thereby seeks to have funds in the Account used or applied to satisfy partially the Arbitration Award thereby reducing outstanding amounts that Pope claims under the Payment Bond. Ultimately, it does not care how the Court gets to that result, but has hitched its wagon to Pope's legal theories.

There was some testimony and evidence at trial that Pope and NFIC are litigating NFIC's obligations under the Payment Bond as part of separate litigation in state court. While NFIC requested a declaration that the funds in the Account be used to satisfy the obligations of RMS and NFIC under the Payment Bond, the hold-

ing here that the Account funds are held entirely in trust under the Illinois Mechanics Lien for the benefit of Pope casts in doubt whether the payment bond issue can be decided here. The payment bond issue cannot be resolved as an issue under core jurisdiction. 28 U.S.C. § 157(b).

 Unlike core proceedings, a " "related to" proceeding does not invoke a substantive right created by the Bankruptcy Code...." *The Gourmet Ctr., Inc. v. Fox et al. (In re Sage Enters., Inc.)*, No. 04–A–03014, 2006 WL 1722582, *7 (Apr. 28, 2006). Proceedings "related to" bankruptcy include, "suits between third parties which have an effect on the bankruptcy estate." *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 n. 5, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995) (citing 1 *Collier on Bankr.* ¶ 3.01(1)(c)(iv) (15th ed.1994)). Accordingly, "[t]he bankruptcy court may ... exercise subject matter jurisdiction over civil proceedings which do not involve the debtor as a party, so long as the outcome of such proceedings could affect the assets or liabilities of the debtor's estate." *Churchill Cabinet Co. v. Cont'l Illinois Nat'l Bank & Trust Co. of Chicago (In re Destron, Inc.)*, 38 B.R. 310, 313 (Bankr. N.D.Ill.1984) (additional citations omitted). While the parties here have made tangential reference to disputes between Pope and NFIC, they have not expressly asked the court to exercise jurisdiction over such disputes. If those disputes were directly presented here, the outcome of those issues would not affect the bankruptcy estate directly, and related jurisdiction would not lie to decide them. *Elscint, Inc. v. First Wisconsin Fin. Corp. (Matter of Xonics)*, 813 F.2d 127, 130–32 (7th Cir. 1987) ("That two creditors have an internecine conflict is of no moment, once all disputes about their stakes in the bankrupt's property have been resolved."). Therefore, any remaining disputes be-

tween Pope and NFIC concerning NFIC's obligation under the Payment Bond to satisfy the balance of the Arbitration Award are not within the core or related jurisdiction of the bankruptcy court and cannot be decided here.

Finally, NFIC seeks a declaratory judgment directing J.P. Morgan Chase Bank, N.A. to release the funds in the Account to NFIC. For the reasons stated above, the funds in the Account are found and held to belong to Pope, and therefore NFIC has not established grounds for obtaining those funds. It may be that when Pope obtains those funds that will reduce the Payment bond obligation by NFIC to Pope, but as noted that cannot be decided here. Moreover, neither NFIC nor Pope has sought to join Chase Bank in this litigation, and therefore personal jurisdiction does not lie over the bank except to the extent it is bound by the injunction order freezing the fund. If Chase Bank refuses to release the funds to Pope, Pope will have to institute supplementary proceedings against the bank. All other relief sought in NFIC's Amended Intervening Complaint is denied.

Similarly, the Official Committee of Unsecured Creditors has hitched its wagon to Raymond's arguments. The Committee has been appointed only in the bankruptcy case of Raymond Professional Group, Inc., (06–bk–16748 Docket No. 28), and therefore wants the funds in the Account to be used to satisfy claims of RPG's creditors. By its pleadings and pre– and post–Trial filings, the Committee incorporates and joins in the theories put forth and arguments made by Raymond. The Committee's Amended Intervening Complaint as to Count VI must fail just as the Raymond contentions have failed as to Account ownership.

## CONCLUSION

Pursuant to the foregoing Findings of Fact and Conclusions of Law, counsel for William A. Pope Company shall supply one Final Judgment Order adjudging and declaring relief in accordance with the following rulings:

1. Pope will recover judgment declaring that all funds in the Current Account are held under a statutory trust pursuant to section 21.02 of the Illinois Mechanics Lien Act as to which Pope is sole beneficiary. Therefore, the Current Account and those funds are not property of the bankruptcy estate of either Raymond Professional Group, Inc. or Raymond Management Services Incorporated n/k/a Raymond Professional Group—Design/Build, Inc.;

2. The Initial and Current Accounts are not and were never escrow accounts;

3. The Initial and Current Accounts were always held by RMS and Pope as tenants in common under the foregoing statutory trust subject to accounting and resolution of disputes between those parties that were resolved by Arbitration and by judgment confirming the Arbitration Award which determined that nothing was due to RMS from its contractual relationship with Pope or from the Initial or Current Account;

4. Pope's remaining claims as to constructive trust and resulting trust, and its defense of equitable estoppel are denied, and under the judgment entered hereon Pope will recover nothing by those claims;

5. Raymond Professional Group, Inc. and Raymond Management Services shall each recover nothing by their claims in Count VI;

6. To the extent not granted herein, the remaining claims of National Fire Insurance Company of Hartford are dismissed for lack of subject matter jurisdiction; and

7. Judgment will enter against the Committee of Unsecured Creditors that it will recover nothing by its Intervening Complaint in Count VI.

## APPENDIX: DETAILED FINDINGS OF FACT

### THE PARTIES AND RELATED INDIVIDUALS.

1. The only parties to Count VI of this Adversary proceeding are:

a. Raymond Professional Group, Inc. ("RPG");

b. Raymond Professional Group—Design/Build, Inc. f/k/a Raymond Management Services, Incorporated ("RMS");[1]

c. William A. Pope Company;

d. National Fire Insurance Company of Hartford; and

e. the Committee of Unsecured Creditors. (JFS 1.)

2. Raymond Professional Group, Inc. is an Illinois corporation. (JFS 2.)

3. Raymond Management Services is an Illinois corporation. (JFS 3.)

4. Raymond Management Services performed design-build, EPC turnkey work.[2] (D. Chidley Test. 45:20–25, Dec. 11, 2008.)

5. Raymond Professional Group–A/E, Inc. f/k/a Doyen and Associates Incorporated ("Doyen") is an Illinois corporation. (JFS 4.)

6. Doyen performed professional engineering services in Illinois and other states. (D. Chidley Test. 44:20–25, Dec. 11, 2008.)

7. Raymond Professional Group—Government, Inc. ("RPG Government") is an Illinois corporation. (JFS 5.)

8. Raymond International, Incorporated ("RPG International") is a Delaware corporation. (JFS 6.)

9. Raymond Professional Group—Puerto Rico, Engineering Services PSC ("RPG Puerto Rico") is a Puerto Rico professional services corporation. (JFS 7.)

10. Douglas Chidley is the President of RPG, RMS, Doyen, RPG Government, RPG International, and RPG Puerto Rico. (JFS 9.)

11. Mr. Chidley has a Bachelors of Science degree in civil engineering from the University of Illinois, and a Master's degree in engineering and an MBA from Northwestern University. Mr. Chidley has been a licensed Professional Engineer in Illinois and several other states for approximately thirty years. (D. Chidley Test. 39:11–22, Dec. 11, 2008.) Mr. Chidley worked for Commonwealth Edison ("ComEd") for approximately eighteen years in engineering, construction and op-

---

**1.** Raymond Management Services, Incorporated (here "RMS") changed its corporate name to Raymond Professional Group—Design/Build, Inc. on or about December 28, 2000.

**2.** In a traditional construction project, the project owner retains a professional engineering or architectural firm to design the project and then hires a contractor to construct the project to the design specifications. (D. Chid-ley Test. 54:6–20, Dec. 11, 2008.) As the name suggests, in an EPC, design/build or turnkey model of project delivery the design, engineering and construction functions are combined so that one firm contracts with the owner from start to finish. (*Id.* 56:2–18.) The design/builder may require a number of subcontractors to deliver the final product. (*Id.* 56:20–23.)

erations including four years as the Operations Manager at ComEd's Waukegan power plant. (*Id.* 41:5–13.)

12. In 1988, Mr. Chidley left ComEd in order to purchase Doyen. (*Id.* 42:10–19.) Doyen was a engineering firm that Mr. Chidley grew from a local industrial engineering firm with approximately twenty employees to a power engineering firm with approximately 500 employees. (*Id.* 42:20–43:5.)

13. As Mr. Chidley continued to grow the business through acquisitions and to expand the scope of the business from power generation into government contracting, pharmaceuticals and other industrial engineering projects, Raymond Professional Group was incorporated as a holding company. (*Id.* 43:16–44:6.)

14. Raymond Professional Group is the 100 percent shareholder of RMS, Doyen, RPG Government and RPG International. Raymond Professional Group and RPG Puerto Rico are affiliated through the common ownership of Douglas Chidley, the majority shareholder of each corporation. (*Id.* 46:3–18.)

15. Raymond Professional Group provided shared corporate services for all Debtors, including accounting, finance, project controls, human resources, information technology, marketing, purchasing, risk management, and office administration (the "Shared Services"). (J. Chidley Test. 282:22–283:5, Dec. 12, 2008.) In addition, RPG collected project revenues for all Debtors in a master operating account (the "Operating Account"), which funds were commingled and then used to disburse funds to satisfy the liabilities associated with the Shared Services. (*Id.* 287:19–289:14.) The Operating Account is identified by account number XXXX1462. (Joint Trial Exhibit ("JTEx") 92; J. Chidley Test. 315:5–7, Dec. 12, 2008.)

16. Jean Chidley is the Secretary and Treasurer of RPG, RMS, Doyen, RPG Government, RPG International, and RPG Puerto Rico. (JFS 10.)

17. Mike Dubois was Vice President and General Manager of RMS. (JFS 18, 19.)

18. Mike Dubois left RMS and RPG on or about April 8, 2001. (JFS 20.)

19. Julia Hazekamp is referenced in correspondence as a Financial Analyst for Doyen. (JFS 11.)

20. Schiff Hardin represented RMS in the Arbitration (defined below). (JFS 12.)

21. Schiff Hardin represents RPG and RMS in this Adversary proceeding. (JFS 13.)

22. David Howard, of Schiff Hardin, was counsel for RMS prior to this Adversary proceeding, and now represents RPG and RMS in this Adversary proceeding. (JFS 14.)

23. David Howard, of Schiff Hardin, represented RMS in the Arbitration. (JFS 15.)

24. Mark Friedlander, of Schiff Hardin, represented RMS and RPG prior to this Adversary proceeding. (JFS 16.)

25. Mark Friedlander was counsel for RMS in the Arbitration. (JFS 17.)

26. Raymond Professional Group, RMS, Doyen, RPG Government, RPG International, and RPG Puerto Rico each ceased doing business on May 18, 2005. (JFS 8.)

27. Pope is an Illinois corporation. (JFS 21.)

28. At all relevant times, Pope performed general construction services in Illinois. (JFS 22.)

29. Paul Troyke is the President of Pope. (JFS 23.)

30. Geri Votava is the Vice President and Secretary of Pope. (JFS 24.)

31. As Vice President, Ms. Votava was responsible for Pope's financial matters, including assembling financial information and communicating that information to Mr. Troyke as well as outside accountants and attorneys. (Votava Test. 545:6–546:4, Dec. 16, 2008.)

32. National Fire Insurance Co. is a surety company that issues performance bonds and payment bonds in Illinois. (JFS 25.)

33. AES Medina Valley Cogen, LLC ("AES") is the entity with which RMS entered into an engineering, procurement, construction and start-up contract for a particular type of power plant known as a cogeneration facility in Mossville, Illinois. (JFS 26.)

34. Tom Thomas was Project Manager of AES. (JFS 27.)

35. Mr. Thomas was the on-site AES representative for the Project (defined below). (Troyke Test. 802:1–5, Dec. 17, 2008.)

36. Paul Santos was an employee of AES. (JFS 28.)

37. Baker & McKenzie was counsel for AES. (JFS 29.)

38. James P. O'Brien was one of AES' attorneys at Baker & McKenzie. (JFS 30.)

39. James J. Dries was one of AES' attorneys at Baker & McKenzie. (JFS 31.)

40. The American Arbitration Association is the organization that administered the arbitration between RMS and Pope, No. 51 Y 1100168903 (the "Arbitration"). (JFS 32.)

*AES AND RMS ENTER INTO THE "EPC" CONTRACT FOR ENGINEERING, CONSTRUCTION AND PROCUREMENT SERVICES.*

41. Design and estimating services for the Project (defined below) started in approximately late 1999. (JFS 33.)

42. Mr. Chidley learned about the Project from a former co-worker at ComEd, then working for AES, who asked Mr. Chidley if RMS would be interested in participating as the lead on the Project. (D. Chidley Test. 50:21–51:5, Dec. 11, 2008.)

43. Raymond Management Services obtained the contract for work on the Project through a competitive bidding process. (*Id.* 52:5–11.)

44. A bid proposal was submitted to AES by RMS that was based upon the collective cost estimation of Pope, RMS, and their respective subcontractors and vendors in March 2000. (JFS 34.)

45. Pope participated in a significant amount of engineering, estimating and pricing of equipment components that went into the bid that RMS submitted to AES for the Project. (D. Chidley Test. 53:1–7, Dec. 11, 2008.) Pope participated in RMS' bid in exchange for not having to compete for the construction aspect of the Project should RMS be the successful bidder. (*Id.* 53:4–14.) Pope did not submit a separate bid to AES in connection with the Project. (*Id.* 53:19–20.)

46. On September 12, 2000, RMS entered into a contract with AES (the "EPC Contract") for the engineering, procurement, construction and start-up of a cogeneration facility on certain property in Mossville, Illinois that AES owned or leased (the "Project"). (JFS 39.)[3]

3. A true and correct copy of the EPC Contract, without appendices, is attached as *Ex-*

47. As stated in recital D of the Pope Subcontract (defined below):

With the knowledge and approval of [Pope], RMS has executed [the EPC Contract] to provide design-build and related services for [AES] for the purpose of owning and operating [the Project]. Prior to executing the EPC Contract, RMS and [Pope] had been performing preliminary services for the Project under a letter of intent between RMS and [AES], which has since been superseded and subsumed within the EPC Contract.

(JFS 45; JTEx 2.)

48. Mike Dubois signed the EPC Contract on behalf of RMS. (JFS 41.)

49. Raymond Management Services is defined as the "Contractor" in the EPC Contract. (JTEx 1, 235 at 4.) This is significant because it indicates that RMS, and no one else, is the Contractor for the Project. (D. Chidley Test. 62:1–4, Dec. 11, 2008.)

50. In summary, pursuant to the EPC Contract, RMS promised to AES that for the lump sum price of $34,600,000 RMS would perform all engineering, procurement, start-up and construction services necessary for the Project. (JFS 46.)

51. Raymond Professional Group is not a party to the EPC Contract. (JFS 43.)

52. Raymond Professional Group did not have any contract with AES for the Project. (JFS 72.)

53. Doyen is not a party to the EPC Contract. (JFS 44.)

54. Doyen did not have any contract with AES for the Project. (JFS 69.)

55. Pope is not a party to the EPC Contract. (JFS 42.)

56. Pope did not have any contract with AES for the Project. (JFS 70.)

57. Raymond Management Services contracted that the Project would meet certain performance criteria set forth in the EPC Contract regarding the amount of steam, chilled water and electrical power produced by the Project. (JTEx 1 at ¶ 2.1.9; D. Chidley Test. 66:14–67:7, Dec. 11, 2008.)

58. The EPC Contract incorporates Appendix I which is entitled Commercial Operation Standards, and Appendix O which is entitled Performance Criteria Sheet. (JFS 63.)

59. As a result, the Project had to be tested to demonstrate that it could meet the performance criteria for the amount of steam, chilled water and electric power to be produced by the Facility. (D. Chidley Test. 66:19–67:7, Dec. 11, 2008.)

60. Pursuant to Paragraphs 2.6 and 10.1(a)(iv) of the EPC Contract, RMS guaranteed and warranted to AES that "the Facility will be capable of achieving all of the applicable performance specifications specified in *Appendix O* during each Completed Performance Test used to determine achievement of Final Acceptance (collectively, the '*Performance Criteria*')," and that "the Facility shall achieve the Performance Criteria specified in Appendix O . . . ." (JTEx 1, 235 ¶¶ 2.6, 10.1(a)(iv).)

61. Pursuant to Paragraphs 10.2(a) of the EPC Contract, if AES notified RMS of any Deficiency within the applicable Warranty Period, RMS was obligated, at its

*hibit* 1 to the Complaint dated July 17, 2007, in this adversary proceeding (the "Complaint"). (JFS 40; JTExs 1, 235.)

own cost and expense, to re-perform its work as necessary to correct the Deficiencies, and repair or replace, and obtain and install new Equipment in order to satisfy the scope of Work and/or to achieve the Performance Criteria. (*Id.* ¶ 10.2(a).)

62. The applicable Warranty Period was defined as "the period ending twelve (12) months after the date of Final Acceptance of such Phase . . ." and for the correction of nonconforming or defective work as "the later of (i) the expiration date of the initial Warranty Period . . . or (ii) the date that is twelve (12) months after the date of such correction . . . but in no event later than the date that is twelve (12) months after the date of the initial Warranty Period. . . ." (*Id.* at 12.)

63. The EPC Contract required performance bonds totaling $34,600,000.00. (JFS 47.)

64. The EPC Contract required payment bonds totaling $34,600,000.00. (JFS 49.)

65. On January 11, 2001, RPG, RMS, Doyen and NFIC entered into a General Agreement of Indemnity (the "GAI"). (JFS 74.)

66. Douglas Chidley signed the GAI on behalf of RPG, RMS and Doyen. (JFS 75.)

67. Raymond Professional Group, RMS and Doyen are identified as corporate indemnitors under the GAI. (JFS 76.)

68. On February 15, 2001, NFIC issued performance bond number 929172639 in the penal sum of $12,600,000 for RMS'

work on the Project (the "RMS Performance Bond").[4] (JFS 77.)

69. Jean Chidley signed the RMS Performance Bond on behalf of RMS as its Secretary and Treasurer. (JFS 82.)

70. NFIC issued the RMS Performance Bond in connection with the Project. (JFS 80.)

71. On February 15, 2001, NFIC issued payment bond number 929172639 in the penal sum of $12,600,000 for RMS' work on the Project (the "RMS Payment Bond").[5] (JFS 78.)

72. The RMS Performance Bond and RMS Payment Bond were dated February 15, 2001. (JFS 79.)

73. Jean Chidley signed the RMS Payment Bond on behalf of RMS as its Secretary and Treasurer. (JFS 83.)

74. Raymond Professional Group paid for the RMS Payment Bond, (J. Chidley Test. 363:9–11, Dec. 15, 2008), from the Operating Account. (*See id.* 287:19–289:14, Dec. 12, 2008.)

75. Raymond Professional Group did not execute the RMS Payment Bond. (JFS 89.)

76. NFIC issued the RMS Payment Bond in connection with the Project. (JFS 81.)

77. The RMS Payment Bond identifies RMS as "Contractor". (JFS 84.)

78. The RMS Payment Bond identifies AES as "Owner". (JFS 85.)

79. The RMS Payment Bond identifies NFIC as "Surety". (JFS 86.)

80. The RMS Payment Bond provides at Paragraph 1 that: "The Contractor and

**4.** A true and correct copy of the RMS Performance Bond is attached as *Exhibit 3* to the Complaint. (JFS 90; JTEx 237.)

**5.** A true and correct copy of the RMS Payment Bond is attached as *Exhibit 4* to the Complaint. (JFS 91; JTEx 238.)

the Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to the Owner to pay for labor, materials and equipment furnished for use in the performance of the Construction Contract, which is incorporated herein by reference." (JFS 87.)

81. The RMS Payment Bond provides, at Paragraph 8, that:

> Amounts owed by the Owner to the Contractor under the Construction Contract shall be used for the performance of the Construction Contract and to satisfy claims, if any, under any Construction Performance Bond. By the Contractor furnishing and the Owner accepting this Bond, they agree that all funds earned by the Contractor in the performance of the Construction Contract are dedicated to satisfy obligations of the Contractor and the Surety under this Bond, subject to the Owner's priority to use the funds for the completion of the work.

(JFS 88.)

82. At the time of the Project, RPG's bonding capacity was ten times the value of its business which was approximately $5 million. In other words, RPG had a bonding capacity of $50 million. (J. Chidley Test. 417:15–21, Dec. 15, 2008.) AES was paying for the bonds in addition to the $34.6 million contract price and, therefore, wanted RMS to obtain the bonds as cheaply as possible. Pope could obtain the bonds at a lower rate than RMS and, therefore, AES was willing to accept two

sets of bonds with a combined value of $34.6 million. (*Id.* 417:25–418:14.)

83. The EPC Contract is governed by the laws of the State of Illinois. (JTEx 349 at ¶ 2(c).)

*RAYMOND MANAGEMENT SERVICES AND POPE ENTER INTO THE SUBCONTRACT.*

84. On or about May 1, 2000, AES and RMS agreed in principal to a Letter of Intent (the "LOI") in relation to the engineering, procurement, construction and start-up of a cogeneration facility on certain property in Mossville, Illinois that AES owned or leased. (JFS 35.)

85. Limited purchasing for the Project started in approximately May 2000. (JFS 36.)

86. The LOI was signed on or about July 3, 2000. (JFS 38.) The LOI was between AES and RMS and not between AES and Pope. (Votava Test. 1193:21–1194:4, Dec. 19, 2008.)

87. Construction work on the Project, including work by Pope, began in approximately July 2000. (JFS 37; Votava Test. 979:18–980:7, Dec. 18, 2008.) [6]

88. Pope was a subcontractor of RMS on the Project. (*See generally* JTEx 2.)

89. Raymond Management Services and Pope signed and entered into a Subcontract Agreement, effective September 12, 2000 (the "Subcontract"). (JFS 54.) [7]

90. Mike Dubois signed the Subcontract on behalf RMS. (JFS 55, 56.)

91. Paul Troyke signed the Subcontract on behalf of Pope. (JFS 57, 59.)

---

**6.** There is a minor discrepancy between the stipulated evidence and trial testimony regarding whether construction on the Project began in June or July 2000, but that discrepancy is not relevant to the issues decided.

**7.** A true and correct copy of the Subcontract is attached as *Exhibit 2* to the Complaint. (JFS 66; JTEx 2, 236.)

92. Paul Troyke did not sign the Subcontract until January 2001. (JFS 58.)

93. Raymond Professional Group did not execute the Subcontract. (JFS 67.)

94. Raymond Professional Group did not have any contract with Pope for the Project. (JFS 71.)

95. Raymond Management Services had thirty to forty subcontractors on the Project. (D. Chidley Test. 70:18–22, Dec. 11, 2008.)

96. Doyen was a subcontractor of RMS for the Project. (JFS 68.)

97. Any materials or services that RPG provided for the Project were provided for RMS and Doyen. (JFS 73.)

98. In the Pope Subcontract:

a. "GC" refers to Pope;

b. "RMS" refers to RMS;

c. "Engineer" refers to Doyen; and

d. "Client" refers to AES. (JFS 62.)

99. As of September 12, 2000, Pope was involved in and working on the Project. (D. Chidley Test. 71:14–16, Dec. 11, 2008.)

100. It was the stated intent of the parties under the Subcontract "to discharge and perform, as capably and efficiently as reasonably possible, the obligations of RMS to [AES] in the EPC Contract." (JTEx 2 at ¶ 2.)

101. Paragraph 7 of the Subcontract states:

Payment. The revenues paid to the Project shall be allocated as follows: First, to pay the costs incurred by the Project to third parties; second, to reimburse RMS and [Pope] for their own costs and the time spent by their own personnel on the Project, including costs incurred in the preparation of the proposal;

third, to provide an allowance to each of RMS and [Pope] for the succeeding month's projected expenses; and finally, the remainder shall be divided equally between RMS and [Pope]. Both Parties agree to share openly with the other their costs and the basis for such costs. (For the purposes of this paragraph, Engineer's costs and personnel are treated as RMS's costs and not as those of a third party.) As of December 31, 2000, the Parties will jointly determine and agree to expended project costs and related profitability. In the event that either Party at any time believes that an independent audit of the Project's profitability is warranted, then the Parties agree to engage a firm for this purpose. An escrow account will be established whereby each Party will make appropriate cash contributions that represents [sic] the cash amount collected over and above the agreed to costs. Distributions from the escrow account will made [sic] only with the agreement of the principals of both Parties. RMS issues pay requests to [AES] shortly after the first of each month. [Pope] shall submit to RMS its pay request for a month promptly following the last Friday of the month. The EPC Contract obligates [AES] to pay undisputed amounts within 15 days of receipt of the pay request. The undisputed amounts of [Pope's] pay request will be paid by RMS immediately following receipt of payment from [AES]. [Pope] shall be responsible for providing to RMS all documentation for [Pope's] scope of services that RMS is obligated to provide to [AES] under the EPC Contract.
(JFS 64.)

102. In addition, the Subcontract provides that "[a]ll revenues received by RMS and [Pope] as a result of or having to do

with the Project from insurance companies or other parties shall be shared equally by the Parties after all costs are paid." (*Id.* at ¶ 8.)

103. The Subcontract does not contain a definition of "costs" for the Project. (JFS 61.)

104. The Subcontract incorporates the entire EPC Contract, including appendices. (JFS 60.)

105. Appendix R to the EPC Contract is a list of "project-related activities and the amount that RMS would charge AES for those activities. Included in each line item are at least three things: cost, contingency and profit." (D. Chidley Test. 265:17–266:3, Dec. 12, 2008.)

106. Appendix R does not reflect Pope's cost estimate for its work on the Project. (Votava Test. 1229:6–8, Dec. 19, 2008.) The difference between Appendix R and Pope's internal numbers, (*see* JTEx 292 at R 185185), is that Appendix R includes profit and contingency. (Votava Test. 1230:11–16, Dec. 19, 2008.)

107. According to Mr. Chidley, Pope's budget on a cost basis was between $18 and $19 million. (D. Chidley Test. 266:11–13, Dec. 12, 2008.)

108. On cross-examination, Mr. Chidley testified that the approximate value of the Pope Subcontract pursuant to Appendix R, including profit, was $22,010,000. (*Id.* at 158:12–16, Dec. 11, 2008.)

109. The Fidelity and Deposit Co. of Maryland/Zurich American Insurance Company issued a performance bond number PRF8440339 in the penal sum of $22,000,000 for Pope's work on the Project, with an effective date of September 12, 2000 (the "Pope Performance Bond"). (JFS 48.)

110. The Fidelity and Deposit Co. of Maryland/Zurich American Insurance Company issued a payment bond number PRF8440339 in the penal sum of $22,000,000 for Pope's work on the Project, with an effective date of September 12, 2000 (the "Pope Payment Bond"). (JFS 50.)

111. Mr. Troyke reviewed and was familiar with the EPC Contract and the work that was to be done on the Project as a result of the EPC Contract. (Troyke Test. 743:9–19, Dec. 17, 2008.) Mr. Troyke was familiar with the EPC Contract so that RMS and Pope could divide their respective scope of work under the EPC Contract. (*Id.* 744:2–9.)

112. Paragraphs 3 and 4 of the Pope Subcontract divided, between RMS and Pope, the work to be done pursuant to the EPC Contract. (JTEx 2.) Paragraph 3 states in part: "Of RMS's duties and responsibilities contained in the EPC Contract, those that under this Subcontract are the responsibility of RMS or Engineer, and therefore are not the responsibility of GC, are listed on Exhibit 'A' attached hereto and incorporated herein." (*Id.*) Paragraph 4 states in part: "Of RMS's duties and responsibilities contained in the EPC Contract, those that under this Subcontract are the responsibility of GC are listed on Exhibit 'B' attached hereto and incorporated herein." (*Id.*)

113. Paragraph 5 of the Pope Subcontract states, "Mutual Obligations. Any duties and responsibilities not listed in Exhibit A or Exhibit B shall be the mutual responsibility of RMS, the Engineer and GC." (JTEx 2 at ¶ 5.)

114. Paragraph 8 of the Pope Subcontract states:

*Change Orders.* Through its cost consulting, scheduling, value engineering

and similar preconstruction services, GC has been intimately involved in the design process and the requirements of the EPC Contract, will have fully familiarized itself with the design and its intent, and is aware that the construction documents are being prepared with less detail than would be industry standard for bidding to unaffiliated contractors. During this process, GC will use its best efforts to identify, notify RMS and take steps to resolve any error, omission, inconsistency or ambiguity in the design which might otherwise result in a change order for an extra during construction. RMS shall not agree to a change order regarding the Project without first obtaining GC's approval of same. RMS and GC agree that GC shall be entitled to a change order from RMS only to the extent that RMS would be entitled to a change order from the Client under the EPC Contract. (*Id.* at ¶ 8.)

115. The parties agreed that the Subcontract would be governed by the laws of the State of Illinois. (*Id.* at ¶ 11.)

*THE INITIAL ACCOUNT.*

116. Pursuant to Paragraph 7 of the Subcontract, an escrow account was to be created for the deposit of excess project revenues with distributions made by agreement of the principals of RMS and Pope. (*Id.*)

117. On February 2, 2001, Mr. Chidley met with Mr. Troyke to explain the mechanics of establishing the escrow account called for in the Subcontract. (D. Chidley Test. 85:19–86:10, Dec. 11, 2008.)

118. Mr. Chidley told Mr. Troyke that articles of escrow would have to be drafted explaining RMS' and Pope's intent relative to an escrow account; that there would be an escrow agent fee; and that escrow accounts are not interest bearing. (*Id.*) Mr. Troyke responded that he wanted to obtain the highest possible rate of return on the funds deposited in the account. (*Id.* 88:6–12.) By the end of the meeting, Mr. Chidley and Mr. Troyke agreed to open a commercial checking account requiring the dual signatures of a RMS representative and a Pope representative to disburse funds or make changes to the account. (*Id.* 88:13–21.)

119. In a February 7, 2001 e-mail suggesting that the parties invest excess Project funds in A1P1 commercial paper, Mr. Troyke did not mention the term "escrow," but does repeatedly address his concerns about maximizing the rate of return on invested funds. (JTEx 28; Troyke Test. 815:13–816:5, Dec. 17, 2008.)

120. As of Mr. Troyke's February 7, 2001 email to Mr. Chidley, Pope had already begun work on the Project and Mr. Troyke had already signed the Pope Subcontract. (*Id.* 814:19–815:7.)

121. As of February 7, 2001, the Initial Account had not yet been opened. (*Id.* 815:8–12.)

122. In February 2001, an account at American National Bank & Trust Company ("ANB") bearing account number XXXXXX7555 was established (the "Initial Account"). (JFS 92.)

123. The Initial Account was established pursuant to the Pope Subcontract. (JFS 93.)

124. Mr. Troyke was informed by Mr. Dubois that the type of account into which funds would be deposited was referred to as a "control account." (Troyke Test. 812:3–9, Dec. 17, 2008.) The only control that Mr. Troyke understood to be on the Initial Account was the dual signatory re-

quirement for withdrawals or changes to the Account. (*Id.* 813:18–814:16.)

125. The Initial Account was entitled the "Raymond Professional Group Inc/ Pope Acct." (JFS 94.)

126. On February 20, 2001, Geri Votava sent a letter to Jim Walkington (the "Votava February 20, 2001 Letter"). (JFS 97.) [8]

127. Pope enclosed with the Votava February 20, 2001 Letter a signed signature card for the Initial Account (the "Initial Account Signature Card"). (JFS 99.) [9]

128. Paul Troyke signed the Initial Account Signature Card. (JFS 103.)

129. Mr. Troyke saw the Initial Account Signature Card before he signed it. (Troyke Test. 819:18–821:21., Dec. 17, 2008.)

130. At the time Paul Troyke signed the Initial Account Signature Card, Paul Troyke had been and was a director of First Northwest Bank. (JFS 105.)

131. In addition, Mr. Troyke was an organizer of two of the banks for which he served as a director. (Troyke Test. 733:1–3, Dec. 17, 2008.)

132. At the time Paul Troyke signed the Initial Account Signature Card, the account number, title and taxpayer identification number were blank. (JFS 106.)

133. On February 26, 2001, RMS faxed to ANB: (a) a Treasury Management Service Agreement signed by Jean Chidley as the authorized representative for the Initial Account; (b) a copy of the Executed Initial Account Signature Care; [10] and (c) a W–9 Form containing RPG's taxpayer identification number. (JTEx 266 at R 078372, 078375, 078377–78.)

134. The Executed Initial Account Signature Card identifies the "Account Number" as XXXXXX7555. (JFS 113.)

135. The Executed Initial Account Signature Card identifies the "Account Title" as "Raymond Professional Group Inc/Pope Acct.". (JFS 114.)

136. Jean Chidley is the only person that has ever been identified as an authorized representative for the Initial Account. (JFS 304.)

137. From the time the Initial Account was opened, Ms. Votava knew that nobody from Pope was identified as an authorized representative for the Initial Account. (Votava Test. 546:17–21, Dec. 16, 2008.)

138. Nobody at Pope has been identified as an authorized representative for the Initial Account. (JFS 305.)

139. The Executed Initial Account Signature Card identifies the Taxpayer ID Number as "36–3869389". (JFS 115.)

---

**8.** A true and correct copy of the Votava February 20, 2001 Letter is attached as *Exhibit 5* to the Complaint as the page that is Bates labeled 072745. (JFS 98; JTEx 239.)

**9.** A true and correct copy of the Initial Account Signature Card is attached to the Complaint as the pages that are Bates labeled 072746 and 072747 of *Exhibit 5* to the Complaint. (JFS 101; JTEx 239.)

**10.** Attached as *Exhibit 6* to the Complaint is a true and correct copy of the Initial Account Signature Card in the form that was sent to

ANB (the "Executed Initial Account Signature Card"). (JFS 112; JTEx 23, 240.) The Executed Initial Account Signature Card is Bates numbered 072751. (JFS 118.) Relative to the Bates number 072751 that appears on *Exhibit 6* of the Complaint Pope applied Bates number 072751 to *Exhibit 6*. (JFS 119; JTEx 23, 240.) Relative to the Bates number 072751 that appears on *Exhibit 6* of the Complaint, Pope applied the Bates number to *Exhibit 6* of the Complaint in connection with Pope's production of Pope's documents in the Arbitration. (JFS 120; JTEx 23, 240.)

140. From September 12, 2000 through the date of the Complaint, RPG's taxpayer identification number has been 36–3869389. (JFS 116.)

141. Pope's taxpayer identification number has never been 36–3869389. (JFS 117.)

142. Pope's tax ID number has never been associated with the Initial Account. (JFS 302.)

143. Pope enclosed with the Votava February 20, 2001 Letter a signed letter of direction for the Initial Account (the "Initial Account Letter of Direction"). (JFS 100.) [11]

144. Paul Troyke signed the Initial Account Letter of Direction. (JFS 104.)

145. At the time Paul Troyke signed the Initial Account Letter of Direction, the account number, title and taxpayer identification number were blank. (JFS 107.)

146. Bank documents associated with the Initial Account indicate that both Paul Troyke's and Douglas Chidley's signatures were required to withdraw any funds from the Initial Account. (JFS 95.)

147. Bank documents associated with the Initial Account indicate that both Paul Troyke's and Douglas Chidley's signatures were required to make any changes to the Initial Account. (JFS 96.)

148. Pope received copies of bank statements for the Initial Account from one of the Debtors and/or Jean Chidley prior to March 12, 2003. (JFS 121.)

149. Pope did not receive copies of bank statements for the Initial Account directly from ANB. (JFS 122.)

150. At the time Paul Troyke signed the Initial Account Signature Card, Pope was not in possession of any documents originating from ANB consisting of articles of escrow for the Initial Account. (JFS 108.)

151. At the time Paul Troyke signed the Initial Account Signature Card, Pope was not in possession of any documents originating from ANB identifying an escrow agent for the Initial Account. (JFS 109.)

152. At all times after Paul Troyke signed the Initial Account Signature Card, Pope has not been in possession of any documents originating from ANB consisting of articles of escrow for the Initial Account. (JFS 110.)

153. At all times after Paul Troyke signed the Initial Account Signature Card, Pope has not been in possession of any documents originating from ANB that identify any terms of escrow for the Initial Account. (JFS 111.)

154. Pope is not in possession of any documents originating from ANB that contain the term "escrow" concerning the Initial Account. (JFS 298.)

*ACCOUNTING AND PERFORMANCE–RELATED DISPUTES ARISE BE-TWEEN RMS AND POPE.*

155. Raymond Management Services submitted invoices to AES for work on the Project that was performed by RMS, Doyen, Pope, subcontractors and vendors of RMS other than Pope, and subcontractors and vendors of Pope. (JFS 51.)

156. Generally invoices submitted to AES for the Project by RMS state "Please remit payments to: Raymond Manage-

---

**11.** A true and correct copy the Initial Account Letter of Direction is attached to the Complaint as the pages that are Bates labels 072748 and 072749 of *Exhibit 5* of the Complaint. (JFS 102; JTEx 239.)

ment Services, Incorporated at 310009 Network Place, Chicago, IL 60673–1310." (JFS 52.)

157. Raymond Professional Group did not submit any invoices directly to AES for work it performed on the Project. (JFS 53.)

158. From the beginning of the Project, there were disputes between RMS and Pope regarding whether or not Pope's invoices to RMS were on a cost basis or included profit. (D. Chidley Test. 266:14–24, Dec. 12, 2008.)

159. From June through August of 2000, Pope submitted invoices to RMS for payment by AES under the LOI which was in accord with the EPC Contract, Exhibit B. Pope's June through August invoices were billed at cost. From September 2000, when the EPC Contract was signed, through December 2000, Pope submitted invoices to RMS in accordance with the EPC Contract, Appendix R values. (Votava Test. 980:8–19, Dec. 12, 2008.)

160. Pursuant to Paragraph 7 of the Subcontract, RMS and Pope would "jointly determine and agree to expended project costs and related profitability" of the Project as of December 31, 2000. (JTEx 2 at ¶ 7.)

161. Ms. Votava testified that the meeting between RMS and Pope called for in Paragraph 7 was held sometime during January 2001. (*See* Votava Test. 980:23–25, Dec. 18, 2008.)

162. In February 2001, $2,134,930 was deposited into the Initial Account (the "$2,134,930 Deposit"). (JFS 123.)

163. The February 28, 2001 Statement identifies the Initial Account as the "Ray-

mond Professional Group Inc/Pope Acct.". (JFS 126.) [12]

164. The February 28, 2001 Statement identifies the Initial Account as a "Commercial Checking" account. (JTEx 241.)

165. The February 28, 2001 Statement reflects the $2,134,930 Deposit. (JFS 127.)

166. The $2,134,930 Deposit was comprised of $775,000 that was deposited via an online internal transfer on February 22, 2001, and $1,359,930 that was deposited via an online internal transfer on February 28, 2001. (JFS 124.)

167. The $2,134,930 Deposit came from monies received by RMS from AES that had been deposited in the RPG Operating Account. (J. Chidley Test. 313:1–317:3, Dec. 12, 2008.) However, pursuant to the Profitability Report as of February 23, 2001, the $2,134,930 Deposit represents the total "Profitability (Excess Cash)" as of December 31, 2000 ($773,896), and January 31, 2001 ($1,361,034). (JTEx 36, 38.)

168. Ms. Votava testified that during the January 2001 meeting between RMS and Pope pursuant to Paragraph 7 "there was an agreement that both parties would bill at cost." (Votava Test. 980:23–25, Dec. 12, 2008.)

169. However, Ms. Votava testified further that for at least January and February of 2001, Pope continued to bill "both ways," billing in accordance with Appendix R but "book[ing] only the invoice that was at cost." (*Id.* 980:25–981:4.)

170. On February 2, 2001, Pope submitted Invoice No. 7659 to RMS for work on the Project through January 26, 2001. (JTEx 292 at R 185178.)

12. A true and correct copy of a February 28, 2001 statement for the Initial Account is attached as *Exhibit* 7 to the Complaint (the "February 28, 2001 Statement"). (JFS 125; JTEx 241.)

171. According to a handwritten notation on the invoice the "TOTAL AMOUNT DUE THIS INVOICE $2,733,287.88" was "[b]illed to AES but only paid Pope $1,814,325.47...." (*Id.*) This $1,814,325.47 payment is reflected on the AES Medina Valley Project Cash Flow Demonstrative Aid. (JTEx 211.) [13]

172. As of January 29, 2001, Pope's Project Cost Report attached to Invoice No. 7659 included a Client Approved Budget of $20,945,782. (JTEx 292 at R 185185.)

173. On March 23, 2001, Raymond paid Pope $1,690,471.78 for Pope's February 2001 Invoice. (JTEx 211.)

174. According to the Sworn Statement for Contractor to Owner dated March 6, 2001, and submitted by RMS to AES in connection with RMS' February 2001 pay request, Pope's Balance to Complete was $3,198,057.34 (the "March 6, 2001 Sworn Statement"). (JTEx 42 at R181264.)

175. From March 2001 to September 2001, RMS continued submitting invoices on the Project to AES for work performed by, *inter alia,* Pope and Pope's subcontractors. (JFS 129; JTEx 211.)

176. In fact, pursuant to invoices submitted by RMS to AES for March and April 2001, RMS received over $6 million from AES ($3,581,591 on April 13, and $2,511,661 on May 24). (JTEx 211.)

177. AES paid the RMS billings for March and April 2001, which was for work performed by RMS, Pope and others. (JFS 128.)

178. However, RMS stopped remitting payment to Pope for Pope's work after March 2001. (JTEx 211.)

179. On May 3, 2001, RMS notified Pope that RMS:

[D]isputes the amount of [Pope's] ... last invoice and has suffered yet unquantified damages, corrective work and backcharges for schedule delays as a result of Pope's failure to perform in accordance with the Subcontract Agreement dated September 12, 2002[sic]. As a result, we are placing Pope's invoices in dispute and will not be remitting payment in response to your current invoice or future invoices until the invoice has been properly verified and our damages have been properly quantified.

(JTEx 47.)

180. On May 23, 2001, Pope made a claim on the RMS Payment Bond. (JFS 130.)

181. On June 19, 2001, Pope executed a Notice of Claim of Subcontractor, 770 ILCS 60/24 (the "Pope Notice"). (JFS 131.) [14]

---

**13.** Joint Trial Exhibit 211 is a demonstrative exhibit created by Mrs. Chidley in connection with the Arbitration. It reflects (1) amounts invoiced by RMS to AES; (2) amounts received by RMS from AES, and the account in which those amounts were deposited; (3) deposits into the Initial Account; (4) amounts invoiced by Pope to RMS; (5) amounts paid to Pope and from what account those amounts were paid; and (6) amounts paid to Pope subcontractors and from what account those amounts were paid. The Exhibit covers the period from February 28, 2001 to March 3, 2003. As used in the Arbitration, the Exhibit does not purport to reflect the accuracy of the Project costs invoiced by Pope. (J. Chidley Test. 528:5–10, Dec. 15, 2008.) However, the parties concede that the Exhibit accurately reflects the amount of those invoices and other cash contributions and distributions made during the Project. (*Id.* 309:7–9, Dec. 12, 2008; Votava Test. 1015:12–1016:9, Dec. 18, 2008.)

**14.** A true and correct copy of the Pope Notice is attached as *Exhibit 8* to the Complaint. (JFS 132; JTEx 56, 242.)

182. On June 21, 2001, Pope's counsel sent a letter to AES' counsel (the "June 21, 2001 Letter"). (JFS 133.) [15]

183. The June 21, 2001 Letter enclosed a copy of the Pope Notice. (JFS 135.)

184. From June 2001 through October 3, 2001 AES withheld payment for RMS' invoices covering work performed in May 2001. (JFS 136.)

185. The RMS invoice for May 2001 work was $1,201,530.00. (JFS 137.)

*THE INTERIM SETTLEMENT AGREEMENT AND SEPTEMBER 2001 LIEN WAIVERS.*

186. On September 18, 2001, Pope executed a document entitled "CONTRACTOR'S PARTIAL WAIVER OF LIEN FOR WORK PERFORMED THROUGH DATE OF WAIVER OF LIEN [H2]" (the "September 18, 2001 Partial Lien Waiver").[16] (JFS 138.) [17]

187. On September 18, 2001, Pope prepared the September 18, 2001 Partial Lien Waiver. (JFS 139.)

188. Paul Troyke signed the September 18, 2001 Partial Lien Waiver. (JFS 143.)

189. Paul Troyke signed the September 18, 2001 Partial Lien Waiver on behalf of Pope. (JFS 144.)

190. Paul Troyke attested to the statements made in the September 18, 2001 Partial Lien Waiver before Pope's corporate secretary, Geri Votava. (JFS 145.)

191. Pope gave RMS the September 18, 2001 Partial Lien Waiver on or about September 26, 2001. (JFS 140.)

192. Pope gave the September 18, 2001 Partial Lien Waiver to RMS to be delivered to AES to effectuate the release of Project funds by AES. (JFS 141.)

193. By September 18, 2001, all of the $16,846,016.32 described in Pope's September 18, 2001 Partial Lien Waiver had been paid. (JFS 146.)

194. On September 26, 2001, RMS, Pope and NFIC entered into an Interim Settlement Agreement (the "ISA"). (JFS 147.) [18]

195. RPG did not execute the ISA. (JFS 149.)

196. The term "Raymond" in the ISA refers to RMS. (JFS 150.)

197. Recital B of the ISA states that: "Raymond and Pope have established a

---

**15.** A true and correct copy of the June 21, 2001 Letter is attached as *Exhibit 9* to the Complaint. (JFS 134; JTEx 77, 243.)

**16.** The September 18, 2001 Partial Lien Waiver is referred to as an accumulative lien waiver. To determine how much a party was paid on an accumulative waiver, one compares the amount on the waiver to the amount on the waiver that immediately preceded it, and the difference is the amount of the current payment. (J. Chidley Test. 421:14–20, Dec. 15, 2008.) In other words, Pope was not given a check for $16,846,165.32 in connection with the September 18, 2001 Partial Lien Waiver. (Votava Test. 572:4–8, Dec. 16, 2008.) The $16,846,165.32 identified in the September

18, 2001 Partial Lien Waiver is the total amount that had been paid to Pope on the Project through the date of September 18, 2001. (*Id.* 573:13–16, 574:10–11, and 575:1–3.) Pope, and its subcontractors, used accumulative waivers on the Project. (J. Chidley Test. 427:17–19 and 431:6–8, Dec. 15, 2008.)

**17.** A true and correct copy of the September 18, 2001 Partial Lien Waiver is attached as *Exhibit 10* to the Complaint. (JFS 142; JTEx 77.)

**18.** A true and correct copy of the ISA is attached as *Exhibit 11* to the Complaint. (JFS 148; JTEx 85, 245.)

bank account number [XXXXXX7555] (the 'Account') to which both are necessary signatories and from which funds can be withdrawn only by mutual consent." (JFS 151.)

198. Recital C of the ISA states that: "Certain disputes have developed between Raymond and Pope regarding various events and accounting issues that have arisen during the Project." (JFS 152.)

199. Recital D of the ISA states that:

As a consequence of the disputes over these events and accounting issues, Pope has sent a Notice of Claim of Subcontractor dated June 21, 2001 to the owner of the Project, Raymond has withheld certain funds otherwise owed to Pope, and Pope has asserted a claim against Raymond's payment bond surety, CNA. (JTEx 85.)

200. Paragraph 1 of the ISA states that:

Raymond agrees to deposit the sum of $371,352.41 from its own funds into the Account immediately, and to pay from its own funds the sum of $310,931.09 to PPG, and $67,716.50 to Bodycote Taussig Inc., third party subcontractors of Raymond with respect to the Project, or produce to Pope proof of recent payments to these subcontractors in said amounts. (JFS 153.)

201. Paragraph 2 of the ISA states that:

Raymond agrees to deposit the additional sum of $500,000 from its own funds in the Account within 60 days from the execution of this Agreement, except that if Raymond reasonably demonstrate to Pope that it does not have the funds or credit to make this payment by the deadline set forth above, then the dead-line for this deposit shall be extended an additional 60 days. (JFS 154.)

202. Paragraph 3 of the ISA states that:

Immediately upon the deposit and payment described in Paragraph 1 above, Pope agrees to execute and deliver to Raymond a document in a form reasonably acceptable to both parties and AES Medina Valley Cogen, L.L.C. releasing the lien claim asserted by Pope as described above. This document shall not be delivered to AES Medina Valley Cogen, L.L.C. until such time as Raymond delivers its final waiver on the Project to AES Medina Cogen, L.L.C. Provided that Raymond performs in accordance with this Agreement, Pope agrees not to file or assert any further mechanic's liens pertaining to or arising out of the Project. Raymond, Pope and CNA agree that Pope will rely on Raymond's payment bond to secure any further payments owed to Pope or its subcontractors for the Project. CNA hereby agrees to waive any and all defenses relative to Pope's payment bond claim or claims that arise or may arise in connection with or by virtue of the acts and undertakings of Pope as provided for in this Interim Settlement Agreement, except as provided for this Paragraph, CNA continues to reserve all other rights it may have including but not limited to the right to dispute that Pope is a proper claimant under Raymond's payment bond. (JFS 155.)

203. Paragraph 4 of the ISA states that: "Raymond and Pope agree that Raymond shall deposit all future revenue received for the Project from any source into the Account." (JFS 156.)

204. Paragraph 5 of the ISA states that:

> Raymond and Pope agree that the first priority for disbursing funds from the Account shall be to pay all of Pope's third-party costs for subcontractors, vendors and other suppliers. Immediately upon execution of this Agreement, Raymond shall issue checks from the Account in payment of the aforesaid costs. If insufficient funds are available to pay these costs, any remaining balance due shall be paid promptly after and to the extent additional funds are received into the Account. These payments shall be made prior to any other payment or distribution from the Account.

(JTEx 85.)

205. Paragraph 6 of the ISA states that:

> Raymond and Pope agree that the second priority for disbursing funds from the Account shall be to pay Raymond third-party subcontractors, vendors and other suppliers, except that neither Pope nor Raymond Professional Group, Inc., or any of its subsidiaries, or affiliates, shall be considered a subcontractor of Raymond for the purposes of the disbursements described in this paragraph. Raymond and Pope shall actively cooperate with each other to minimize and to facilitate the disbursements to subcontractors described in Paragraphs 5 and 6.

(JFS 157.)

206. Paragraph 7 of the ISA states that:

> Pope shall be paid $2,808,671 from the Account after the payments described in Paragraph 5 above [payments for third-party costs for subcontractors, vendors and other suppliers]. If insufficient funds are available to pay this sum, then payment shall be made to the extent that funds are available, with any remaining balance to be paid promptly after and to the extent additional funds are received into the Account. This payment shall be made to Pope prior to any payment or other distribution to [RPG] or any of its subsidiaries or affiliates.

(JFS 158.)

207. The $2,808,671 described in Paragraph 7 of the ISA includes an estimate of $240,000 for Pope's June 2001 invoice. (Votava Test. 1205:2–25, Dec. 19, 2008.)

208. Paragraph 8 of the ISA calls for the payment of Pope's actual costs for June through August 2001. (JTEx 85 ¶ 8.)

209. The actual amount of Pope's June 2001 invoice was $311,353. (Votava Test. 1210:7–16, Dec. 19, 2008.)

210. Ms. Votava testified that if Pope were paid $2,808,671 pursuant to Paragraph 7 of the ISA and $311,353 pursuant to Paragraph 8 of the ISA, that would result in Pope being paid both for the estimated June invoice and the actual June invoice. (*Id.* at 1211:13–21.)

211. Ms. Votava conceded that it would be improper for Pope to receive payment for the $240,000 estimated June 2001 invoice and $311,353 for the actual June 2001 invoice. (*Id.* at 1210:17–24.) However, Ms. Votava testified further that Pope was not paid for both these amounts. (*Id.*)

212. According to Ms. Votava, at the time the ISA was signed, Pope was owed more than the $2.8 million described in Paragraph 7 of the ISA. (*Id.* at 1211:8–9.)

213. Paragraph 9 of the ISA states, in part, that:

> a. "Raymond has withheld $50,000 and hereby agrees that it will pay or credit the sum of $50,000 to Pope, less any sum that is not a Pope

Project cost under the [Subcontract] for small tools utilized on the Project as invoiced . . . .

b. "Raymond has withheld $125,000 and hereby agrees that it will pay or credit the sum of $125,000 to Pope, less any sum that is not a Pope Project cost under the [Subcontract] for the use and rental of Pope owned equipment on the Project as invoiced . . . .

c. "Raymond has withheld $98,000 and hereby agrees that it will pay or credit the sum of $98,000 to Pope when Pope produces @ 40–50 purchase orders for pipe, valves and fitting totaling @ $700,000, and when Pope and Raymond complete the on-site verification that the material on these purchase orders has been installed . . . .

d. "Raymond has withheld $42,000 and hereby agrees that it will pay or credit the sum of $42,000 to Pope when Pope produces its bid documents that verify pipe fabrication materials . . . .

e. "Raymond has withheld $171,000 and hereby agrees that it will pay or credit the sum of $171,000 to Pope upon verification of the multiplier of 1.9 for home office personnel and costs . . . .

f. "This payment shall be made to Pope prior to any payment or other distribution to [RPG], or any of its subsidiaries and affiliates."

(JFS 159.)

214. Paragraph 10 of the ISA states:

In addition to the disputes outline in Paragraph 8, Raymond disputes Pope's entitlement to and quantification of labor costs claimed by Pope for re-welding work and overtime labor costs claimed by Pope to enclose the Project site building. Also, Raymond disputes Pope's quantification and verification of its own labor costs for the Project. Pope disputes Raymond's quantification and verification of Raymond's total Project costs. By this Agreement, neither party is waiving any rights, claims, or causes of action that it may have against the other, the parties' sureties, or otherwise for any such claims arising out that [sic] party's performance of its duties and obligation under the [Pope] Subcontract.

(JFS 160.)

215. Paragraph 11 of the ISA states:

The Project accounting with [AES] has not yet been finalized, and the parties do not yet know whether there will be a profit or loss for this Project. Since the [Pope] Subcontract call for the parties to pay third-party costs first, and to share in profits and losses equally, any payments that either party is agreeing to make to the other under this Agreement may be modified or may be required to be returned in order to effectuate the parties' agreement to share profits and losses.

(JFS 161.)

216. Paragraph 14 of the ISA states that: "Pope invoices for work performed subsequent to August 31, 2001 will be paid or credited pursuant to the terms and conditions of the [Pope] Subcontract and this Agreement." (JFS 162.)

217. Paul Troyke signed the September 26, 2001 Lien Waiver. (JFS 165.) [19]

19. A true and correct copy of "APPENDIX H–3 FORM OF SUBCONTRACTOR'S FINAL WAIVER AND RELEASE SUBCONTRAC-TOR'S FINAL WAIVER OF LIEN AND RELEASE" dated September 26, 2001 (the "September 26, 2001 Final Lien Waiver") is

218. Paul Troyke signed the September 26, 2001 Lien Waiver on behalf of Pope. (JFS 166.)

219. Pope executed the September 26, 2001 Lien Waiver pursuant to Paragraph 3 of the ISA. (J. Chidley Test. 403:20–404:4, 406:8–11 and 407:6–24, Dec. 15, 2008.)

220. Paul Troyke attested to the statements made in the September 26, 2001 Lien Waiver before Pope's corporate secretary, Geri Votava. (JFS 167.)

221. Pope gave RMS the September 26, 2001 Lien Waiver on or about September 27, 2001. (JFS 164.)

222. Pope requested that the September 26, 2001 Lien Waiver be held in trust. (Votava Test. 593:24–594:8, Dec. 16, 2008.)

223. The September 26, 2001 Lien Waiver states:

> NOW, THEREFORE, the Subcontractor, for and in consideration of the sum of $17,151,135.03 [amount of payment] Dollars, and other good and valuable considerations, the receipt of which is hereby acknowledged by the Subcontractor, but subject to the conditions and exceptions set forth below, does hereby waive and release any and all lien or claim or right under the Statutes of the Statement [sic] of Illinois relating to mechanics' [sic] liens, with respect to material, fixtures, apparatus or machinery furnished, and on the moneys or other considerations due or to become due from the Owner, on account of labor, services, material, fixtures, apparatus or machinery, furnished by the Subcontractor heretofore or which may hereafter be furnished by the Subcontractor, to or on account of the said Contractor of the said Owner, for the above-described

attached as *Exhibit 12* to the Complaint.

> Premises, and any claims, causes of action or liabilities against Contractor or Owner arising out of any of the foregoing, excepting only claims previously asserted against Owner or claims for which a limitations period under a statute has not yet commenced.
>
> This waiver and release is expressly conditioned upon the undersigned's receipt of the aforementioned sum and shall be null and void if said sum is not fully received. Further, this waiver and release does not waive or release the undersigned's claim for any retainage withheld for not-yet-completed punch list work nor for any sums owed for the work which is the subject of the pending but not-yet-resolved change order requests.

(JTEx 88, 246.)

224. As of September 26, 2001, all of the $17,151,135.03 described in Pope's September 26, 2001 Lien Waiver had been paid. (JFS 172.)

225. The September 18, 2001 Partial Lien Waiver is the lien waiver that immediately preceded the September 26, 2001 Lien Waiver. (Votava Test. 570:25–571:4, Dec. 16, 2008.)

226. On September 26, 2001, $305,118.71 was paid to Pope's subcontractors from the Initial Account with checks signed by both Douglas Chidley and Paul Troyke (the "$305,118.71 Payment"). (JFS 168.)

227. The $17,151,135.03 described in Pope's September 26, 2001 Lien Waiver consists of the $16,846,016.32 that had been paid pursuant to Pope's September 18, 2001 Partial Lien Waiver plus the $305,118.71 Payment. (JFS 171.)

(JFS 163; JTEx 88, 246.)

228. The $305,118.71 Payment was for work performed on the Project by Pope's subcontractors pursuant to their subcontracts with Pope. (JFS 169.)

229. The $305,118.71 Payment was made for amounts that Pope owed to Pope's subcontractors and that Pope claimed RMS owed to Pope. (JFS 170.)

230. All but one of Pope's subcontractors who performed work on the Project have been paid in full pursuant to paragraph 5 of the ISA, and Pope is presently engaged in a dispute with the one unpaid Pope subcontractor, Psychrometric. (JFS 286.)

231. The $305,118.71 Payment reduced Pope's obligations to Pope's subcontractors for the Project. (Votava Test. 1241:11–16, Dec. 19, 2008.)

232. On or about March 5, 2003, Pope prepared a document entitled "MEDINA–RECAP OF ESCROW ACCOUNT PAYMENTS TO POPE & RPG" (the "Pope Recap"). (JFS 202.) [20]

233. The Pope Recap reflects the $305,118.71 Payment. (JFS 204.)

234. Pope has not returned the $305,118.71 Payment back to RMS. (J. Chidley Test. 409:15–19, Dec. 15, 2008; Votava Test. 579:4–6, Dec. 16, 2008.)

235. On September 27, 2001, $371,352.41 was deposited into the Initial Account (the "$371,352.41 Deposit"). (JFS 174.)

236. The $371,352.41 Deposit was made pursuant to paragraph 1 of the ISA. (JFS 175.)

237. The Pope Recap reflects the $371,352.41 Deposit. (JFS 205.)

238. The Pope Recap refers to the $371,352.41 Deposit as an "RPG Deposit". (JFS 206.)

239. However, Ms. Votava testified that as used in the Pope Recap, RPG refers to Raymond Professional Group—Design/Build, Inc. (Votava Test. 584:14–22, Dec. 16, 2008.)

240. An Online Internal Transfer confirmation dated September 21, 2001 reflects that the $371,352.41 Deposit was debited from the RPG Operating Account. (JTEx 92.)

241. However, pursuant to the ISA, "Raymond" is a defined term that refers to Raymond Management Services. (JTEx 85 at 1.) Therefore, when Paragraph 1 of the ISA refers to the $371,352.41 Deposit coming from Raymond's own funds, it refers to RMS.

242. The September 26, 2001 Lien Waiver contains language suggested by Mark Friedlander. (JFS 173.)

243. The last paragraph of the September 26, 2001 Lien Waiver provides in part that: "Further, this waiver and release does not waive or release the undersigned's claim for any retainage withheld for not-yet-completed punchlist work nor for any sums owed for the work which is the subject of the pending but not-yet-resolved change order requests." (JTEx 88.)

244. The last paragraph of the September 26, 2001 Lien Waiver was drafted by RMS' attorney Mark Friedlander. (JTEx 93; Votava Test. 1235:16–25, Dec. 19, 2008.)

245. On October 1, 2001, AES' counsel James P. O'Brien sent a letter by facsimile

---

20. A true and correct copy of the Pope Recap is attached as *Exhibit 17* to the Complaint.

(JFS 203; JTEx 175, 251.)

to Mr. Friedlander acknowledging AES' receipt of the September 26, 2001 Lien Waiver. (JTEx 95.) According to the letter, "the Lien Waiver is insufficient and defective." (*Id.*) AES objected to the accumulative nature of the September 26, 2001 Lien Waiver, as well as the fact that it excepted claims for retainage, punch list work and scope change requests. (*Id.*)

246. On October 2, 2001, Mr. Friedlander sent an email to Pope requesting that Pope submit a revised lien waiver for "the amount that Pope is seeking to have paid in THIS pay request. . . ." (JTEx 99.)

247. Raymond Management Services never advised Pope that the September 26, 2001 Lien Waiver was not acceptable to RMS. (D. Chidley Test. 113:8–10, Dec. 11, 2008; J. Chidley Test. 408:1–5, Dec. 15, 2008.)

248. Also on October 2, 2001, Mr. Friedlander sent a letter to Mr. O'Brien indicating that Pope would be submitting a revised lien waiver, but disagreeing with AES' position that the September 26, 2001 Lien Waiver was defective because it excepted retainage, punch list work, and scope change requests. (JTEx 96.) In support of RMS' position, Mr. Friedlander cited to Section 2.1.22.2 of the EPC Contract as well as general notions of fairness and reasonableness. (*Id.*) According to Mr. Friedlander:

> Just logically, Jim, it is unfair and unreasonable for AES to request that the Lien Waivers be final and absolute, without exception, because they are not being exchanged for final payment. You desire to receive Final Lien Waivers despite continuing to withhold some of the retainage and the payments due for change orders. It is not reasonable to ask the subcontractors or Raymond to give up their lien rights for these funds still being withheld. In the typical construction project, final, unconditioned waivers of lien are exchanged for the final payment, not for a second– or third-to-last payment.

(*Id.*) Thus, RMS asserted that AES' "improper rejection of the Lien Waiver form in violation of Section 2.1.22.2 of the EPC Contract" was a breach of that Contract. (*Id.*)

249. At trial, Mr. Friedlander testified that subsequent to his sending the October 2, 2001 letter, he had a telephone conversation with Mr. O'Brien in which Mr. Friedlander ultimately persuaded Mr. O'Brien to accept the September 26, 2001 Lien Waiver on behalf of AES. (Friedlander Test. 1681:25–1682:5, Jan. 15, 2009.)

250. However, Mr. O'Brien testified that "AES did not accept [the September 26, 2001 Lien Waiver]." (O'Brien Test. 1288:1–5, Jan. 13, 2009.) Nevertheless, on October 3 and October 12, 2001, AES made three payments totaling $1,815,917.00, an amount that corresponds to the total amount of RMS' invoices for May through July 2001. (JTEx 211.)

251. The $1,201,530 that AES paid RMS for the May 2001 invoice was first deposited into the Operating Account and then, from the Operating Account, $1,201,530 was transferred into the Initial Account by an online internal transfer on October 4, 2001. (JTEx 103.)

252. On September 27, 2001, Pope's counsel sent a letter to AES' counsel (the "September 27, 2001 Letter"). (JFS 176.) [21]

21. A true and correct copy of the September 27, 2001 Letter is attached as *Exhibit 13* to the Complaint. (JFS 177; JTEx 89.)

253. The September 27, 2001 Letter states, in part: "Please be advised that the William A. Pope Company does hereby withdraw the Notice of Claim of Subcontractor dated June 19, 2001 previously forwarded to you with respect to the Medina Valley Cogeneration Plant in Mossville, Illinois." (JFS 178.)

254. The only written notice of intent to pursue a lien claim that Pope ever issued in connection with its work on the Project is contained in *Exhibit 8* to the Complaint. (JFS 317; JTExs 56, 242.)

255. After September 27, 2001, Pope did not issue any other notice to AES that informed AES of an intention by Pope to record a lien. (JFS 179.)

256. On August 28, 2003, Mr. Troyke wrote a letter to "Raymond Professional Group ATTENTION: Doug Chidley" demanding payment under Paragraph 7 of the ISA (the "August 28, 2003 Letter"). (JTEx 183.)

257. According to the August 28, 2003 Letter: "In addition, we worked with you for months to create an agreement that was finalized on September 26th, 2001 .... As you will recall, William A. Pope waived its lien rights so that monies could be released by the owner to fund this agreement." (*Id.*) As used in the August 28, 2003 Letter, "agreement" refers to the ISA. (Troyke Test. 735:5–12, 738:14–24 and 862:9–16, Dec. 17, 2008.)

258. Mr. Troyke executed an affidavit that is attached to a response that Pope filed in a separate lawsuit with NFIC that is captioned *National Fire Insurance Company of Hartford v. William A. Pope Company*, No. 07 CH 28521, in the Circuit Court of Cook County, Illinois, County Department, Chancery Division. (Troyke Test. 1524:11–1526:18, Jan. 14, 2009.) According to the affidavit: "as stated in the interim settlement agreement, on behalf of Pope, I agreed to release Pope's mechanic's lien claim against the owner of the project in consideration for, among other things, NFIC's agreement to, 'waive any and all defenses relative to Pope's payment bond claim.'" (JTEx 339, ¶ 6.)

259. Pope never recorded any mechanics lien relative to its work on the Project. (JFS 315.)

260. Pope has never instituted any lawsuit to foreclosure upon any mechanic's lien in connection with its work on the Project. (J. Chidley Test. 409:10–14, Dec. 15, 2008.; Votava Test. 717:15–25, Dec. 16, 2008.)

261. On October 12, 2001, $614,387 was deposited into the Initial Account from the Operating Account. (JTEx 274, p. 2002.)

262. The $614,387 consists of two deposits for payments by AES to RMS on October 12, 2001 in the respective amounts of $332,527 and $281,860. (JTEx 211.)

263. On November 5, 2001, RMS caused $73,773.11 to be deposited into the Initial Account. (JTEx 113.)

264. On November 19, 2001, AES was instructed to wire any future Project payments directly into the Initial Account. (JFS 180.)

265. On December 14, 2001, AES caused $179,740 to be deposited directly into the Initial Account. (JTEx 274, p. 2018.)

266. On January 7, 2002, Pope submitted an invoice for work performed between September and December of 2001. (JTEx 211.)

267. On January 23, 2002, AES caused $789,889 to be deposited into the Initial Account. (JTEx 273, p. 2026.)

268. On January 25, 2002, $500,000 was deposited into the Initial Account (the "$500,000 Deposit"). (JFS 182.)

269. The $500,000 Deposit came from the Operating Account. (JTEx 265, p. 1567; JTEx 273, p. 2027.)

270. The $500,000 Deposit was made pursuant to Paragraph 2 of the ISA. (JFS 183.)

271. The Pope Recap reflects the $500,000 Deposit. (JFS 207.)

272. The Pope Recap refers to the $500,000 Deposit as an "RPG Deposit". (JFS 208.)

273. After Pope entered into the ISA, Pope was paid a portion of the $2.8 million described in Paragraph 7 of the ISA. (Votava Test. 1204:13–16, Dec. 19, 2008.)

274. Pope submitted an invoice on February 7, 2002 for payment pursuant to Paragraph 7 of the ISA (JTEx 211.)

275. On February 7, 2002, Pope was paid $220,000. (*Id.;* Votava Test. 1182:24–1183:5, Dec. 19, 2008.)

276. The $220,000 was paid pursuant to Paragraph 7 of the ISA. (JTEx 211; J. Chidley Test. 1720:20–25, Jan. 15, 2009.)

277. On May 29, 2002, AES caused $57,980 to be deposited directly into the Initial Account. (JTEx 211; JTEx 273 at R187700.)

278. On September 13, 2002, a check payable to Pope from Kelso–Burnett Co. in the amount of $5,756.67 was deposited in the Initial Account. (JTEx 147.)

279. All funds deposited into the Initial Account were deposited either by RPG or were payments by AES to RMS pursuant to the EPC Contract. (J. Chidley Test. 320:11–18, Dec. 12, 2008.)

*PUNCH–LIST AND WARRANTY WORK.*

280. The Project had three phases: (a) Phase I—steam production; (b) Phase II—chiller plant; and (c) Phase III—cogeneration for electricity production. (D. Chidley Test. 121:11–13, Dec. 11, 2008.)

281. AES certified final acceptance for phase one of the Project on September 21, 2001. (JTEx 90; D. Chidley Test. 123:11, Dec. 11, 2008.)

282. AES certified final acceptance for phase two of the Project on August 2, 2001. (JTEx 90; D. Chidley Test. 123:25, Dec. 11, 2008.)

283. AES certified final acceptance for phase three of the Project on September 21, 2001. (JTEx 90; D. Chidley Test. 124:22–25, Dec. 11, 2008.)

284. All three phases of the Project achieved final acceptance by September 2001. (JTEx 90; J. Chidley Test. 420:9–11, Dec. 15, 2008; D. Chidley Test. 120:11–14, Dec. 11, 2008.)

285. In September 2001, the Project was fully functional. (JTEx 90; Troyke Test. 862:17–23, Dec. 17, 2008.)

286. The Project was accepted by AES as "complete" in September 2001. (JTEx 90; Troyke Test. 862:24–863:11, Dec. 17, 2008.)

287. As of September 21, 2001, it was Mr. Troyke's understanding that all three phases of the Project had met with AES' acceptance. (*Id.* 864:4–24.)

288. According to Pope's written responses to questions posed by the Arbitration Panel, "Pope completed all available site work and demobilized the site in August 2001." (JTEx 215 at 10.)

289. The Arbitration Award stated that: "By the end of August 2001 Pope began to demobilize to reduce project

costs. Thereafter it utilized the man power of its local subcontractors to furnish construction labor, under Pope's supervision, for completion of work." (JFS 285.)

290. To the extent that there was any work remaining on the Project after September 26, 2001, it was punch list and warranty work. (D. Chidley Test. 121:23, Dec. 11, 2008; Votava Test. 712:2–12, Dec. 16, 2008.)

291. The condensate sample lines did not work after they had been installed by Pope. (JTEx 146 and 150; Troyke Test. 755:3–13, Dec. 17, 2008.)

292. Pope originally installed the condensate sample lines. (JTEx 151; Troyke Test. 782:22–783:2, Dec. 17, 2008.)

293. On September 12, 2002, Doug Chidley wrote a letter to Paul Troyke requesting that Pope fix the condensate sample lines because they were not functioning (the "September 12, 2002 Letter"). (JTEx 146; Troyke Test. 769:20–770:16, Dec. 17, 2008.)

294. According to the September 12, 2002 Letter, "since start up of the facility, three of the condensate sample lines have not supplied continuous samples during the operation of the plant." (JTEx 146; Troyke Test. 770:21–771:11, Dec. 17, 2008.)

295. The problem with the condensate sample lines was that the condensate itself (some water) was not making its way to the sample sink. (JTExs 146, 150; Troyke Test. 766:16–24, Dec. 17, 2008.)

296. The condensate sample lines needed to be fixed in such a manner that the condensate would make it to the sample sink. (JTExs 146, 150; Troyke Test. 766:25–767:4, Dec. 17, 2008.)

297. On September 13, 2002, Mr. Troyke sent a letter to Mr. Chidley, which letter shows Mr. Troyke's understanding that Pope had been asked to initiate corrective work on the condensate sample lines. (JTEx 148; Troyke Test. 773:22–774:19, Dec. 17, 2008.)

298. Mr. Troyke understood that the condensate sample line problem had been in existence for almost one year. (JTEx 148; Troyke Test. 774:21–775:15, Dec. 17, 2008.)

299. On September 16, 2002, Mr. Chidley sent a letter to Mr. Troyke attaching a corrected quote from O'Brien Bros. Inc. Piping Contractors for the work on the condensate sample line. (JTEx 150. *See also* JTEx 151.)

300. After the original installation of the condensate sample lines, Pope made changes to the sampling system in order to make the condensate sample lines function. (Troyke Test. 755:14–22, Dec. 17, 2008.)

301. There was also a problem with the roof exhaust fan involving failed bearings. (JTEx 149; Troyke Test. 776:7–12, Dec. 17, 2008.)

302. Relative to the roof exhaust fan bearing issue, the work was to figure out why the bearings failed and then decide what corrective action was required. (*Id.* at 776:13–18.)

303. On September 30, 2002, Mr. Troyke wrote a letter to Mr. Chidley that addressed several issues, including how Pope was proceeding with the condensate sample lines and roof exhaust fan issues (the "September 30, 2002 Letter"). (JTEx 152; Troyke Test. 783:14–784:4, Dec. 17, 2008.)

304. As of September 30, 2002 letter, Pope was waiting before it took further action relative to the Griswold valves. (JTEx 152; Troyke Test. 786:10–15, Dec. 17, 2008.)

305. October 21, 2002, Mr. Troyke wrote a letter to Mr. Chidley informing him that the work on the roof exhaust fan bearings had been completed, and that Pope awarded a subcontract to O'Brien Bros. to work on the condensate sample lines. (JTEx 155; Troyke Test. 790:7–18, Dec. 17, 2008.)

306. Item 5 of the October 21, 2002 letter refers to punch list item "# 559 Insulation." (JTEx 155.) The insulation had already been installed and was damaged by Pope and/or its subcontractors after installation; the work referred to in the October 21, 2002 letter was in the nature of a repair to a damaged portion of the Project. (Troyke Test. 791:18–792:3, Dec. 17, 2008.)

307. According to the October 21, 2002 letter: "The latest information we have from Dean Thompson is that Griswold is paying for all material and labor to do the job and nothing is required by Pope." (JTEx 155.)

308. Pope did not do anything relative to the Griswold valves. (Troyke Test. 793:4–12, Dec. 17, 2008.)

309. The drains from the turbines were originally designed and installed to discharge to a floor drain, but AES later said that was not acceptable and that AES wanted this condition to be fixed. Pope re-piped the drains around the turbine, cut a trench in the floor that received water from the turbine drains and allowed the drainage to flow into the floor drain (the "Trench Work"). (Troyke Test. 795:12–24, Dec. 17, 2008.)

310. The trenches were each ten feet long or less. (*Id.* 795:25–796:5.)

311. The Facility was operating even without the trenches. (*Id.* 796:10–12.)

312. The Trench Work was never the subject of a contract change notice. (*Id.* 796:13–18.)

313. The Trench Work cost $3,371.75. (JTEx 156 and 157; Troyke Test. 796:19–801:13, Dec. 17, 2008.)

314. As of December 5, 2002, AES had accepted the punch list work regarding the condensate samples lines, the roof exhaust fans and the trench work. (JTEx 158 at R183352, R183355–57.)

315. Pope's last invoice on the Project was dated March 3, 2003 for work performed in January and February of 2002. This invoice was just for cleaning up unbilled items. (JTEx 211; Votava Test. 1040:23–1041:1, Dec. 18, 2008.)

*THE AES–RMS SETTLEMENT, THE JANUARY 30, 2003 FINAL LIEN WAIVER, AND THE $2.5 MILLION PAYMENT BY AES.*

316. After entering into the ISA, AES made payments to RMS pursuant to the EPC Contract, which payments were deposited into the Initial Account. (JFS 181.)

317. After approximately November 2001, disputes existed between AES and RMS concerning RMS' work for AES on the Project (the "AES Dispute"). Relative to the AES Dispute:

a. AES refused to pay RMS the percentage of each of RMS's invoices to AES that AES had withheld pursuant to the EPC Contract as retainage (the "Retainage"), and RMS asserted that AES was obligated to pay the Retainage. The Retainage was approximately $1 million.

b. AES refused to compensate RMS for extra work performed on the Project (the "Extra Work"), and RMS asserted that AES was obligated to pay for the Extra Work.

The Extra Work was valued at approximately $2.8 million. (D. Chidley Test. 125:8–126:1, Dec. 11, 2008.)

318. Relative to change orders that were submitted prior to the recording of the RMS Lien (i.e., the Extra Work), Mr. Troyke believed that the funds in connection with those change orders had been earned. (Troyke Test. 754:12–18, Dec. 17, 2008.)

319. Thereafter, throughout 2002, payment disputes continued between RMS and AES regarding amounts withheld as retainage. (JTEx 165, 248.)

320. On June 6, 2002, RMS recorded a lien against the real property on which the Project is situated in the approximate amount of $3.8 million (the "RMS Lien"). (JFS 184.)

321. The RMS Lien was for the Retainage and the Extra Work. (D. Chidley Test. 125:5–127:12, Dec. 11, 2008.)

322. Mr. Troyke understood that as of the time that the RMS Lien was recorded, RMS was demanding full and complete payment from AES for RMS' work on the Project. (Troyke Test. 752:19–24, Dec. 17, 2008.)

323. In response to RMS filing the RMS Lien, RMS and AES submitted the AES Dispute to arbitration. (D. Chidley Test. 129:21–23, Dec. 11, 2008.)

324. Pope assisted RMS in attempting to collect funds from AES in connection with the Retainage and the Extra Work. (Troyke Test. 754:5–11, Dec. 17, 2008.)

325. Prior to January 30, 2003, Mr. Troyke believed that Pope was owed in excess of $3 million. (Id. at 809:7–810:3.)

326. On or about January 30, 2003, AES and RMS entered into a settlement agreement (the "AES Settlement Agreement"). (JFS 185.)[22]

327. The term "Raymond" in the AES Settlement and the mutual general release incorporated therein refers to RMS. (JTEx 165, 248.)

328. The term "Medina" in the AES Settlement and the mutual general release incorporated therein refers to AES. (JTEx 165, 248.)

329. The term "Lien" in the AES Settlement and the mutual general release incorporated therein refers to the RMS Lien. (JTEx 165, 248.)

330. Doug Chidley signed the AES Settlement Agreement on behalf of RMS. (JFS 187.)

331. Tom Thomas signed the AES Settlement Agreement on behalf of AES. (JFS 188.)

332. Pope was not a signature party to the AES Settlement Agreement. (D. Chidley Test. 130:3–5, Dec. 11, 2008.) However, under the dispute resolution procedures contemplated by the EPC Contract, Mr. Troyke of Pope attended two meetings between AES and RMS at which settlement discussions were conducted. (Id. 130:6–131:21.)

333. At the first meeting, AES made an initial settlement offer of approximately $250,000. (Id. 132:6–12.) At that point Mr. Chidley and Mr. Troyke went out in the hall for a discussion, and decided that RMS and Pope would not settle for less than $2.5 million. (Id. 132:12–20.)

334. The AES Settlement Agreement incorporated a mutual general release be-

22. A true and correct copy of the AES Settlement Agreement is attached as *Exhibit 14* to the Complaint. (JFS 186; JTEx 165, 248.)

tween RMS and AES that is contained in Exhibit E thereto, which states:

> WHEREAS, such conditions precedent have been satisfied or waived, the steps required to be taken by each Party, including [AES'] payment to Raymond of $2.5 million, have occurred, and the Parties agree that this Release is the Mutual General Release required to be delivered pursuant to the Settlement Agreement.
>
> * * *
>
> 2. Claims Released. In consideration for [AES'] payment to Raymond in accordance with the Settlement Agreement, and Raymond release of the Lien, and the other good and valuable consideration recited therein, [AES] hereby releases. Raymond, and Raymond releases ... [AES]....

(JTEx 165, 248 at 14.)

335. Prior to January 30, 2003, Mr. Troyke of Pope was aware of the settlement agreement between AES and RMS and the amount of that settlement. (Troyke Test. 808:16–24, Dec. 17, 2008.)

336. On or about January 29, 2003, Mr. O'Brien, counsel for AES, sent a lien waiver form to Pope for signature. (JTEx 163.)

337. Also on January 29, 2003, Pope's counsel sent a letter to RMS' counsel: "[C]onfirm[ing] [RMS'] January 29, 2003 request that Pope provide a Final Waiver of Lien pursuant to paragraph 3 of our Interim Settlement Agreement dated September 26, 2001, in order to assist Raymond in settling its claims against the project's owner." (JTEx 166; JTEx 349 at 13.)

338. On January 30, 2003, Pope executed a document entitled "Final Waiver of Lien" under the seal of an Illinois Notary Public (the "January 30, 2003 Final Lien Waiver"). (JFS 189.) [23]

339. Pope prepared the January 30, 2003 Final Lien Waiver. (JFS 195.)

340. Paul Troyke made the statements in the January 30, 2003 Final Lien Waiver under oath before a Notary Public of the State of Illinois. (JFS 193.)

341. Pope's counsel sent a cover letter with the January 30, 2003 Final Lien Waiver that stated:

> 'Enclosed please find the Final Waiver of Lien requested in connection with the captioned matter that I am delivering to you, in trust, pending the wire transfer of $2,500,000 into the joint account of Raymond and Pope.... If the aforementioned funds are not wire transferred as directed on or before the close of business February 12, 2003, you have agreed to return the enclosed Waiver to me.

(JTEx 164.)

342. Attached to the January 30, 2003 cover letter were both a notarized and unnotarized version of the January 30, 2003 Final Lien Waiver. (JTEx 164.)

343. Mr. Troyke did not personally and directly transmit any lien waiver to AES during January of 2003. (Troyke Test. 810:5–8, Dec. 17, 2008.)

344. Mr. Troyke does not have firsthand knowledge of what specific documents, if any, were sent to AES on or about January 30, 2003, other than that he signed a January 30, 2003 Final Lien Waiver and forwarded it to Pope's counsel, Clausen Miller. (*Id.* at 810:5–15.)

---

**23.** A true and correct copy of the January 30, 2003 Final Lien Waiver is attached as one of the documents in *Exhibit 15* to the Complaint. (JFS 190; JTEx 164, 249.)

345. Mr. Troyke did not supervise the physical delivery of any lien waiver to AES in the January 2003 time period. (*Id.* at 810:25–811:6.)

346. Mr. Troyke did not know which version of the January 30, 2003 Final Lien Waiver was actually sent to AES. (*Id.* at 851:4–24.)

347. James O'Brien, an attorney for AES from Baker & McKenzie, testified that he recalls receiving a version of the January 30, 2003 Final Lien Waiver, but that he cannot specifically recall whether it was the notarized or un-notarized version. (O'Brien Test. 1296:2–13, Jan. 13, 2009.) However, he testified further that he "would not have accepted a lien waiver that wasn't notarized because it wasn't effective." (*Id.* 1298:14–23.)

348. Debtors' counsel asked Mr. O'Brien to look through Baker & McKenzie's files for any lien waivers. Mr. O'Brien did so and could not find any lien waivers. Debtors' counsel then sent a subpoena to Baker & McKenzie (the "Subpoena"), which was given to the person at Baker & McKenzie who handled the litigation piece of the Project for AES, and that individual searched for documents responsive to the Subpoena. That person could not find any lien waivers or other documents responsive to the Subpoena. (*Id.* at 1300:1–8 and 1308:18–23.)

349. Mr. O'Brien testified further that he presumes that AES, the bank or the title company have the original version of the January 30, 2009 Final Lien Waiver. (*Id.* at 1300:1–17.)

350. The January 30, 2003 Final Lien Waiver stated:

TO WHOM IT MAY CONCERN: WHEREAS the undersigned has been employed by Raymond Management Services Inc. to furnish Equipment And Construction Services for the premises known as AES Medina Valley Cogeneration Project, of which AES Medina Valley Cogen L.L.C. is the owner.

THE undersigned for and in consideration of Ten Dollars ($10.00) Dollars, and other good and valuable consideration, the receipt whereof is hereby acknowledged, do(es) hereby waive and release any and all lien or claim of, or right to, lien, under the statues of the State of Illinois, relating to Mechanics liens, with respect to an on said above-described premises, and the improvements thereon, an on the material, fixtures, apparatus or machinery furnished, and on the monies, funds or other considerations due or to become due from the owner, on account of all labor services, material, fixtures, apparatus or machinery heretofore furnished, or which may be furnished at anytime hereafter, by the undersigned for the above described premises. INCLUDING EXTRAS.* EXTRAS INCLUDE BUT ARE NOT LIMITED TO CHANGE ORDERS, BOTH ORAL AND WRITTEN, TO THE CONTRACT.

(JFS 194.)

351. Pope inserted the words "ten dollars and other good and valuable consideration" into the January 30, 2003 Final Lien Waiver. (JFS 196.)

352. The January 30, 2003 Final Lien Waiver includes a section entitled "CONTRACTOR'S AFFIDAVIT" in which Pope acknowledged having received $19,656,738.54 in payment for work performed by Pope and Pope subcontractors on the Project. (JFS 191.)

353. The difference between the cumulative amount paid to Pope for its work on the Project, $19,656,738.54, (JTEx 164,

249), and the cumulative amount sought in the September 26, 2001 Lien Waiver, $17,151,135.03, (JTEx 88), is $2,505,603.51 which is approximately equal to the amounts paid to Pope and Pope subcontractors from the Account between October 1, 2001 and November 25, 2002.[24] (JTEx 211.)

354. Under the section entitled Contractor's Affidavit, the January 30, 2003 Final Lien Waiver lists Pope's contract value for the Project as $22,900,000. (JTEx 164 at 2; JTEx 249 at 1.) The Contractor's Affidavit section of the unnotarized January 30, 2003 Final Lien Waiver does not list the total amount of contract. (JTEx 164 at 3; JTEx 249 at 1; Troyke Test. 852:15–22, Dec. 17, 2008.)

355. The difference between the contract value of $22,900,000 and the amount paid to Pope for its work on the Project of $19,656,738.54 is $3,243,261.46. (JTEx 164 at 2; JTEx 249 at 1.)

356. The Contractor's Affidavit includes a box in which to identify:

[T]he names and addresses of all parties who have furnished material or labor, or both, for said work and all parties having contracts or sub contracts for specific portions of said work or for material entering into the constructions thereof and the amount due or to become due to each, and that the items mentioned include all labor and material required to complete said work according to plans and specifications.

(The "Contractor's Affidavit Box"). (JTEx 164, 249.)

357. The Contractor's Affidavit Box is completely blank on both versions of the January 30, 2003 Final Lien Waiver.

(JTEx 163, 249; Troyke Test. 854:7–9, Dec. 17, 2008.)

358. Pope did not put its name in the Contractor's Affidavit Box and indicate any balance due to Pope. (*Id.* 854:10–12.)

359. The January 30, 2003 Final Lien Waiver includes a place to identify the account number of an escrow account, which space is blank. (JFS 192.)

360. Mr. Troyke could have inserted an account number on the "escrow number" line of the January 30, 2003 Final Lien Waiver, but did not do so. (Troyke Test. 855:17–856:9, Dec. 17, 2008.)

361. On January 29, 2003, AES contacted Mr. Troyke by facsimile regarding instructions for the account to which the funds should be wired. (Votava Test. 679:17–680:8, 681:5–682:23, Dec. 16, 2008.)

362. RMS was aware that Pope provided a final lien waiver to AES. (JFS 197.)

363. In a letter dated February 4, 2003, counsel for the owner of the Project, AES, sent a letter to David Howard, counsel for RMS wherein he stated: "This letter also confirms receipt of the final lien waiver from William A. Pope Company, which we have been authorized to release to [AES] Medina upon wire transfer of $2.5 million into the account specified on the signature page of the [AES Settlement] Agreement." (JFS 198.)

364. Lien waivers from RMS, York and Protherm were also supplied to AES in connection with the AES Settlement. (JTEx 165 and 248; O'Brien Test. 1342:6–11, Jan. 13, 2009.)

365. The lien waiver from York that was submitted to AES in connection with the AES Settlement was given for and in

24. According to JTEx 211, a total of $2,507,221.32 was paid to Pope and Pope subcontractors between October 1, 2001 and November 25, 2002.

consideration of $1,672,147.52. (JTEx 165, 248.)

366. The lien waiver from Protherm that was submitted to AES in connection with the AES Settlement was given for and in consideration of $631,302.12. (*Id.*)

367. On February 4, 2003, AES caused $2,500,000 to be deposited directly into the Initial Account. (JTEx 211.)

368. Prior to the January 30, 2003 Final Lien Waiver, Pope knew of a dispute regarding the amount Pope was claiming as its contract costs. (JTEx 85 at Recital C. ¶¶ 9 and 10.)

369. As of January 30, 2003, an audit of the Project's costs had not yet occurred. (Troyke Test. 856:11–14, Dec. 17, 2008.)

370. On February 4, 2003, RMS' counsel sent Pope's counsel a letter (the "February 4, 2003 Letter"). (JFS 199.)[25]

371. The February 4, 2003 Letter notified Pope of a dispute and demanded that said dispute be submitted to the dispute resolution procedures set forth in the EPC Contract. (JFS 201.)

372. On or about February 7, 2003, after AES had wire transferred the funds to the Initial Account, Pope renewed its demand for payment and RMS refused to release any funds to Pope. (JTEx 171, 172.)

*THE FUNDS ARE TRANSFERRED TO THE CURRENT ACCOUNT.*

373. On a date between the date when the Initial Account was opened and March 12, 2003, ANB was acquired by Bank One (the "Bank One Acquisition"). (JFS 209.)

---

25. A true and correct copy of the February 4, 2003 Letter is attached as *Exhibit 16* to the

374. From and after the date of the Bank One Acquisition, Bank One held the Initial Account. (JFS 210.)

375. At all times from and after the Bank One Acquisition, Pope was not in possession of any documents originating from Bank One that identify any terms of escrow for the Initial Account. (JFS 211.)

376. At all times from and after the Bank One Acquisition, Pope was not in possession of any documents originating from Bank One consisting of articles of escrow for the Initial Account. (JFS 212.)

377. At all times from and after the Bank One Acquisition, Pope was not in possession of any documents originating from Bank One that identified an escrow agent for the Initial Account. (JFS 213.)

378. Pope is not in possession of any documents originating from Bank One that contain the term "escrow" concerning the Initial Account. (JFS 299.)

379. Pope did not receive any account statement for the Initial Account directly from Bank One. (JFS 214.)

380. The Initial Account was listed as an asset of RMS on RPG's Financial Statements for 2001 through 2003. (JTEx 125; JTEx 188.)

381. On February 25, 2003, Pope's counsel sent a letter to RMS' counsel (the "February 25, 2003 Letter") that stated:
[W]e believe it is in everyone's best interest to maximize the investment return on available funds while the parties move forward in resolving their differences. Therefore, Pope will agree that any new account established by the parties will have the same joint control feature as currently exists.

Complaint. (JFS 200; JTEx 168, 250.)

(JTEx 173.)

382. The joint control feature described in the February 25, 2003 Letter refers to the dual signatures of Mr. Chidley and Mr. Troyke for withdrawals or changes to the account. (J. Chidley Test. 355:20–356:23, Dec. 15, 2008.)

383. On March 12, 2003, all funds in the Initial Account were transferred to a different account at Bank One (the "Transfer"), bearing account number XXXXXX5099 (the "Current Account"). (JFS 215.)

384. The Transfer was made at the request of Paul Troyke to earn a higher rate of interest. (JFS 216.)

385. On and prior to the Transfer, Pope never insisted that the funds in the Initial Account be transferred into a bank account for which: (a) there were articles of escrow issued by a bank that identify the conditions for releasing the funds; and (b) there was an escrow agent employed by the bank in order to disburse funds upon the happening of the terms stated in the articles of escrow. (Votava Test. 563:1–12, 564:6–7 and 568:17–21, Dec. 16, 2008.)

386. On March 12, 2003, Jean Chidley executed a letter of direction for the Current Account (the "Current Account Letter of Direction"). (JFS 217.) [26]

387. The Current Account Letter of Direction identifies the "Account Name" as the "Raymond Professional Group–Pope Joint Account". (JFS 220.)

388. Jean Chidley is identified on the Current Account Letter of Direction as an "Authorized Representative." (JFS 222.)

389. Jean Chidley is the only person that has ever been identified as an authorized representative for the Current Account. (JFS 306.)

390. Nobody employed by Pope is identified on the Current Account Letter of Direction as an "Authorized Representative." (JFS 223.)

391. Ms. Votava reviewed the Current Account Letter of Direction and the Current Account Signature Card (defined below) before Mrs. Chidley delivered those documents to Bank One. (Votava Test. 560:17–561:17, Dec. 16, 2008.) In fact, Ms. Votava made corrections to the Current Account Letter of Direction and the Current Account Signature Card. (*Id.* at 561:22–562:6–8.)

392. At all times after the Transfer, Ms. Votava knew that no one at Pope was identified as an authorized representative for the Current Account. (*Id.* at 546:22–547:3.)

393. On March 13, 2003, Mr. Troyke sent an e-mail to Mrs. Chidley in which Mr. Troyke requested that Ms. Votava also be an authorized representative for the Current Account along with Mrs. Chidley (the "March 13, 2003 e-mail"). (JTEx 224; J. Chidley Test. 360:15–25, Dec. 15, 2008.)

394. The March 13, 2003 e-mail request was denied. (*Id.* at 360:19–361:2.)

395. No one on behalf of Pope protested the fact that Ms. Votava was not identified as an authorized representative for the Current Account. (*Id.* at 361:11–15.)

396. Nobody at Pope has been identified as an authorized representative for the Current Account. (JFS 307.)

397. The Current Account Letter of Direction identifies the signature controls

---

**26.** A true and correct copy of the Current Account Letter of Direction is attached as *Exhibit 18* to the Complaint. (JFS 218; JTEx 252.)

that the Bank One should use when approving checks, drafts or orders of withdrawal for the Current Account. (JFS 219.)

398. The Current Account Letter of Direction contains a place to:

[I]ndicate any signature controls that bank should use when approving checks, drafts, or orders of withdrawal. Signature control establishes signing authority by limiting dollar amounts or requiring multiple signatures. If the signature control is left blank, the Check Signer is assumed to have authority to sign checks, drafts, or orders of withdrawal of money singly and in unlimited amounts.

The following language is inserted into that section of the Current Account Letter of Direction: "Checks signers have authority to sign checks, drafts, or orders of withdrawal of money jointly and in unlimited amounts and to jointly make any revision to this account[.]" (JFS 221.)

399. The Current Account Signature Card comes from Pope's files. (JFS 238.) [27]

400. The Current Account Signature Card was submitted to Bank One with the Current Account Letter of Direction. (JFS 225.)

401. The Current Account Signature Card identifies the Current Account as the "Raymond Professional Group—Pope Joint Account." (JFS 226.)

402. At the time Paul Troyke signed the Current Account Signature Card, Paul

Troyke was a director of First Northwest Bank. (JFS 237.)

403. At the time Paul Troyke signed the Current Account Signature Card, Paul Troyke was aware that the title of the Current Account was identified on the Current Account Signature Card as the "Raymond Professional Group—Pope Joint Account." (JFS 231.)

404. The Current Account Signature Card contains the signature of Douglas Chidley. (JFS 227.)

405. The Current Account Signature Card contains the signature of Paul Troyke. (JFS 228.)

406. The Current Account Signature Card identifies the taxpayer identification number as 36–3869389. (JFS 229.)

407. The Current Account Signature Card does not contain any taxpayer identification number for Pope. (JFS 230.)

408. Similar to the controls on the Initial Account, the Letter of Direction and Signature Card associated with the Current Account indicates that both Douglas Chidley's and Paul Troyke's signatures are required to withdraw any funds from the Current Account. (JTExs 252–53.)

409. At the time Paul Troyke signed the Current Account Signature Card, Paul Troyke was aware that there were no articles of escrow originating from Bank One for the Current Account. (JFS 232.)

410. At the time Paul Troyke signed the Current Account Signature Card and at all times thereafter, Pope was not in possession of any documents originating from Bank One consisting of articles of escrow for the Current Account. (JFS 234.)

---

**27.** A true and correct copy of the signature card for the Current Account is attached to the Complaint as page 072805 of *Exhibit 19* to the Complaint (the "Current Account Signature Card"). (JFS 224; JTEx 253.)

411. At the time Paul Troyke signed the Current Account Signature Card and at all times thereafter, Pope was not in possession of any documents originating from Bank One that identify any terms of escrow for the Current Account. (JFS 235.)

412. At the time Paul Troyke signed the Current Account Signature Card, Paul Troyke was aware that there was no escrow agent originating from Bank One for the Current Account. (JFS 233.)

413. At the time of the Transfer of funds to the Current Account, Ms. Votava was aware of the dispute with RMS referenced in the February 4, 2003 Letter. (JTEx 168; Votava Test. 565:11–18, 567:23–568:9, Dec. 16, 2008.)

414. Pope could have, but did not insist that there be a third party involved relative to the Current Account. (*Id.* at 564:6–13, 568:17–21.)

415. Even though Pope was aware of the dispute referenced in the February 4, 2003, Letter in March 2003, Pope still did not insist that there be a third party that would act as an escrow agent in connection with the Current Account. (*Id.* at 568:10–16.) Pope only asked that the same controls that were already in place for the Initial Account be maintained for the Current Account. (*Id.* at 568:23–569:2.)

416. At the time Paul Troyke signed the Current Account Signature Card and at all times thereafter, Pope was not in possession of any documents originating from Bank One that identified an escrow agent for the Current Account. (JFS 236.)

417. Pope is not in possession of any documents originating from Bank One that contain the term "escrow" concerning the Current Account. (JFS 300.)

418. Pope did not receive any account statement for the Current Account directly from Bank One other than pursuant to subpoena in this bankruptcy proceeding. (JFS 239.)

419. Information concerning the Current Account could also be obtained via the bank's online account access system if one had an ID and password. (J. Chidley Test. 416:9–24, Dec. 15, 2008.) Raymond Professional Group has online access to the Current Account. (*Id.* at 416:9–24.) Pope never has had online access to the Current Account. (*Id.* at 416:9–24.)

420. After the Transfer, J.P. Morgan Chase Bank, N.A. ("Chase") acquired Bank One (the "Chase Acquisition"). (JFS 240.)

421. As a result of the Chase Acquisition, Chase holds the Current Account. (JFS 241.)

422. Chase has held the Current Account since the Chase Acquisition to the date of these joint stipulations. (JFS 242.)

423. From and after the date of the Chase Acquisition, Pope was not in possession of any documents originating from Chase consisting of articles of escrow for the Current Account. (JFS 244.)

424. From and after the date of the Chase Acquisition, Pope was not in possession of any documents originating from Chase identifying an escrow agent for the Current Account. (JFS 245.)

425. From and after the date of the Chase Acquisition, Pope was not in possession of any documents originating from Chase identifying any terms of escrow for the Current Account. (JFS 246.)

426. Pope is not in possession of any documents originating from Chase that contain the term "escrow" concerning the Current Account. (JFS 301.)

427. Pope's tax ID number has never has been associated with the Current Account. (JFS 303.)

428. Pope did not receive any account statement for the Current Account directly from Chase. (JFS 243.)

429. Pope has never maintained an address at 321 North Clark Street in Chicago, Illinois. (JFS 259.)

430. Pope does not have access to the post office box numbered 345 located at 126 East Wing Street in Arlington Heights, Illinois. (JFS 260.)

431. After the initiation of this bankruptcy proceeding, Pope stopped receiving post-petition copies of statements for the Current Account. (JFS 261.)

432. After the initiation of this bankruptcy proceeding, Pope's counsel contacted counsel for Debtors and requested that copies of post-petition statements for the Current Account be sent to Pope, after which time Pope again received post-petition statements for the Current Account. (JFS 262.)

433. A request to change the name of the Current Account was made by Pope in a letter dated May 20, 2005, which stated that: "In light of the fact that Raymond has closed its doors, we want to move the funds into an account in the name of William A. Pope Company to be held subject to further Order of the AAA." (The "Pope Account Change Request"). (JFS 271; JTEx 198.)

434. The Pope Account Change Request was denied. (JFS 272.)

435. Pope never tried to make the changes requested in the Pope Account Change Request on its own. (JFS 273.)

436. No changes were made to the Current Account as a result of the Pope Account Change Request. (JFS 274.)

437. No changes were made to the Current Account in May 2005. (JFS 275.)

438. On March 15, 2006, Jean Chidley sent a letter to Paul Troyke. (JFS 267.)[28]

439. In 2006, the New York Attorney General sued several insurance brokers about recommending insurance that was more to the benefit of the broker than to the insured which resulted in a settlement (the "Bond/Insurance Settlement"). (J. Chidley Test. 362:19–25, Dec. 15, 2008.)

440. In the March 15, 2006 Letter, Jean Chidley informed Paul Troyke that RPG received a refund from its former insurance broker, Willis (the "Refund"). (JFS 269.)

441. The Refund was a result of the Bond/Insurance Settlement. (See J. Chidley Test. 362:24–363:8, Dec. 15, 2008.)

442. Raymond Professional Group received the Refund in the approximate amount of $700, of which $684.40 was allocated to the premium paid for the surety bond. (Id. at 363:12–17.)

443. The Refund was dispersed as follows: (a) $700 was deposited into the Operating Account; (b) a check for $684.40 was written from the Operating Account for the portion that was allocable to the surety bond premium and was deposited into the current account. (JTEx 208; J. Chidley Test. 363:18–25, 364:7–11 and 364:21–25, Dec. 15, 2008.)

444. On March 17, 2006, $684.40 was deposited into the Current Account. (JFS 270.)

445. The March 17, 2006 Deposit was made by RPG. (JTEx 206–209.)

28. A true and correct copy of the March 15, 2006 letter from Jean Chidley to Paul Troyke is attached as Exhibit 26 to the Complaint. (JFS 268; JTEx 260.)

446. Since the inception of account number XXXXXX7555 at ANB and account number XXXXXX5099 at Bank One and Chase, Pope:

a. Has never listed the Initial Account or the Current Account as an asset on any of its financial statements;

b. Has never identified the Initial Account or the Current Account as an asset on any of its tax returns or any other document;

c. Has never included or otherwise reported to the Internal Revenue Service interest accruing on the funds within account number XXXXXX7555 as interest income attributable to Pope; and

d. Has never included or otherwise reported to the Internal Revenue Service interest accruing on the funds within account number XXXXXX5099 at Bank One and Chase as interest income attributable to Pope. (JFS 318.)

447. Raymond Professional Group's and its Subsidiaries and Affiliates 2003 Combined Financial Report identifies the Current Account as a "Restricted Cash" asset of RMS on the Combining Balance Sheet found at the page Bates labeled MP0019. (JFS 296; JTEx 186.)

448. Raymond Professional Group and Subsidiaries filed consolidated tax returns from 2001 through 2005 on which they reported all interest earned on the funds deposited in the Initial and Current Accounts. (JTExs 275–79.)

449. Approximately $480,000 of interest has accrued upon the funds in the Initial and Current Accounts from the time the Initial Account was opened until the end of November 2008. (J. Chidley Test. 403:14–17, Dec. 15, 2008.)

450. Pope never approached any Debtor and offered to report the interest on the Initial Account and/or the Current Account as income to Pope. (Votava Test. 1242:6–14, Dec. 19, 2008.)

*THE ARBITRATION AND AWARD.*

451. Paragraph 11 of the Subcontract states:

Dispute Resolution. Any disputes between or among RMS, [Pope] and [Doyen] shall be resolved in accordance with the dispute resolution procedures of the EPC Contract, and the Parties hereby agree to joinder of their claims with any claims involving the Client in the procedures initiated under the EPC Contract. The [Pope] Subcontract shall be governed by the laws of the state of Illinois. Any term of this Agreement may be modified or deleted, but only if the modification or deletion is put in writing and signed by the parties. RMS and [Pope] respectively bind themselves, their partners, successors, assigns and legal representatives to the other party hereto. Neither party to this [Pope] Subcontract shall assign the [Pope] Subcontract as a while without the written consent of the other. This [Pope] Subcontract represents the entire and integrated agreement between RMS and GC for the Project and supersedes all prior negotiations, representations or agreements, either written or oral.

(JFS 65.)

452. On September 9, 2003, RMS filed a demand for arbitration against Pope with the AAA in the Arbitration (the "RMS Demand"). (JFS 247.) [29]

(JFS 250; JTEx 254.)

---

**29.** A true and correct copy the RMS Demand is attached as *Exhibit 20* to the Complaint.

453. Raymond Professional Group is not named as a party in the RMS Demand. (JTEx 254.)

454. Raymond Management Services requested that:

Raymond [RMS] is unable to quantify the damages at this time, in large part because Pope has not cooperated with Raymond's [RMS'] attempt to audit its costs. As an interim measure, Raymond [RMS] will request to be allowed to have an independent accounting firm audit Pope's costs for the project. As part of the final award, Raymond will request the arbitrators to allocate between the parties a previously-escrowed sum paid by AES.

(The "RMS Demand"). (JFS 249.)

455. The RMS Arbitration Demand did not seek a determination as to whether the Initial Account and/or the Current Account is an escrow account or any other type of account, nor does it seek a determination as to who the legal owner of either account is. (JTEx 254.)

456. On November 11, 2003, Pope filed a Counterclaim and Answering Statement in the Arbitration (the "Pope Counterclaim and Answer"). (JFS 251.) [30]

457. In its Counterclaim and Answer, Pope requested, among other things "that the Arbitrator direct Raymond to comply with Paragraph 7 of the [ISA], and determine what additional sums are due Pope under Paragraph 9 of the [ISA]." (JTEx 185.)

458. The Pope Counterclaim and Answer did not seek a determination as to whether the Initial Account and/or the

Current Account is an escrow account or any other type of account, nor does it seek a determination as to who the legal owner of either account is. (JTEx 255.)

459. The words "Raymond Professional Group, Inc." do not appear anywhere in the Pope Counterclaim and Answer. (JFS 253.)

460. The Arbitration panel had three members, which included Retired Judge Franklin I. Kral, Allan M. Pickus and James J. Adrian (the "Panel"). (JFS 248.)

461. On June 28, 2004, Pope filed a "Motion for Pre-hearing Distribution" in the Arbitration (the "Pope Summary Judgment Motion"). (JTEx 256.)

462. In the Pope Summary Judgment Motion, Pope requested that the panel in the Arbitration award Pope $2,808,671 pursuant to paragraph 7 of the ISA, but Pope did not seek any determination as to whether the Initial Account and/or the Current Account was an escrow account or any other type of account, nor did it seek a determination as to who the legal owner of either account is. (JTEx 184, 185 and 256; J. Chidley Test. 524:6–11, Dec. 15, 2008.)

463. Mrs. Chidley submitted a sworn affidavit to the Arbitration Panel in connection with RMS' response to Pope's Motion for Summary Judgment in the Arbitration (the "Chidley Affidavit"). (JTEx 192.)

464. According to the Chidley Affidavit:

The [Current Account] was intended to function as an escrow account, from which the remaining Project funds would be distributed once the disputes between Raymond and Pope were re-

---

**30.** A true and correct copy of the Pope Counterclaim and Answer is attached as *Exhibit 21* to the Complaint. (JFS 252; JTEx 255.)

solved and the audit was completed and the true, final project finances were known. [Pope] advised me that [it] desired to realized a higher interest rate than was available in the [Initial] Account. . . . Raymond and Pope each jointly own the [Current] Account.

(JTEx 192 at ¶ 12; J. Chidley Test. 435:7–437:22, Dec. 15, 2008.)

465. On August 19, 2004, Geri Votava executed an Affidavit that was submitted as an exhibit to the Pope Summary Judgment Reply in the Arbitration (the "2004 Votava Affidavit"). (JFS 263.) [31]

466. Ms. Votava made the statements in the August 19, 2004 Affidavit executed by Geri Votava and submitted as an exhibit to the Pope Summary Judgment Reply under oath. (JFS 265.)

467. In paragraph 5 of the 2004 Votava Affidavit, Ms. Votava testified that: "Pope released its lien pursuant to the agreement and did so in reliance on Raymond's promise to release funds to Pope in payment of project costs incurred by Pope." (JFS 266.)

468. The "agreement" referred to in the 2004 Votava Affidavit refers to the ISA. (JTEx 194, 258; Votava Test. 623:25–631:10, Dec. 16, 2008.)

469. The Pope Summary Judgment Motion was denied. (D. Chidley Test. 270:24–271:7, Dec. 11, 2008; J. Chidley Test. 523:24–524:5, Dec. 15, 2008.)

470. Pope prepared a Trial Balance statement (the "Pope Trial Balance Statement"). (JFS 254.) [32]

471. Pope produced the Pope Trial Balance to RMS in the Arbitration. (December 16, 2008 Tr. 553:7–12.)

472. The Pope Trial Balance Statement identifies Pope's assets as of December 31, 2003. (JFS 255.)

473. The Pope Trial Balance does not list the Initial Account as a Pope asset. (JFS 257.)

474. The Pope Trial Balance does not list the Current Account as a Pope asset. (JFS 258.)

475. Ms. Votava understood that the Initial Account and the Current Account were earning interest at all times they were in existence. (Votava Test. 557:18–24, Dec. 16, 2008.) Nowhere on the Pope Trial Balance is the interest that accrued on the funds in the Current Account identified. (*Id.* at 556:22–557:1.)

476. Ms. Votava understood that somebody had to report the interest that accrued upon the funds in the Initial Account and the Current Account as interest income to the federal government. (*Id.* at 557:25–558:4.) Ms. Votava understood that Pope was not reporting the interest on the Initial Account and the Current Account to the federal government. (*Id.* at 558:5–7.)

477. On August 29, 2005, David Howard, counsel for RMS, Ned Markey (Schiff Hardin), Jean Chidley and Ron Grant (one of RMS' experts) went to the offices of Pope and examined documents produced by Pope related to the Arbitration. (JFS 276.)

478. On August 30, 2005, Ned Markey (Schiff Hardin), Jean Chidley and Ron

---

**31.** A true and correct copy of the 2004 Votava Affidavit is attached as *Exhibit 24* to the Complaint. (JFS 264; JTEx 194, 258.)

**32.** A true and correct copy of the Pope Trial Balance Statement is attached as *Exhibit 28* to the Complaint. (JFS 256; JTEx 187.)

Grant (one of RMS' experts) went to the offices of Pope and examined documents produced by Pope related to the Arbitration. (JFS 277.)

479. Pope did not produce, nor was it ordered to produce, the January 30, 2003 Final Lien Waiver during the Arbitration. (JTEx 349 at 30; Votava Test. 1174:16–1175:4, Dec. 19, 2008.)

480. Both Douglas Chidley and Jean Chidley appeared and testified under oath in the Arbitration. (*See* D. Chidley Test. 149:20–150:2, Dec. 11, 2008.)

481. The Arbitration was an audit of Project costs, and neither the January 30, 2003 Final Lien Waiver or any of the other preceding lien waivers were at issue in the Arbitration. (JTEx 349 at 30.)

482. The ownership of the Initial Account and/or the Current Account was never at issue in the Arbitration. (J. Chidley Test. 450:23–25, 451:4–6, 452:4–10, 452:20–25, and 453:1, Dec. 15, 2008; Docket No. 62 in Adv. No. 07 A 137.)

483. As of June 30, 2006, there was $3,072,550.44 in the Current Account. (JFS 278.)

484. On November 30, 2006, the Panel in the Arbitration issued its award (the "Award"). (JFS 279.) [33]

485. Raymond Professional Group and RMS filed voluntary petitions for relief under Chapter 11 of Title 11, United States Code eighteen days after the Award. (JFS 297.)

486. The Award was entered during the ninety-day period prior to the Petition Date. (JFS 282.)

487. The Award has not been overturned. (JFS 281.)

488. In the Award, the term "Raymond" refers to RMS. (JFS 292.)

489. The Award denied all of Pope's and RMS' performance claims. (JFS 283.)

490. Under the "Computation of Awards" section on page 5, the Award states:

> The Panel has reviewed: The AICPA Audit and Accounting Guide for Construction Contractors, paragraph 72, and its application of general principles in accounting consistent with generally accepted principles for costs of construction type and production type contracts; The audit reports of Africk Chez P.C. and Nykiel Carlin & Company; The evidence presented of the parties' costs and their conduct throughout the performance of the contractual obligation to AES.
>
> (JFS 289.)

491. Page 5 of the Award states that: "the Panel stated that it made equitable adjustments to the materials presented and pronounced the Total Cost of the Medina Valley Project and the distribution of project revenues from AES as follows." The chart on page 6 of the award follows this statement. (JFS 290.)

492. The Panel found that Pope incurred costs related to its work on the Project in the amount of $21,676,973. (JFS 284.)

493. The chart at page 6 of the Award lists Pope's "TOTAL PROJECT COSTS" as "$21,676,973" and lists "Payments distributed from Project Revenue Funds" to Pope totaling "$19,658,356." (JFS 287.)

(JFS 280; JTEx 261.)

---

33. A true and correct copy of the Award is attached as *Exhibit 27* to the Complaint.

494. The chart at page 6 of the Award lists RMS' "TOTAL PROJECT COSTS" as "$14,942,223" and lists "Payments distributed from Project Revenue Funds" to RMS totaling "$16,084,687." (JFS 288.)

495. Note 16 to the chart on page 6 of the Award states: "Per bank statement for the escrow account provided to the Panel by Raymond." (JFS 291.)

496. Note 17 to the chart on page 6 of the Award states that:

The total amount to be paid Pope is $3,634,714. The funds in the Escrow Account Balance through 6/30/06 were $3,072,550. The additional funds due Pope are to be funded by the additional interest in the Escrow account as of the date of the satisfaction; any unsatisfied balance to be paid by Raymond to Pope. (JFS 293.)

497. The Award did not expressly state that funds in the Current Account are to be held in trust. (JTEx 261.)

498. The Award did not expressly state that funds in the Current Account are to be held in constructive trust. (*Id.*)

499. From the date the Initial Account was first opened to the date of this Complaint, no court has ordered that funds in the Initial Account are held in any form of trust. (See *generally* JTExs.)

500. From the date the Current Account was first opened to the date of this Complaint, no court has ordered that funds in the Current Account are held in any form of trust. (See *generally* JTExs.)

501. The Arbitration was an audit of Project costs, and neither the January 30, 2003 Final Lien Waiver or any other preceding lien waivers were at issue in the Arbitration. (JTEx 349 at 30.)

502. The Award does not make a determination as to whether the Initial Account and/or the Current Account is an escrow account or any other type of account, nor does it determine who is the legal owner of either account. (*Id.*)

503. The Panel stated on page 21 of the Award that: it "is of the opinion that a significant component of the dispute between the two parties stems from the lack of definition of 'cost' in the Subcontract Agreement between RMS and Pope." (JFS 294.)

504. The Award stated on page 26 that: An element that may have contributed to the excessive costs experienced is the entwinement of the several entities that were utilized by RMS. The subsidiaries, affiliates and service vendors utilized and contracted with to satisfy RMS' contractual duties all revolved around Douglas Chidley and Jean Chidley. This type of business practice raises a question of independence in record keeping and favoritism to the detriment of third parties. (JFS 295.)

*POST–AWARD FILING OF BANKRUPTCY.*

505. On December 7, 2006, one of the attorneys for RMS advised Jerome Gardocky of NFIC via electronic mail that:

I am enclosing a copy of the Arbitration Panel's ruling in the above-referenced arbitration. As you can see, the ruling awarded Pope approximately $3.6 million, the vast majority of which would be satisfied from the remaining balance of a bank account that is jointly owned by Raymond and Pope. At the present time there is approximately $3.1 million in that account. Raymond does not have sufficient other assets to satisfy the remaining balance of the award and its other remaining creditors. In the event

Raymond does not appeal all or a portion of the arbitration award, we expect that Raymond will seek bankruptcy protection and/or will file an assignment for the benefit of creditors and that the William A. Pope Company will look to the bond to satisfy any unpaid portion of the award. Accordingly, the purpose of this letter is to provide you with notice of the foregoing. (JFS 308.)

506. On December 18, 2006 (the "Bankruptcy Petition Date"), RPG, RMS, Doyen, RPG Government, RPG International and RPG Puerto Rico each filed a voluntary petition for relief under Chapter 11 of Title 11, United States Code (the "Bankruptcy Code"). (JFS 309.)

507. As of the Bankruptcy Petition Date, Pope has been paid approximately $19,658,356 for the work of Pope and its subcontractors on the Project. (JFS 310.)

508. Raymond Professional Group, Inc. listed the Current Account as an asset of Raymond Professional Group, Inc. on its Schedule B. Personal Property filed January 2, 2007. (JFS 314.)

509. Pursuant to the Schedules filed in connection with RPG's, RMS' and Doyen's bankruptcy petitions, the Current Account is listed solely as an asset of RPG, and not an asset of RMS or Pope.

510. After December 18, 2006, the name of the Current Account was changed to "Raymond Professional Group, Inc. DIP" (the "December 2006 Account Name Change"). (JFS 311.)

511. The term "DIP" that is part of the Current Account title after December 18, 2006 means "Debtor in Possession". (JFS 312.)

512. Pope was not involved in and did not authorize the December 2006 Account Name Change. (JFS 313.)

513. Mrs. Chidley testified that she instigated the December 2006 Account Name Change based on instructions that she received from the United States Trustee's Office, and based on the advice of counsel. (J. Chidley Test. 328:2–24, Dec. 12, 2008.) According to Mrs. Chidley, she made the change in her capacity as the authorized representative on the account, and did not obtain Mr. Troyke's signature approving the change. (*Id.* 327:4–328:2, 329:3–10.)

*ENTRY OF JUDGMENT CONFIRMING THE AWARD.*

514. On February 27, 2007, RMS filed a Petition to Vacate the Award (the "Petition"). (JFS 316.)

515. On November 19, 2008, a Memorandum Opinion allowing Pope's Motion for Summary Judgment was entered confirming the Arbitration Award and entering judgment thereon. (Adv. No. 07 A 137, Docket No. 59.)

516. On December 23, 2008, a Supplemental Opinion was entered clarifying that the Arbitration Award did not find that the Current Account was an escrow account or otherwise adjudicate ownership of the funds in the Account. (*Id.* at Docket No. 62.)

517. A Judgment Order was entered in accordance with the Opinion and Supplement confirming the Arbitration Award in the amount of $3,634,714, thereby fixing the amount owed by RMS to Pope. (*Id.* at Docket No. 63.)

*ADDITIONAL FINDINGS OF FACT.*

Additional statements of fact contained in the Conclusions of Law section shall constitute additional Findings of Fact.